SEALED

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED
Mar 06, 2024
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

United States of America
v.

23 Defendants listed in the attached affidavit incorporated herein

*Defendant(s)*

Case No. 1:24-mj-00027-BAM

## CRIMINAL COMPLAINT BY RELIABLE ELECTRONIC OR TELEPHONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or between the date(s) of Various in the county of Fresno, Tulare, and Kings in the Eastern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| | See Attached Penalty Slips incorporated herein |

This criminal complaint is based on these facts:

See affidavit of DEA Special Agent Aaron Acosta

☑ Continued on the attached sheet.

Aaron Acosta, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 41.1, by internet/ telephone

Date: 03/06/2024

*Judge's signature*

City and state: Fresno, CA

Hon. Barbara A. McAuliffe, U.S. Magistrate Judge
*Printed name and title*

PHILLIP A. TALBERT
United States Attorney
ANTONIO J. PATACA
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>ALBERTO ALVARADO;<br>AKA "BETO";<br>ALFONSO ORTIZ;<br>AKA "40";<br>ANGELICA FLORES,<br>AKA "Cupcake";<br>YERLLY MALDONADO VEGA;<br>ANTHONY OCHOA;<br>JORGE PEREZ;<br>CARLOS MACIAS MANZO;<br>LORRAINE RENTERIA;<br>FRANCISCO GARCIA;<br>AKA "CISCO";<br>CORY JAY DONALDSON;<br>ADAM SAHAGUN;<br>JOSHUA BROCK;<br>ALEJANDRO HERNANDEZ DIARTE;<br>CORNELL HICKS;<br>LANDON JONES;<br>WILLIAM BOSMA;<br>ARNOLD HUERTA;<br>JENNIFER HUERTA;<br>EDGAR ROBLES;<br>PRISCILLA PITTS;<br>JAMES MELO;<br>JESUS MARIN;<br>MARIE QUAADMAN;<br>Defendants. | CASE NO.<br><br>AFFIDAVIT IN SUPPORT OF COMPLAINT<br><br>**FILED UNDER SEAL** |

**TABLE OF CONTENTS**


I. INTRODUCTION AND AGENT BACKGROUND ....... 5

A. Purpose of Affidavit ....... 5

B. Agent Experience ....... 10

C. Summary of Investigation ....... 13

II. PROBABLE CAUSE ....... 14

A. QUAADMAN distributes and purchases pound quantities of methamphetamine ....... 15

1. QUAADMAN Distributes Methamphetamine to CS2 on July 20, 2023 ....... 15

2. QUAADMAN Purchases Methamphetamine from Alfonso ORTIZ ....... 17

B. DONALDSON and FLORES Distribute Methamphetamine on July 27, 2023 and August 30, 2023 ....... 18

1. Uncharged Co-conspirator 1 Introduces CS2 to DONALDSON to Purchase Methamphetamine ....... 18

2. DONALDSON and FLORES Distribute Five Pounds of Methamphetamine ....... 20

C. DONALDSON and FLORES Distribute Four Pounds of Methamphetamine on August 30, 2023 ....... 23

D. DONALDSON and SAHAGUN Illegally Possess and Sell Firearm and Ammunition on September 7, 2023 ....... 24

E. DONALDSON Distributes One Pound of Methamphetamine to Uncharged Co-Conspirator 2 on September 30, 2023 ....... 27

F. ORTIZ and FLORES Distribute Methamphetamine to Joshua BROCK ....... 30

1. ORTIZ and FLORES Distribute Five Pounds of Methamphetamine to BROCK on October 1, 2023. ....... 30

2. ORTIZ Continues to Distribute Methamphetamine to BROCK ....... 33

G. Alejandro HERNANDEZ-Diarte Transports 35 Pounds of Methamphetamine on October 17, 2023 ....... 34

1. Initial Identification of a Drug Transport Vehicle Subsequently Used by HERNANDEZ ....... 34

2. Arrest of HERNANDEZ Utilizing the Drug Transport Vehicle ....... 36

H. ORTIZ Distributes 18 Kilograms of Methamphetamine to Uncharged Co-conspirator 3 ....... 37

1. Surveillance and Arrest of Uncharged Co-conspirator 3 on October 2, 2023 .....37

2. Intercepted Communications about Uncharged Co-conspirator 3 Arrest and Methamphetamine Seizure .....38

I. ORTIZ and FLORES Conspire to Distribute Two Pounds of Methamphetamine to DONALDSON and HICKS on October 21, 2023 .....40

J. ORTIZ Distributes Five Pounds of Methamphetamine to Landon JONES and William BOSMA on October 24, 2024 .....44

1. Intercepted Communications and Arrest of William BOSMA on October 24, 2023 .....44

2. ORTIZ Supplies Methamphetamine to JONES on other Occasions .....47

K. ORTIZ Conspires with Arnold Huerta to Distribute Methamphetamine to Jennifer HUERTA .....48

1. Distribution of Methamphetamine on December 15, 2023 .....48

2. Distribution of Methamphetamine on December 18, 2023 .....50

3. Distribution of one Pound of Methamphetamine on December 29, 2023 and Arrest of Jennifer HUERTA .....52

L. A. HUERTA Illegally Possesses Firearms and Ammunition on January 4, 2024 .....53

M. Anthony OCHOA Transports 21 Pounds of Methamphetamine on December 16, 2023 .....56

N. Anthony OCHOA and Yerlly VEGA Transport Methamphetamine on December 20, 2023 .....59

1. Arrest of Yerlly VEGA on December 20, 2023 while Transporting 30 Pounds of Methamphetamine. .....59

2. Intercepted Communication Between VEGA and ALVARADO Regarding Drug Seizures .....63

O. Lorraine RENTERIA Assists ORTIZ in Furtherance of this Conspiracy .....68

1. ORTIZ uses RENTERIA's Residence and Vehicle to Distribute Methamphetamine .....68

2. ORTIZ uses RENTERIA's vehicle to store methamphetamine. .....69

3. RENTERIA drives ORTIZ to deliver methamphetamine on December 18, 2023 .....70

4. RENTERIA assists ORTIZ to Obtain a New Phone to Avoid Law Enforcement Detection on December 18, 2023 .....74

5. ORTIZ and RENTERIA Discuss Using Drug Proceeds to Purchase a Residence ....77

P. UM5675 Arranges Methamphetamine Transaction with ORTIZ Resulting in the Arrest of Jesus MARIN on January 6, 2024 with 5 Pounds of Methamphetamine....79

Q. Francisco GARCIA Involvement in Methamphetamine Trafficking ....82

1. GARCIA Distributes Approximately 1.86 kilograms of Methamphetamine to Cornell HICKS and HICKS Arrest on December 23, 2023....82

2. GARCIA Purchases 10 Pounds of Methamphetamine from ORTIZ and FLORES on February 20, 2024 and is Subsequently Arrested. ....86

R. ROBLES Obtains Methamphetamine from ORTIZ and FLORES....93

1. ROBLES Orders Methamphetamine from ORTIZ, is Supplied by FLORES, and Subsequently Arrested on February 13, 2024, with One Pound of Methamphetamine and a Firearm....93

2. Additional Methamphetamine Transactions Between ORTIZ and ROBLES during this Investigation ....96

S. Priscilla PITTS Purchases One Pound of Methamphetamine from ORTIZ ....97

T. Carlos Fernando MACIAS Manzo Supplies Methamphetamine to ORTIZ and Transports Drug Proceeds....100

U. Jorge PEREZ Transports Methamphetamine on Behalf of ALVARADO. ....105

1. Identification of PEREZ as a Drug Transporter for Alberto ALVARADO ....105

2. Identification of PEREZ as a Drug Transporter for Roberto SORIA ....106

3. Arrest of PEREZ on February 23, 2024 while Transporting 20 Pounds of Methamphetamine for ALVARADO ....109

V. James Earl MELO Possesses Controlled Substances with the Intent to Distribute....112

III. REQUEST FOR SEALING....115

IV. CONCLUSION....115

I, Aaron Acosta, being first duly sworn under oath, depose and say:

## I. INTRODUCTION AND AGENT BACKGROUND

### A. Purpose of Affidavit

1. I make this Affidavit in support of a complaint charging:

a) **Alberto ALVARADO aka "Beto" (ALVARADO)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a). **ALVARADO** is a narcotics source of supply and the user of Target Telephone 8 and Target Telephone 11. Multiple communications were intercepted indicating **ALVARADO** is a Mexico based drug source who directs the importation and transportation of methamphetamine, cocaine, as well as other controlled substances in Tulare County and elsewhere.

b) **Alfonso ORTIZ aka "Forty" (ORTIZ)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a) and distribution of methamphetamine, in violation of Title 21, United States Code, Section 841(a). **ORTIZ** is a methamphetamine source of supply and the user of three Target Telephones (Target Telephone 3, Target Telephone 4, and Target Telephone 10) which were the focus of multiple wire intercepts conducted during this investigation. Based on interceptions, as well as observations made during this investigation, I believe that **ORTIZ** is a large-scale methamphetamine distributor in Tulare County, CA, distributes methamphetamine with the assistance of his sister Angelica **FLORES**, and supplies methamphetamine to multiple co-conspirators.

c) **Angelica FLORES aka "Cupcake" or "Cakes" (FLORES)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a) and distribution of methamphetamine, in violation of Title 21, United States Code, Section 841(a). **FLORES** is a methamphetamine distributor and transporter who operates criminally within this DTO at the direction of her brother, Alfonso **ORTIZ**. **FLORES** was initially identified during this investigation during a series of controlled purchases during which she supplied methamphetamine to **DONALDSON** which, in turn, was

transacted with a confidential source. During the subsequent wire intercepts, **FLORES** distributed methamphetamine to multiple customers at **ORTIZ**' direction.

d) **Yerlly Maldonado VEGA (VEGA)** with conspiracy to distribute and possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a) and possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **VEGA** is a poly-narcotic source of supply and transporter who operates criminally at the direction of **ALVARADO**. On December 20, 2023, **VEGA** was arrested while transporting approximately 30 pounds of methamphetamine for **ALVARADO**.

e) **Anthony OCHOA (OCHOA)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a) and possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **OCHOA** was identified during this investigation as **VEGA**'s cousin who was also criminally involved with **VEGA and ALVARADO** in transporting and distributing methamphetamine which belonged to **ALVARADO**. On December 16, 2023, a vehicle **OCHOA** was driving was stopped resulting in the seizure of approximately 20 pounds of methamphetamine.

f) **Jorge PEREZ (PEREZ)** with possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **PEREZ** was identified during this investigation as **ALAVARADO** and SORIA-CUEVAS' transporter and distributer of methamphetamine. On February 23, 2024, a vehicle **PEREZ** was driving was stopped resulting in the seizure of approximately 20 pounds of methamphetamine.

g) **Lorraine RENTERIA (RENTERIA)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a) and misprision of a felony, in violation of Title 18, United States Code, Section 4. **RENTERIA** was identified as **ORTIZ**' girlfriend. **ORTIZ** utilized **RENTERIA**'s vehicle and residence to distribute methamphetamine. **ORTIZ** and **RENTERIA** discussed a plan to use **ORTIZ**' drug proceeds to purchase a residence. On December 18, 2023, **RENTERIA** purchased a new cell phone for **ORTIZ** after **ORTIZ** informed **RENTERIA** that he was being monitored

by law enforcement.

h) **Carlos MACIAS Manzo** with distribution of methamphetamine, in violation of Title 21, United States Code, Section 841(a). **MACIAS** is a poly-narcotic source of supply and transporter who supplies **ORTIZ** with methamphetamine. On February 19, 2024, communications were intercepted from **MACIAS** to **ORTIZ** indicating that **MACIAS** was dropping off a load of methamphetamine to **ORTIZ**. Surveillance observed **MACIAS** arrive at **ORTIZ'** residence, unload three large duffle bags into **ORTIZ'** garage, and depart. On the same date, **MACIAS** was stopped by law enforcement, and investigators seized $65,040 in U.S. currency.

i) **Francisco GARCIA aka "Cisco" (GARCIA)** distribution of methamphetamine, in violation of Title 21, United States Code, Section 841(a) and possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **GARCIA** is a methamphetamine source of supply and the user of Target Telephone 6. **GARCIA** supplied methamphetamine to Cornell **HICKS** on December 23, 2023, which resulted in the arrest of **HICKS** and the seizure of the methamphetamine. On February 20, 2024, communications were intercepted indicating **ORTIZ** and **FLORES** supplied **GARCIA** with ten pounds of methamphetamine which was seized from **GARCIA** during a subsequent stop. During this stop, **GARCIA** was found to be illegally in possession of a firearm.

j) **Cory DONALDSON (DONALDSON)** with distribution of methamphetamine, in violation of Title 21, United States Code, Section 841(a) and felon in possession of a firearm and ammunition, in violation of Title 18, United States Code, Section 922(g)(1). **DONALDSON** was identified during this investigation while distributing methamphetamine and firearms to a confidential source during controlled purchases. **DONALDSON** has been intercepted multiple times distributing methamphetamine or obtaining methamphetamine from **ORTIZ,** who is his source of supply.

k) **Adam SAHAGUN aka "Looney" (SAHAGUN)** with felon in possession of a firearm and ammunition, in violation of Title 18, United States Code, Section 922(g)(1). **SAHAGUN** was identified early in this investigation illegally selling firearms and ammunition to a

confidential source.

l) **Joshua BROCK aka "Tiny" (BROCK)** with possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **BROCK** is a drug customer primarily being supplied with methamphetamine by **FLORES** and **ORTIZ**. During this investigation, **BROCK** was intercepted multiple times ordering methamphetamine and was arrested on October 1, 2023, after obtaining methamphetamine from **FLORES**.

m) **Alejandro HERNANDEZ-Diarte (HERNANDEZ)** with possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **HERNANDEZ** is a methamphetamine transporter who operates criminally within this DTO. On October 17, 2023, **HERNANDEZ** was arrested with approximately 30 pounds of methamphetamine while transporting the drugs from a known stash house in Orange Cove, CA.

n) C**ornell HICKS (HICKS)** with possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **HICKS** is a methamphetamine customer and transporter who was arrested on two occasions during this investigation. On October 21, 2023, **HICKS** was supplied with methamphetamine by **FLORES** and subsequently stopped and arrested with the drugs. On December 23, 2023, **HICKS** purchased methamphetamine from Francisco **GARCIA** and was also subsequently arrested with the drugs. During this second arrest, **HICKS** was illegally in possession of a firearm and ammunition.

o) **Landon JONES aka "Bomber" (JONES)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a). **JONES** is a methamphetamine distributor and broker who operates criminally within this DTO. Based on intercepted communications over Target Telephone 3 and Target Telephone 10, as well as observations made during this investigation, I believe that **JONES** is a pound level methamphetamine customer being supplied by **ORTIZ**, as well as a methamphetamine distributor in Tulare County, CA.

p) **William BOSMA aka "Bill" (BOSMA)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a) and with possession with intent to distribute methamphetamine, in violation of Title

21, United States Code, Section 841(a). **BOSMA** was arrested during this investigation on October 24, 2023, after fleeing from police with multiple pounds of methamphetamine previously purchased by Landon **JONES** from **ORTIZ**. Intercepted communications indicated **BOSMA** is criminally involved with **JONES** in the distribution of methamphetamine.

q) **Arnold HUERTA aka "Juice" (A. HUERTA)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a) and with felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1). **A. HUERTA** is a methamphetamine and illegal firearms distributor who operates criminally within the DTO. Based on intercepted communications as well as evidence obtained during search warrant conducted at **A. HUERTA**'s residence, A. **HUERTA** consistently ordered pound quantities of methamphetamine from **ORTIZ**. **A. HUERTA** also illegally attempted to transact, and was later found in possession of, a firearm and ammunition.

r) **Jennifer HUERTA (J. HUERTA)** with possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **J. HUERTA** was arrested on December 29, 2023, while transporting methamphetamine obtained from **ORTIZ**. **J. HUERTA** was transporting the methamphetamine to **A. HUERTA**, who the drugs were intended for.

s) **Edgar ROBLES (ROBLES)** with possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **ROBLES** is a methamphetamine customer and transporter who was consistently supplied by **ORTIZ** during this investigation. On February 13, 2024, **ROBLES** ordered a pound of methamphetamine from **ORTIZ** which was supplied by **FLORES**. On the same date, **ROBLES** was arrested with the methamphetamine as well as illegally being in possession of a firearm and ammunition.

t) **Priscilla PITTS (PITTS)** with possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **PITTS** is a methamphetamine customer supplied by **ORTIZ**. On February 19, 2024, **PITTS** ordered a pound of methamphetamine from **ORTIZ**. **PITTS** obtained the methamphetamine from **ORTIZ**' residence and was stopped and arrested with the drugs once departing.

u) **James MELO (MELO)** with possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a). **MELO** is a poly-narcotic distributor who lives in Visalia, CA. On January 25, 2024, Visalia Police Department conducted a search warrant at **MELO**'s residence and seized approximately 0.70 gross kilograms of suspected methamphetamine[1], approximately 67.7 gross grams of suspected cocaine HCL, approximately 109.4 gross grams of suspected heroin, and arrested **MELO** for possession of a controlled substance for sale.

v) **Jesus MARIN (MARIN)** with possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 841(a). **MARIN** is a methamphetamine source of supply and transporter who was arrested on January 6, 2024, with approximately five pounds of methamphetamine which was supplied by **ORTIZ.**

w) **Marie QUAADMAN (QUAADMAN)** with distribution of methamphetamine, in violation of Title 21, United States Code, Section 841(a). **QUAADMAN** sold methamphetamine to a confidential source at the beginning of this investigation during a controlled purchase. **QUAADMAN** has also been intercepted multiple times ordering various quantities of methamphetamine from Alfonso **ORTIZ**, a co-conspirator in this investigation.

**B. <u>Agent Experience</u>**

2. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. I am a Special Agent (SA) of the United States Department of Justice, Drug Enforcement Administration (DEA). I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been employed as a Special Agent with the Drug Enforcement Administration (DEA) since December 2022 and am presently

[1] The 0.70 gross kilograms of suspected methamphetamine was submitted to the Western Regional Laboratory for testing, however prior to sending the suspected methamphetamine to the lab, a presumptive test for methamphetamine was conducted on the exhibit, for which it returned presumptive positive for methamphetamine.

assigned to the DEA District Office in Fresno, California. I have successfully completed a nineteen (19) week DEA Basic Agent Training Academy at the Drug Enforcement Administration Academy in Quantico, Virginia. This training included instruction in the investigation of federal drug violations, including, but not limited to, Title 21, United States Code, Sections 841(a)(1) and 846. I have assisted in approximately 15 to 20 narcotics investigations that have led to the seizure of narcotics and the arrests of numerous individuals. I have used various methods of investigation including but not limited to physical surveillance, electronic surveillance, phone toll analysis, records research, executed search warrants, trash searches, photo and video analysis, interviews of confidential informants, defendants and witnesses. I have discussed with law enforcement officers, cooperating defendants, and informants, the methods and practices used by narcotics distributors. I am a law enforcement officer as defined by federal statutes. In addition, I have completed various training provided by the DEA and local law enforcement agencies, including, but not limited to training on identifying characteristics associated with the manufacture, sale, and transportation of various narcotics, including, but not limited to phencyclidine (PCP), methamphetamine, heroin, cocaine, and marijuana. This training involved the use, possession, packaging, sale, concealment, manufacturing, and transportation of various controlled substances as well as its precursors and chemicals used in the manufacturing process.

4. I have participated in narcotics investigations either as a case agent or in a supporting role. I have assisted on the execution of approximately twenty (20) federal and state narcotics search warrants that resulted in the arrest of suspects and seizure of narcotics. I have debriefed approximately five (5) defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations. Additionally, I have participated in many aspects of drug investigations including but not limited to, undercover operations, conducting physical and electronic surveillance, and arrests. I have conducted and been involved in investigations regarding the unlawful manufacture, possession, distribution, and transportation of controlled substances, as well as conspiracies associated with controlled substance offenses, in violation of Title 21, United States Code, §§ 841(a)(1), 841(c)(2), 843, and 846. As a result, I am familiar with narcotics traffickers' methods of operation including the distribution, storage, manufacturing, and transportation of narcotics and the collection of money proceeds of narcotics trafficking.

5. During one previous federal wiretap investigation, I monitored, conducted wire room supervision, and conducted surveillance. During that investigation, I had the opportunity to monitor, listen to, review transcripts or “line sheets” or monitor logs prepared by linguists and/or otherwise discussed with linguists the content of intercepted drug related conversations. Most of these intercepted communications contained coded language used by the participants to cloak their intentions and thwart law enforcement. During that investigation, I obtained information from other law enforcement officers who are familiar with intercepted coded language, as well as confidential sources and defendants who were intercepted and/or arrested during wiretap investigations. Information from these sources has confirmed my understanding of intercepted coded language.

6. Through prior investigations, conversations with other law enforcement officers and training, I have become familiar with the types and amounts of profits made by drug traffickers, and the methods, language, and terms used by persons dealing in such contraband. I am aware drug traffickers often communicate with their co-conspirators and criminal associates through the use of cellular telephones. In addition, I am aware drug and firearms traffickers frequently use multiple cellular telephones. I am aware drug traffickers frequently change telephone numbers and cellular telephones. I know from my training and experience; drug traffickers often use fictitious names and identification for the purpose of subscribing to cellular telephones and hardline telephones. I also know drug traffickers put communications devices in the names of associates and/or relatives. The use of fictitious names and identification or placing communication devices in the names of associates or relatives is designed to impede law enforcement investigations into the true subscriber and/or user of such communication devices.

7. Some members of this drug and firearm trafficking (DFTO) speak Spanish, and occasionally utilize the Spanish language to communicate with each other. Throughout this investigation, linguists and Spanish-speaking members of the investigative team have assisted me in translating communications between DFTO members.

8. I make this affidavit, in part, based on personal knowledge derived from my participation in this and past investigations and in part, upon discussion of facts and information developed by other agents/detectives involved in this investigation. The information contained in this affidavit is based

upon my personal observations and training and, where noted, information related to me by other law enforcement officers and/or agents.

9. Because this Affidavit is being submitted for the limited purpose of securing a complaint and arrest warrants for the named subjects, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe establish probable cause that evidence of the violations further described above in paragraph 1 have been committed.

### C. <u>Summary of Investigation</u>

10. Beginning July 2023, a confidential source, referred to during this investigation as CS2, began conducting recorded communications with Uncharged Co-Conspirator 1 who was using phone number XXX-XXX-2612[2] (Target Telephone 1).[3] At the direction of controlling agents, CS2 represented himself/herself as a methamphetamine customer during recorded communications with Uncharged Co-Conspirator 1 who offered to supply CS2 with methamphetamine. As negotiations continued, Uncharged Co-Conspirator 1 began to introduce CS2 to other co-conspirators, specifically Marie **QUAADMAN** and Cory **DONALDSON**, to complete the negotiated methamphetamine transactions. CS2 initiated recorded communications with **QUAADMAN** and **DONALDSON** which resulted in a series of controlled purchases of methamphetamine and firearms from **QUAADMAN**, **DONALDSON**, as well as other co-conspirators. During an analysis of call detail records (CDRs) from phone number 559-589-3580 (Target Telephone 2) used by **DONALDSON** during the controlled purchases of methamphetamine from CS2, it was determined that **DONALDSON**'s methamphetamine source of supply, identified as Alfonso **ORTIZ**, was utilizing phone number 559-378-5402 (Target Telephone 3) in furtherance of this conspiracy.

11. As the investigation progressed, a series of federal wire intercepts were initiated on

---

[2] The first six numbers of this phone number have been obfuscated throughout this affidavit to protect the privacy of uncharged co-conspirator 1.

[3] During this investigation and at the direction of controlling agents, CS2 conducted multiple recorded phone and text communications with Uncharged Co-Conspirator 1, **DONALDSON**, and Marie **QUAADMAN**. These recorded communications included both text and phone calls. The communications between CS2 and the Target Subjects were recorded on a law enforcement recording system which captures the phone number being used by each Target Subject, the date and time of the communication, as well as the content of the communications. I know this law enforcement system recording to be accurate due to the use of the system in prior investigations and because information from the system was corroborated when compared to CDRs from the respective phone numbers used by Uncharged Co-Conspirator 1, **DONALDSON**, and **QUAADMAN**.

targets of this investigation, referred to as Target Subjects, based on probable cause that the Target Subjects were engaged in drug and firearm trafficking, illegal possession of firearms, and money laundering.

## II. PROBABLE CAUSE

12. During the course of this investigation, five wire intercepts were initiated and are further described as follows.

a) On September 27, 2023, the Honorable Ana I. De Alba, US District Court Judge for the Eastern District of California, signed Wire Intercept Order 1:23-SW-00225-ADA, authorizing the interception of wire and electronic communications to and from XXX-XXX-2612 (Target Telephone 1) used by Uncharged Co-Conspirator 1, 559-589-3580 (Target Telephone 2) used by **DONALDSON**, and 559-378-5402 (Target Telephone 3) used by Alphonso **ORTIZ**. This wire intercept was initiated on September 28, 2023, and terminated on October 27, 2023.

b) On December 8, 2023, the Honorable Jennifer L. Thurston, US District Court Judge for the Eastern District of California, signed Wire Intercept 1:23-SW-00292-JLT authorizing the interception of wire and electronic communications to and from phone numbers 559-378-5402 (Target Telephone 3), 559-563-2981 (Target Telephone 4), both used by Alfonso **ORTIZ**, 661-520-8147 (Target Telephone 6) used by Francisco **GARCIA**, and 559-333-0004 (Target Telephone 8), used by Alberto **ALVARADO** (AKA BETO). This wire intercept was initiated on December 11, 2023 and terminated on January 9, 2024.

c) On December 12, 2023, the Honorable Jennifer L. Thurston, US District Court Judge for the Eastern District of California, signed Wire Intercept 1:23-SW-00299-JLT which also authorized the interception of wire and electronic communications to and from Target Telephone 3 used by **ORTIZ**. Interceptions were initiated on December 13, 2023 and terminated on January 11, 2024.

d) On February 5, 2024, the Honorable Jennifer L. Thurston, US District Court Judge for the Eastern District of California, signed Wire Intercept 1:24-SW-0036-JLT authorizing the interception of wire and electronic communications to and from phone number 559-378-5402 (Target Telephone 3), 559-563-2981 (Target Telephone 4), and 559-731-4513 (Target

Telephone) 10, all three used by **ORTIZ**, 559-333-0004 (Target Telephone 8) used by **ALVARADO**, and wire communications to and from phone number 559-725-0373 (Target Telephone 9) used by SORIA. This wire intercept was initiated on February 6, 2024 and interceptions are anticipated to end on March 6, 2024.

e) On February 24, 2024, the Honorable Jennifer L. Thurston, US District court Judge for the Eastern District of California, signed Wire Intercept 1:24-SW-00051-JLT authorizing the interception of wire communications to and from phone number 559-216-2470 (Target Telephone 11) used by **ALVARADO**. The wire intercept was initiated on February 24, 2024 and is currently ongoing.

**A. <u>QUAADMAN distributes and purchases pound quantities of methamphetamine</u>**

**1. QUAADMAN Distributes Methamphetamine to CS2 on July 20, 2023**

13. On July 20, 2023, CS2[4] arranged to meet with **QUAADMAN**, using 559-414-9391, at the Tachi Palace Casino in Lemoore, CA to complete the two-pound methamphetamine transaction. Through a series of text messages between CS2 and **QUAADMAN**, using 559-414-9391, CS2 arranged to purchase two pounds of methamphetamine for $2,000 USD. In preparation of a controlled purchase[5] operation, agents met with CS2 at a neutral location. At this location, CS2 and CS2's vehicle were

---

[4]CS2 was providing information to law enforcement for monetary compensation during the course of this investigation. Although other confidential sources, cooperating defendants, and sources of information have provided information regarding the suspects in this investigation, CS2 has been utilized to obtain direct evidence of drug trafficking by conducted recorded communications with suspects, conducted recorded meetings with suspects, as well as conducted controlled purchases of drugs and firearms. CS2's criminal history includes an arrest for conspiracy with intent to deliver marijuana, and an arrest and felony conviction for possession of dangerous drugs. CS2's information in this investigation has been corroborated by information from law enforcement databases, physical surveillance, through controlled purchases, and consensually recorded communications with **suspects.** CS2 has worked as a confidential source for the DEA since November 2019. CS2 has provided information in other unrelated investigations which has been corroborated and which has also resulted in the arrest and prosecution of drug and firearm traffickers, as well as resulted in the seizure of illegal drugs and firearms. Much of the information provided by CS2 has been corroborated, and the investigative team has never found CS2 to be dishonest of deceitful. For these reasons, I consider CS2's information to be reliable.

[5] A controlled purchase is a technique used by law enforcement to confirm a target of investigation is involved in the distribution of contraband. The controlled purchases conducted during this investigation proceeded in the following manner. Prior to the controlled purchase, controlling agents met with CS2 at a pre-arranged meeting location. During this meeting, CS2 and CS2's vehicle would be searched. CS2 and/or CS2's vehicle would be outfitted with audio/video recording equipment. CS2 was provided with government funds to purchase the controlled substances and/or firearms. CS2 would then be maintained under surveillance. CS2 would then conduct the transaction with targets of investigation which CS2 exchanged government funds for drugs and/or firearms. CS2 would then be followed by surveillance back to a meeting location. Upon returning to the meeting location, the purchased drugs and/or firearms would be seized as evidence and CS2 and CS2's vehicle would be searched a second time. No contraband was located during the search of CS2 and CS2's vehicle during this investigation. The audio/video recording produced during the transaction would also be maintained as evidence.

searched with negative results. CS2 was provided with $2,000 in government funds to complete the two-pound methamphetamine transaction from **QUAADMAN**. CS2 was outfitted with audio and video recorders to document the controlled purchase. CS2 was then kept under constant surveillance and situated in the Tachi Palace Casino parking lot in anticipation of **QUAADMAN's** arrival. Through a series of recorded voice and text communications with phone number 559-414-9391[6], used by **QUAADMAN,** CS2 directed **QUAADMAN** to his/her location in the parking lot to complete the transaction.

14. At approximately 2:02 PM, surveillance observed **QUAADMAN** arrive as the passenger in a gold Ford Ranger pickup, registered to Marie **QUAADMAN,** which parked next to CS2. Upon arrival, **QUAADMAN** was not only observed by surveillance, but was captured on a video recording device, which was subsequently compared to **QUAADMAN's** CA driver's license photo and confirmed to be her. **QUAADMAN** exited the passenger side of this vehicle, retrieved a plastic grocery bag from the bed of the pickup, and met with CS2 through the driver side window of CS2's vehicle. **QUAADMAN** placed the plastic grocery bag in CS2's vehicle and received $2,000 in government funds in exchange. During their recorded meeting, CS2 counted out the $2,000 for **QUAADMAN**. **QUAADMAN** stated, "its' actually twenty-two but that's ok", a reference to the two pounds of methamphetamine costing $2,200. CS2 responded, "[Uncharged Co-conspirator 1] told me something else", a reference to Uncharged Co-conspirator 1 previously quoting price of $1,000 per pound. **QUAADMAN** replied, "that's probably because he's going somewhere else than me", indicating Uncharged Co-conspirator 1 had a different methamphetamine source of supply. **QUAADMAN** then stated that they (Uncharged Co-conspirator 1 and her) go to the same "guy" who was having "trouble." I believe that **QUAADMAN** was referring to a methamphetamine source who she shares in common with Unindicted Co-conspirator 1. CS2 stated that everyone was "dry right now", which I believe was a reference to methamphetamine not being currently available. **QUAADMAN** responded, "we're not" but

[6] Phone number 559-414-9391 is subscribed to "Marie QUAADMAN". CS2 negotiated to meet and purchase methamphetamine from the user of phone number 559-414-9391 and, upon arrival, QUAADMAN was captured during a video recording supplying methamphetamine to CS2. This video was compared with QUAADMAN's California driver's license photo confirming her identification. Based on this information, QUAADMAN was identified as the user of phone number 559-414-9391.

explained one of their "shipments" was like "rubber tires" and **QUAADMAN** did not want to sell it. Based on this statement, I believe that **QUAADMAN** was referring to a shipment of methamphetamine which was of poor quality, or like rubber tires, which she did not want to sell to CS2.

15. After the transaction, CS2 was kept under constant surveillance back to the neutral location where the two pounds of methamphetamine was seized as evidence[7]. These narcotics tested positive for methamphetamine and contained 838 grams of actual methamphetamine. CS2 and CS2's vehicle were searched with negative results and the audio/video recordings of the transaction was secured as evidence.

**2. QUAADMAN Purchases Methamphetamine from Alfonso ORTIZ**

16. Although only one controlled purchase of methamphetamine was conducted from **QUAADMAN**, she was intercepted multiple times during the investigation purchasing methamphetamine from Alfonso **ORTIZ**. During these intercepted communications, **QUAADMAN** continued to use phone number 559-414-9391[8]. The intercepted communications indicated **ORTIZ** and **QUAADMAN** were in an established methamphetamine customer/source of supply relationship. I know, based on my training and experience, that co-conspirators who are in such a criminal relationship will often only refer to the quantity of methamphetamine to be transacted, without further discussing price or quality of the drug. This is because those details have already been established during multiple prior drug transactions. Therefore, only the amount of methamphetamine, usually expressed as a number- ("one", "two", three", etc), or a faction ("quarter" or "half"), is verbalized. Since **QUAADMAN** was identified as a multi pound source of supply, I believe she was ordering this quantity of methamphetamine from **ORTIZ**, unless otherwise indicated. Therefore, the quantities referenced during the intercepted communications with ORTIZ were believed to be pounds of methamphetamine. The following table summarizes some of the completed methamphetamine transactions between **ORTIZ** and **QUAADMAN** identified during this investigation and are based on their intercepted communications.

---

[7] The methamphetamine purchased from QUAADMAN was submitted to the Western Regional Laboratory for analysis and safekeeping and, upon testing, returned positive for methamphetamine.

[8] 559-414-9391 was the phone number that CS2 communicated with prior to the controlled purchase of two pounds of methamphetamine on July 20, 2023.

| DATE | QUANTITY | DESRIPTION |
|---|---|---|
| 10/04/2023 | 1 pound | QUAADMAN asked **ORTIZ** for a "whole one." ORTIZ directed QUAADMAN to 533 E. Cross, Tulare, CA to conduct the transaction |
| 10/20/2023 | 1 pound | QUAADMAN asked to meet for "one." **ORTIZ** told QUAADMAN to "hit my sis she got u", a reference to **FLORES**. |
| 10/24/2023 | 2 pounds | QUAADMAN sent ORTIZ a text stating, "I was wanting to get 2." QUADMAN then informed **ORTIZ** she already got "two" from "Cakes", **FLORES**" known alias. |
| 10/26/2023 | 1 pound | QUAADMAN said she needed "one." This transaction was observed by surveillance at ORTIZ' residence of 2680 Bright St, Tulare, CA. At that location, surveillance observed ORTIZ place a brown bag in the passenger seat of QUAADMAN's vehicle, a green Mercedes sedan with CA license plate #7ABJ570 which is registered to Marie QUAADMAN |

17. Based on these intercepted communications, I believe **QUAADMAN** obtained approximately five pounds of methamphetamine from **ORTIZ** and **FLORES**.

**B. <u>DONALDSON and FLORES Distribute Methamphetamine on July 27, 2023 and August 30, 2023</u>**

**1. Uncharged Co-conspirator 1 Introduces CS2 to DONALDSON to Purchase Methamphetamine**

18. On July 20, 2023, at approximately 1:12 PM, CS2 sent a text message to Target Telephone 1 used by Uncharged Co-conspirator 1 stating, "Yo fam im here at the casino want me to hit up ol girl?" During this text message, CS2 was informing Uncharged Co-conspirator 1 that he/she was at the Tachi Palace Casino and was asking if he/she should contact **QUAADMAN** to complete the methamphetamine transaction. After receiving no response, CS2 conducted a series of recorded communications directly with **QUAADMAN** who delivered the methamphetamine as described above.

19. At approximately 2:15 PM and after the completion of the controlled purchase of methamphetamine from **QUAADMAN**, the following text message exchange occurred between Uncharged Co-conspirator 1 using Target Telephone 1 and CS2.

- Uncharged Co-conspirator 1: I already did
- Uncharged Co-conspirator 1: She didn't answer me but I got one of my friends already almost there to you

- Uncharged Co-conspirator 1: He should be calling you now his name is Corey
- CS2: I already got it awhile ago from her

20. Based on this text message exchange, I concluded that Uncharged Co-conspirator 1 was not aware that the methamphetamine transaction had been completed between **QUAADMAN** and CS2 and that Uncharged Co-conspirator 1 was attempting to introduce CS2 to another methamphetamine source of supply named "Corey."

21. Beginning at approximately 2:22 PM and following the above introduction by Uncharged Co-conspirator 1, CS2 began to receive an incoming phone call and text messages from phone number 559-589-3580 (Target Telephone 2) which is used by Cory **DONALDSON**[9]. The phone call was not answered and the following is **DONALDSON** and CS2's initial text message exchange.

- **DONALDSON**: This. Is a friend of [Uncharged Co-conspirator 1].
- CS2: Whats good this is [CS' name]
- **DONALDSON**: Hey [CS' name]. I'm almost to the palace. I'm in a black Altima. Dent. On the rear passenger side.
- CS2: Damn sophie already served me up i thought [Uncharged Co-conspirator 1] know alrwady
- **DONALDSON**: Oh. No he sidn't say anything. U cool u got what u needed
- CS2: I got two od them already ima need 5 next week. Whats the price on 5?
- CS2: Of
- **DONALDSON**: Right now 45. But. That can change .. save my number my name. is cory

22. During the above text message conversation, **DONALDSON** identified himself as a "friend of [Uncharged Co-conspirator 1]", a reference to Uncharged Co-conspirator 1, indicated he was in route to the Tachi Palace Casino to conduct the methamphetamine transaction with CS2, and self-

[9] Phone number 559-589-3580 is subscribed to "Cory **DONALDSON**" with a listed address of 10635 Sunflower Circle, Armona, CA. The user of phone number 559-589-3580 self-identified as "Cory." Lastly, CS2 negotiation to meet with the user of phone number 559-589-3580 to conduct purchases of methamphetamine and firearms. During three subsequent controlled purchases, Cory **DONALDSON** was the individual who arrived identified by comparing surveillance video and observations by surveillance to his CA DMV photo resulting in a positive identification. Based on this information, I believe that **DONALDSON** is the user of Target Telephone 2.

identified as "cory." Additionally, during that same text message conversations, CS2 stated "I got two od them already ima need 5 next week. Whats the price on 5?" **DONALDSON** responded, "Right now 45. But. That can change .. save my number my name. is cory." I believe that CS2 was asking **DONALDSON** how much 5 pounds of methamphetamine would cost if CS2 bought that amount and **DONALDSON** responded with a price of "45" which I believe was a reference to $4,500. Based on my training and experience, I know that $4,500 is consistent with the illicit price of five pounds of methamphetamine.

### 2. DONALDSON and FLORES Distribute Five Pounds of Methamphetamine

23. Between July 24, 2023 and July 25, 2023, the following text message conversation occurred between Cory **DONALDSON** using Target Telephone 2 and CS2:

- **DONALDSON**: Hey. Are u jn town? ARE u going to need any.. this is Cory. [Uncharged Co-conspirator 1]. Friend
- CS2: Wassup fam ima need some this week . Ima need those 5 if you can still do that deal for me
- **DONALDSON**: Whe. U coming
- CS2: Maybe Thursday or Friday idk yet im waiting on some extra m.oney to come in. But ima need it forsure fam
- **DONALDSON**: So. I can have that ready this day or Friday. Preferabky give me a few hours notice.. it's 4800 is the best I can do for the best. But I'd need u to lock that in cause my guy is goj g out of twon and I'll need to set that to the side for u
- CS2: Thursday forsure bro will you be ready around 4pm ? Or 5 depending on the traffic. Im coming from madera
- **DONALDSON**: Either way. I'll be ready.

24. Initially during this text message exchange, **DONALDSON** again self-identified as "Cory" and asked if CS2 needed anything. CS2 indicated that he/she needed a quantity of "5" and **DONALDSON** quoted CS2 a price of "4800." I believe that CS2 was asking **DONALDSON** for five pounds of methamphetamine and **DONALDSON** was quoting CS2 a price of $4,800. Although this price is less than that quoted by Uncharged Co-conspirator 1, ($960 per pound of methamphetamine

compared to $1,000 per pound of methamphetamine), I know that the illicit price of methamphetamine fluctuates based on quantity purchased. Usually, the larger the quantity of methamphetamine being purchased, the lower the unit price. Toward the end of their conversation, **DONALDSON** referenced "my guy" leaving for out of town and stated, "I'll need to set that to the side for u." I believe that **DONALDSON** was referencing his methamphetamine source of supply not being available on the day of the transaction and was informing CS2 that the methamphetamine needed to be reserved in advance. After CS2 confirmed that transaction by stating "Thursday forsure bro", **DONALDSON** also confirmed the transaction stating, "Either way, I'll be ready." Based on this text message exchange, I concluded that the methamphetamine transaction was confirmed to occur on "Thursday", a reference to July 27, 2023.

25. On July 27, 2023, recorded communications continued between **DONALDSON**, using Target Telephone 2, and CS2 to conduct a methamphetamine transaction. As **DONALDSON** and CS2 negotiated where to complete the transaction, **DONALDSON** indicated his methamphetamine source of supply resided in "tukare", which I believe is a misspelling for Tulare, CA, and suggested the transaction occur at "flying js and loves." I believe this is a reference to a Flying J truck stop located in Tulare, CA. Additional recorded communications occurred between **DONALDSON** and CS2 during which they confirmed the meeting location, the price for five pounds of methamphetamine, and the status of their location as they traveled to the meeting location.

26. In anticipation of conducting a controlled purchase of methamphetamine from **DONALDSON**, controlling agents met with CS2 at a neutral location. At the neutral location, CS2 and CS2's vehicle were searched with negative results. CS2 was provided with $4,800 in government funds to complete the methamphetamine transaction with **DONALDSON**. CS2 was also outfitted with an audio/video recorder. CS2 was kept under constant surveillance as he/she traveled to the meeting location and conducted a recorded meeting with **DONALDSON** beginning at approximately 6:25 PM. Surveillance had observed a black Nissan Altima arrive, and after referring to **DONALDSON**'s CA Driver's License picture, determined that the driver of the Nissan was **DONALDSON. DONALDSON** arrived prior to CS2 and, upon CS2's arrival, exited the black Nissan Altima and entered the passenger seat of CS2's vehicle.

27. At approximately the same time, a female subsequently identified as Angelica **FLORES** arrived driving a gray BMW sedan with California license plate 7UMV119 and parked near CS2 and **DONALDSON**. Angelica **FLORES** was identified later in this investigation based upon a unique neck tattoo, her driver's license photo, and observing her drive the same vehicle during subsequent surveillances. **DONALDSON** informed CS2, "that's her right there", indicating **FLORES** had the methamphetamine. **DONALDSON** confirmed the price with CS2 stating, "I said forty-eight, right.", a reference to $4,800 for the five pounds of methamphetamine. CS2 confirmed the price and counted out $4,800 in front of **DONALDSON**. **DONALDSON** then took the funds to **FLORES**' vehicle and entered the passenger side of the BMW. Minutes later, surveillance observed **DONALDSON** exit **FLORES** vehicle with a plastic bag and re-enter CS2's vehicle. Handing CS2 the plastic bag, **DONALDSON** stated, "two is mine" and instructed CS2 to pick "any ones you want." CS2 instructed **DONALDSON** to pick, and **DONALDSON** proceeded to take five plastic packages containing suspected methamphetamine out of the larger plastic bag and placed the packages in CS2's vehicle. CS2 and **DONALDSON** then discussed future methamphetamine transactions before **DONALDSON** exited CS2's vehicle, returned to his black Nissan Altima, and then departed the meeting location.

28. After the transaction, CS2 was kept under constant surveillance and followed back to the neutral location. At this location, the five pounds of methamphetamine were seized as evidence. CS2 and CS2's vehicle were searched with negative results. The narcotics tested positive for methamphetamine and contained 2,040 grams of actual methamphetamine.

29. Based on the above information, I concluded that **FLORES** transported the methamphetamine to the transaction between **DONALDSON** and CS2. I concluded that **DONALDSON** exchanged at least a portion of the government funds he was provided by CS2 with **FLORES** for the methamphetamine. I further concluded that **DONALDSON** then supplied five pounds of methamphetamine to CS2.

**C. <u>DONALDSON and FLORES Distribute Four Pounds of Methamphetamine on August 30, 2023</u>**

30. Additional recorded text messages occurred between **DONALDSON** using Target Telephone 2 and CS2 to arrange a second methamphetamine transaction on August 30, 2023. On that date, the following text messages occurred between **DONALDSON** using Target Telephone 2 and CS2:

- CS2: Whats good bro i need those 4
- CS2: For 4200$
- **DONALDSON**: Ok when u coming
- **DONALDSON**: I just need. A time you will be in town
- CS2: Ima be in your area around 6 fam or 6:30pm same spot at the truck stop
- **DONALDSON**: Yeah. That will work.

31. During the above text message exchange, CS2 asked for "4" for "4200$." I believe, based on the prior evidence described above, that CS2 was asking for four pounds of methamphetamine for $4,200. Based on my training and experience, this price is consistent with the illicit price for four pounds of methamphetamine. **DONALDSON** asked, "Ok, when you coming" and CS2 responded with a time frame between 6:00 PM and 6:30 PM. **DONALDSON** agreed to the methamphetamine transaction by stating, "Yeah. That will work."

32. The text message exchange between **DONALDSON** and CS2 continued in furtherance of the pending methamphetamine transaction. CS2 advised **DONALDSON** that he/she would be there at 6:30 PM and stated, "Ill have the cash ready bro thanks !" which I believe was a reference to money needed to purchase the methamphetamine. **DONALDSON** responded that he would be waiting at the "truck stop", a reference to the Flying J Truck Stop where the first transaction occurred.

33. In anticipation of conducting a controlled purchase of methamphetamine from **DONALDSON**, controlling agents met with CS2 at a neutral location in Tulare, CA. At the neutral location, CS2 and CS2's vehicle were searched with negative results. CS2 was provided with $4,200 in government funds to complete the methamphetamine transaction with **DONALDSON**. CS2 was also outfitted with an audio/video recorder. CS2 was kept under constant surveillance as he/she traveled to the location in Tulare, CA and conducted a recorded meeting with **DONALDSON**. CS2 and

**DONALDSON** initially greeted each other through their respective vehicle windows after which time **DONALDSON** entered CS2's vehicle as the passenger. CS2 and **DONALDSON** counted the $4,200 in government funds to complete the purchase. While waiting for **FLORES** to arrive, CS2 asked if **DONALDSON** could obtain firearms. **DONALDSON** referred to a gun source of supply who had a "Lugar", a type of firearm for sale for $500. **DONALDSON** also indicated that his firearm source had "rifles" and "Glocks" for sale. CS2 asked if the firearm source had access to a "ghost gun", a reference to a personally manufactured firearm with no identification markings, such as serial numbers. **DONALDSON** replied that he would contact his "guy", a reference to the firearm source, regarding the sale of a "ghost gun."

34. At approximately 6:28 PM, surveillance observed **FLORES**[10] arrive in her BMW sedan and park close to **DONALDSON** and CS2. **DONALDSON** took the $4,200 in government funds and entered **FLORES**' vehicle as the passenger. Minutes later, **DONALDSON** exited **FLORES**' vehicle, opened the driver door of his Nissan Altima, and then threw an item on the driver's seat after returning to CS2's vehicle. **DONALDSON** handed CS2 four pounds of methamphetamine before returning to his vehicle and departing[11].

35. Based on the above information, I believe that **FLORES** transported the suspected methamphetamine to the transaction between **DONALDSON** and CS2. I concluded that **DONALDSON** exchanged at least a portion of the government funds he was provided by CS2 with **FLORES** for the suspected methamphetamine. I further concluded that **DONALDSON** then supplied four pounds of suspected methamphetamine to CS2.

**D. DONALDSON and SAHAGUN Illegally Possess and Sell Firearm and Ammunition on September 7, 2023**

36. After the August 30, 2023, controlled purchase of methamphetamine described, recorded communications continued between **DONALDSON** using Target Telephone 2 and CS2 regarding future

---

[10] FLORES was positively identified on August 11, 2023, by surveillance. Specifically, surveillance followed FLORES, with the assistance of a vehicle tracker on her BMW, to a store. Surveillance photographed FLORES and placed a controlled call to her number, 559-602-2364, which is subscribed in her name.

[11] The methamphetamine purchased from **DONALDSON** was submitted to the Western Regional Laboratory for analysis and safekeeping and, upon testing, returned positive for methamphetamine and contained 1,740 grams of actual methamphetamine.

methamphetamine and firearms transactions. On September 1, 2023, the following text messages occurred between **DONALDSON** using Target Telephone 2 and CS2 in furtherance of a firearm transaction.

- CS2: Im trying to pay cash for it. Does he have any 38? Or 45??
- **DONALDSON**: [This multimedia message was a Snapchat message from an account named "Adam **SAHAGUN**" which stated the followed: "Only will part with the rifle with scope and shells for $450 and some shit oh Had a 38 but just sold the 2 38 I had one was a handgun the other was a revolver and I lasso have this one it's a nine converted to a AR15 brand new too."]
- **DONALDSON**: This is what. He sent me.
- CS2: How much for the nine fam??

37. Initially during this text message exchange, CS2 asked **DONALDSON** for a "38" or "45", a reference to a .38 or .45 caliber firearm. In response, **DONALDSON** sent a screen shot of a message from an account named "Adam **SAHAGUN**" who offered to supply a "rifle with scope" as well as a "AR15" type rifle. **SAHAGUN** also claimed to have "sold" a "38" caliber firearm which he (**SAHAGUN**) just sold. Based on this message, I concluded that **SAHAGUN** was a firearm source of supply or broker who was able to obtain firearms for **DONALDSON**.

38. After this text message exchange, additional text messages occurred between **DONALDSON** using Target Telephone 2 and CS2 arranging a transaction for two firearms for $1,500 which was scheduled to occur on September 7, 2023, in Hanford, CA. On that date, the following text message exchange occurred between **DONALDSON** using Target Telephone 2 and CS2.

- CS2: Wassup bro we good for later??
- **DONALDSON**: Yes sir.
- CS2: Im picking up the 1500$ from my buddy in a bit. Its 1500 for the package right ?
- **DONALDSON**: Yes
- CS2: Okay yeah sounds
- **DONALDSON**: E.t.a.
- CS2: Ima be at the lowest loke 6:30 bro im catching all this traffic im on my way tho

- **DONALDSON**: K
- CS2: I have the money ready ill let you know when im close by
- **DONALDSON**: Ok. Dudes going to pick those up. Right now
- **DONALDSON**: Imma be I. The stpre
- CS2: Okay im 5 min away bro

39. During this text message exchange, CS2 confirmed the price of $1,500 for "the package", which I believe is coded language for the two firearms which he/she negotiated to purchase. **DONALDSON** confirmed the firearms transaction by stating, "yes." **DONALDSON** then stated, "Dudes going to pick those up", which I believe was a reference to his (**DONALDSON's**) firearm source of supply or broker obtaining the firearms to complete the transaction.

40. In anticipation of conducting a controlled purchase of two firearms from **DONALDSON**, controlling agents met with CS2 at a neutral location in Hanford, CA. CS2 and CS2's vehicle were searched with negative results. CS2 was provided with $1,500 in government funds to complete the firearms transaction. CS2 was also outfitted with an audio/video recorder. CS2 was kept under constant surveillance as he/she traveled to Hanford, CA and conducted a recorded meeting with **DONALDSON** who arrived at approximately 6:37 PM continuing to drive his Nissan Altima. **DONALDSON** and CS2 initially spoke through their respective vehicle windows at which time **DONALDSON** indicated a third party would be arriving with the firearms. CS2 provided **DONALDSON** with the $1,500 in government funds to complete the transaction.

41. At approximately 6:44 PM, surveillance observed a grey Dodge Charger arrive and park next to **DONALDSON's** Nissan Altima. The passenger from the Dodge Charger exited the vehicle and spoke briefly with **DONALDSON** outside of their respective vehicles. Surveillance identified the passenger of the Dodge Charger as **SAHAGUN** from recent booking photographs. Surveillance observed **SAHAGUN** open the rear passenger door of the Dodge Charger and **DONALDSON** retrieved the two firearms which were wrapped in a towel from within the vehicle. Surveillance observed **DONALDSON** place the two firearms in the back seat of CS2's vehicle. Surveillance observed **SAHAGUN** hand CS2 a firearm magazine through CS2's driver side window. After this time, **DONALDSON** and **SAHAGUN** returned to their respective vehicles and departed the location.

42. CS2 was followed by surveillance back to the neutral location. Controlling agents seized the two firearms, magazine, and ammunition as evidence. One of the firearms is a personally manufactured AR15-type firearm which had been modified to fire a .9mm caliber round. The magazine which was provided by **SAHAGUN** directly to CS2, contained multiple live rounds of ammunition and fit the magazine well of the modified personally manufactured AR15-type firearm. The second purchased firearm was a Savage Arms .243 caliber bolt action rifle with serial number K921376. A records check confirmed that this firearm was reported as stolen in April 2023 to the Hanford Police Department. CS2 and CS2's vehicle were searched with negative results.

43. A consultation was conducted with agents from ATF, who indicated that Savage Arms is not manufactured in the state of California. Additionally, the ammunition that was contained in the magazine was ten rounds of assorted brands of 9mm live ammunition, one of which is Winchester which is not manufactured in the state of California.

44. Both **DONALDSON**[12] and **SAHAGUN**[13] have multiple felony convictions and are prohibited from possessing firearms or ammunition.

### E. DONALDSON Distributes One Pound of Methamphetamine to Uncharged Co-Conspirator 2 on September 30, 2023

45. On September 29, 2023, at approximately 12:58 PM, a phone call was intercepted from **DONALDSON,** using Target Telephone 2, to an individual subsequently identified as Uncharged Co-conspirator 2, using phone number XXX-XXX-9708[14]. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| Uncharged Co-conspirator 2 | Hey, bro. |
| DONALDSON | Hey, what is going on? |
| Uncharged Co-conspirator 2 | Um, about I think eleven O'clock I got someone guy coming in from out of town. But [static] He needs three (3). |
| DONALDSON | He needs three (3) at eleven. |
| Uncharged Co-conspirator 2 | Uh-huh. |
| DONALDSON | Tonight? |

[12] In 2019, Donaldson was convicted of inflicting corporal injury on a spouse or cohabitant, in violation of California Penal Code § 273.5 in Kings County, California and sentenced to 3 years imprisonment.

[13] Sahagun was convicted of burglary, in violation of California Penal Code section 459, on or about May 7, 2020, in Kings County, California and sentenced to four years in prison.

[14] The full phone number is obfuscated for privacy purposes.

| | |
|---|---|
| Uncharged Co-conspirator 2 | Tomorrow morning. |
| DONALDSON | Oh tomorrow morning, yeah that is fine. |
| Uncharged Co-conspirator 2 | Okay. |
| DONALDSON | Yeah that is fine… |
| | [Voices overlap] |
| Uncharged Co-conspirator 2 | … [U/I] the price on those? |
| DONALDSON | Um no, uh well uh let me call him since he his buying three (3) at a time so let me see what my, my guy says. Maybe get him a better deal maybe get him like nine-fifty (950) or something. |
| Uncharged Co-conspirator 2 | All right… |
| | **[End of call]** |

46. During this phone call, Uncharged Co-conspirator 2 indicated that a third party would be coming "froun out of town" who "needs three." Uncharged Co-conspirator 2 and **DONALDSON** discussed meeting "tomorrow morning", a reference to September 30, 2023. Uncharged Co-conspirator 2 then asked for the "price" and **DONALDSON** quoted a price of "nine-fifty." I know that this is a price of $950 and is consistent with the price range for a pound of methamphetamine. Based on this conversation, I believe that Uncharged Co-conspirator 2 planned to conduct a methamphetamine transaction with **DONALDSON** on September 30, 2023.

47. On September 30, 2023, multiple communications occurred between **DONALDSON** and Uncharged Co-conspirator 2 to arrange a methamphetamine transaction. At approximately 9:47 PM, the following phone call was intercepted.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| Uncharged Co-conspirator 2 | Hello? |
| DONALDSON | Hey, so I'm going to put it on the passenger side mirror of my white truck. So when you just pull up [U/I] [Voices overlap] |
| Uncharged Co-conspirator 2 | Passenger side mirror? Will you dangle it there? |
| DONALDSON | Yeah, no, yeah, no one can, I got cameras on everything. No one can see [U/I] [Voices overlap]. |
| Uncharged Co-conspirator 2 | Ok, right on. [U/I] [Voices overlap] |
| DONALDSON | But just pull up in front of the truck and you can grab it. |
| Uncharged Co-conspirator 2 | Which truck is that? |
| DONALDSON | My white truck in front of my house. The one that's parked. |

| | |
|---|---|
| Uncharged Co-conspirator 2 | Is it in the driveway or [U/I] on street? |
| DONALDSON | Like where I, its on the street, right there on the [U/I] [Voices overlap]. |
| Uncharged Co-conspirator 2 | Ok, I think I parked behind it, didn't I? |
| DONALDSON | Yes you have, yeah. |
| Uncharged Co-conspirator 2 | Alright bro. That's not a problem. I'll go snatch that up. [Voices overlap] |
| DONALDSON | Ok, yeah, park, park in front of it and I'll keep an eye on it till you get here. |
| Uncharged Co-conspirator 2 | Alright, thank you. I'm going to be leaving my house in minute. [Voices overlap] |
| DONALDSON | [U/I] Ok, no problem. |
| Uncharged Co-conspirator 2 | Alright, by. |
| DONALDSON | By. |
| | **[End of call]** |

48. During this phone call, **DONALDSON** stated her was going to place "it" in his "white truck" and directed Uncharged Co-conspirator 2 to "just pull up." **DONALDSON** assured Uncharged Co-conspirator 2 that he had "cameras on everything", indicating he would be able to watch what he put in the white truck. Based on the prior intercepted communication, I believe that **DONALDSON** had placed methamphetamine in a white truck which he further described as "in front of my house." This statement matched a full-size inoperable pickup which is consistently parked in front of **DONALDSON's** house in Armona, CA. Uncharged Co-conspirator 2 agreed to do the methamphetamine transaction as proposed by **DONALDSON** stating, "I'll go snatch that up."

49. Based on this information, surveillance was established at 10635 Sunflower Circle, Armona, CA in anticipation of Uncharged Co-conspirator 2' arrival to retrieve the methamphetamine. At approximately 10:07 PM, surveillance observed an individual subsequently identified as Uncharged Co-conspirator 2 arrive in the area of 10635 Sunflower Cir, Armona, CA driving a silver Honda SUV. Uncharged Co-conspirator 2 was observed walking toward 10635 Sunflower Cir, Armona, CA and then walking away. Due to the time of day being dark outside, surveillance was not able to tell if Uncharged Co-conspirator 2 was carrying anything.

50. After Uncharged Co-conspirator 2 departed, surveillance followed Uncharged Co-conspirator 2 toward Hanford, CA. A marked Kings County Sheriff's Office unit conducted a stop on Uncharged Co-conspirator 2. During this stop, a search of Uncharged Co-conspirator 2' vehicle was conducted resulting in the seizure of approximately one pound of methamphetamine.

51. Based on the above intercepted communication, surveillance, and seizure, I believe **DONALDSON** distributed methamphetamine to Uncharged Co-conspirator 2.

**F. <u>ORTIZ and FLORES Distribute Methamphetamine to Joshua BROCK</u>**

**1. ORTIZ and FLORES Distribute Five Pounds of Methamphetamine to BROCK on October 1, 2023.**

52. On October 1, 2023, beginning at approximately 1:53 PM, a phone call was intercepted from **ORTIZ,** using Target Telephone 3, to an individual subsequently identified as Joshua **BROCK**, using phone number 559-809-2664. Prior to this phone call, **BROCK** had sent a series of text messages to **ORTIZ** ordering a quantity of "five." During this phone call, **BROCK** stated that he was "ready." **ORTIZ** directed **BROCK** to the area of "Prosperity and J." This location was identified as a Dollar General in Tulare, CA, which Angelica **FLORES**, **ORTIZ'** sister, would commonly meet drug customers to complete methamphetamine transactions. Based on this knowledge, I believed that **ORTIZ** was directing **BROCK** to that location to complete a methamphetamine transaction. Later in the call, **ORTIZ** asked **BROCK** how many he (**BROCK**) needed and **BROCK** again stated "five" but would need to check the "wallet." Based on the reference to a wallet, I believe **BROCK** was going to check how much money he had to complete the transaction prior to confirming the amount. Based on my training, experience, and the knowledge that these intercepted communications resulted in the seizure of approximately five pounds of suspected methamphetamine from **BROCK**, I believe that **BROCK** was ordering five pounds of methamphetamine from **ORTIZ** during this intercepted communication.

53. Beginning at approximately 2:00 PM, a series of text messages were intercepted between **ORTIZ** using Target Telephone 3 and **BROCK** using phone number 559-809-2664. During these text messages, **BROCK** confirmed his methamphetamine order by sending a text stating "5", and provided his location to **ORTIZ** as he traveled toward Tulare, CA.

54. At approximately 2:07 PM and immediately after the text message exchange with **BROCK**, the following phone call was intercepted from **ORTIZ** using Target Telephone 3 to his sister, **FLORES**, using phone number 559-378-5406[15].

[15] During intercepted communications, **ORTIZ** referred to the user of phone number 559-378-5406 as his sister. **FLORES** has been identified as **ORTIZ**' sister during a prior criminal investigation. **ORTIZ** would direct the user of phone number 559-378-5406 to conduct transactions with various drug customers and surveillance would observe **FLORES**

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **FLORES** | What? |
| **ORTIZ** | Yeah, uh, he'll, he'll be there in five minutes or less. |
| **FLORES** | For the fire? |
| **ORTIZ** | Yeah. |
| **FLORES** | And what does he do, four? |
| **ORTIZ** | Uh, forty, two, fifty. |
| **FLORES** | Damn. I'm doing big things today, huh? You better [U/I] at me. [Voices overlap] |
| **ORTIZ** | [U/I] had to up it on everybody. |
| **FLORES** | Huh, ok. [Voices overlap] |
| **ORTIZ** | Had to up it on everybody. |
| **FLORES** | Uh, ok, other big things today you [U/I] at me. |
| **ORTIZ** | [Chuckles] Shut the fuck up. [Voices overlap] |
| **FLORES** | Call me money today, ok? That's my name today. |
| **ORTIZ** | [U/I] |
| **FLORES** | [U/I] Hey. |
| | **[End of call]** |

55. During this phone call, **ORTIZ** informed **FLORES** that a third party, referred to only as "he", would be there in "five minutes or less." Since this communication was intercepted immediately after **ORTIZ'** text message exchange with **BROCK**, I believe **ORTIZ** was directing **FLORES** to meet with **BROCK**. Since the Dollar General was such a common meeting place between **FLORES** and drug customers, the location of the transaction was assumed and did not have to be discussed during this phone call. **ORTIZ** then directed **FLORES** to collect "forty, two, fifty." I believe this was a reference to $4,250. Since **BROCK** was purchasing a quantity of five, this would result in a unit price of $850. I know, based on my training and experience, that this price is consistent with the illicit price of a pound of methamphetamine in the Central Valley of California. Therefore, I believe that **ORTIZ** was directing **FLORES** to sell **BROCK** five pounds of methamphetamine for a total price of $4,250. **ORTIZ** informed **FLORES** that he had to "up" the price of the methamphetamine. **FLORES** then joked to call her "money", which I concluded was a reference to the drug proceeds she anticipated to collect from **BROCK** during the transaction.

56. At approximately 2:11 PM, the text message exchange continued between **ORTIZ**, using Target Telephone 3, and **BROCK**, using phone number 559-809-2664, as follows:

---

complete the criminal activity. Based on this information, **FLORES** was identified as the user of phone number 559-378-5406.

- **BROCK**: I'm just about to the Dollar general now the one I'm at your sister at
- **ORTIZ**: Yea she got it
- **BROCK**: Okay I'm pulling in the parking lot now

57. During this text message exchange, **BROCK** informed **ORTIZ** that he was at the meeting location, referred to as the "Dollar general" and then referenced **ORTIZ**' sister, known to be **FLORES**. **ORTIZ**' responded, "Yea she got it", which I believe was a confirmation that **FLORES** was in possession of the requested methamphetamine. Lastly, **BROCK** informed **ORTIZ** when he had arrived at the meeting location by stating, "I'm pullin in the parking lot now."

58. At approximately 2:12 PM and immediately after the text message from **BROCK** indicating he had arrived at the meeting location, **ORTIZ**, using Target Telephone 3, called **FLORES**, using phone number 559-378-5406, stating, "Hey, he's there", to which **FLORES** responded, "Alright."

59. Based on these intercepted communications, surveillance was established in the area of the Dollar General located on the south/east corner of W. Prosperity Ave and N J St, Tulare, CA. At approximately 2:20 PM, surveillance observed a grey BMW driven by **FLORES**, park behind a white Hyundai sedan. Surveillance observed the driver of the white Hyundai sedan exit the car and recognized him **BROCK** based on prior contact. Surveillance then observed **BROCK** conduct a hand-to-hand transaction with **FLORES**, and return to his vehicle carrying a plastic bag.

60. Based on the intercepted communications and surveillance, a marked Tulare Police Department unit was arranged to stop **BROCK**. This contact occurred in the city of Tulare, CA as **BROCK** was in a Walmart parking lot. **BROCK** was detained without incident and a search of his vehicle was conducted resulting in the seizure of approximately five pounds of methamphetamine[16] in the plastic bag he had previously obtained from **FLORES**.

61. Therefore, I concluded that **BROCK** had ordered five pounds of methamphetamine from **ORTIZ** and provided his (**BROCK**'s) location to conduct the methamphetamine transaction. In turn, communications were intercepted during which **ORTIZ** directed **FLORES** to conduct the methamphetamine transaction with **BROCK**, informing **FLORES** of the amount of drug proceeds to

---

[16] The methamphetamine seized from **BROCK** was submitted to the DEA Western Regional Lab where it was analyzed and returned positive for methamphetamine and contained 2,158 grams of actual methamphetamine.

collect and when **BROCK** had arrived to conduct the transaction.

### 2. ORTIZ Continues to Distribute Methamphetamine to BROCK

62. The above-described methamphetamine transaction was a reoccurring pattern during the wire intercepts conducted during this investigation. Multiple pertinent drug related communications were intercepted between **ORTIZ** using Target Telephone 3 and Target Telephone 10 during which **BROCK** would order various quantities of methamphetamine from **ORTIZ**[17]. **ORTIZ** would either directly distribute the methamphetamine to **BROCK** or would arrange for **BROCK** to obtain the methamphetamine from his sister, **FLORES**. As with Marie **QUAADMAN**, **ORTIZ** was in an established criminal relationship with **BROCK** during this investigation. Therefore, based on my training and experience, **BROCK** and **ORTIZ** only needed to discuss the amount of drugs to be purchased and decide on where to meet to conduct the transaction. Therefore, other details such as price and quality were omitted from most of their conversations. Based on the above described information, **BROCK** was identified as a multi pound methamphetamine customer. Therefore, when **BROCK** ordered quantities expressed in whole numbers, I believed he was ordering pound quantities of methamphetamine from **ORTIZ**. The following table is a summary of some of the methamphetamine transactions which occurred between **ORTIZ** and **BROCK** during this investigation.

| DATE | QUANTITY | DESRIPTION |
|---|---|---|
| 10/10/23 | 2 lbs | **BROCK** asked **ORTIZ** for "two" and informed **ORTIZ** he was a Target to conduct the transaction. Surveillance subsequently observed a meeting between ORTIZ and BROCK in the Target parking lot in Visalia, CA. |
| 10/20/23 | 1 lb | **BROCK** asked **ORTIZ** for "one" and they negotiated where to meet to conduct the transaction. |
| 10/23/23 | 2 lbs | **BROCK** asked **ORTIZ** for "two" and arranged to meet **ORTIZ** to conduct the transaction. |
| 10/24/23 | 2 lbs | **BROCK** asked **ORTIZ** for "two" and met **ORTIZ** at a Shell gas station to complete the transaction. Surveillance observed ORTIZ & BROCK meet at the Shell gas station located at Bardsley St and Laspina Ave, Tulare, CA |

[17] **BROCK** utilized phone number 559-809-2664 until the October 1, 2023 after which time he was arrested and this cell phone seized. Beginning October 6, 2023, **BROCK** began to be intercepted using phone number 559-668-3491, a phone subscribed to him with a listed address of 309 North C St, Exeter, CA. **BROCK** was also identified as the user of this phone number by monitors and agents conducted a voice comparison between the users of both phones and confirming they were both used by the same person, **BROCK**. Based on this information, **BROCK** was identified as the user of phone number 559-809-2664 as well as 559-668-3491 during this investigation.

| | | |
|---|---|---|
| 10/25/23 | 2 lbs | **BROCK** asked **ORTIZ** for the "same" and agreed to meet at **ORTIZ**' residence to complete the transaction... |
| 10/26/24 | 2 lbs | **BROCK** informed **ORTIZ** he needed at least "two." . |
| 02/10/24 | 3 or 4 lbs | **BROCK** informed ORTIZ he needed "3 or 4." **ORTIZ** told **BROCK** his sister, a reference to **FLORES**, would take care of it. Surveillance observed a meeting between FLORES and BROCK after which time BROCK returned to his vehicle carrying a bag. |
| 02/12/24 | 3 lbs | **BROCK** said he needed "four, but then messaged **ORTIZ** stating **ORTIZ**' sister, a reference to **FLORES**, only sent three. |
| 2/20/24 | 3 lbs | **BROCK** said he need "three," and asked **ORTIZ** to "front" one. **ORTIZ** agreed to meet **BROCK** at the Dollar General. |

63. Based on these intercepted communications, **BROCK** purchased approximately twenty pounds of methamphetamine from **ORTIZ** and **FLORES** during this investigation.

### G. Alejandro HERNANDEZ-Diarte Transports 35 Pounds of Methamphetamine on October 17, 2023

#### 1. Initial Identification of a Drug Transport Vehicle Subsequently Used by HERNANDEZ

64. On October 1, 2023, at approximately 12:42 PM, a phone call was intercepted between **ORTIZ** using Target Telephone 3 and his sister, Angelica **FLORES**, using phone number 559-487-5406. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **ORTIZ** | Hey? |
| **FLORES** | Huh? |
| **ORTIZ** | Well that guys like about twenty-five minutes away. |
| **FLORES** | What guy? |
| **ORTIZ** | Uh, they're gonna drop off some work, this guy, just open the garage just, when he drops off, just leave it in the garage and [U/I]. |
| **FLORES** | Uh, open the garage? [Voices overlap] |
| **ORTIZ** | [U/I] Yeah, yeah. [Voices overlap] |
| **FLORES** | I don't…. |
| **ORTIZ** | He'll be there in about twenty, twenty five minutes. |
| **FLORES** | I don't have to take the car out? |
| **ORTIZ** | Nah, nah, just, uh, nah, nah, hell no. |
| **FLORES** | Alright. |
| **ORTIZ** | He's just gonna, he's gonna drop it off in like a bag or something. [Stutters] I'll, I'll pay them whenever I get home, but, just so we can have it. |
| **FLORES** | Alright. |
| **ORTIZ** | Alright. |

| | |
|---|---|
| | **[End of call]** |

65. During this phone call, **ORTIZ** informed **FLORES** that a third party was "twenty-five minutes away" and the third party would, "drop off some work." Based on my training and experience, I know the term "work" is commonly used by drug traffickers to refer to drugs. Based on this statement, I believe **ORTIZ** was anticipating a shipment of drugs and was directing **FLORES** to receive the shipment in the garage of his residence at 2680 Bright St, Tulare, CA.[18] **ORTIZ** indicated the drug shipment would be dropped off "in like a bag or something", and informed **FLORES**, "I'll pay them whenever I get home." This statement was consistent with **ORTIZ** receiving the drug shipment on credit, "just so we can have it" and then paying for the drugs at a later time.

66. At approximately 1:16 PM, **FLORES**' BMW sedan was observed via a remote-control video surveillance camera arriving at the driveway which leads to **ORTIZ**' residence.

67. At approximately 1:32 PM, a phone call was intercepted from **ORTIZ** using Target Telephone 3 to **FLORES** using phone number 559-487-5406 during which **ORTIZ** directed **FLORES** to "go out there", indicating the drug shipment had arrived.

68. This intercepted communication corresponded to surveillance observing a black Toyota sedan with California license plate 7YYP143 arriving and entering the driveway leading to **ORTIZ**' residence. Minutes later, this vehicle departed. It should be noted that the occupants of this vehicle were not observed clearly enough to be identified at the time of this surveillance.

69. At approximately 1:34 PM, a phone call was intercepted from **ORTIZ** using Target Telephone 3 to **FLORES** using phone number 559-487-5406. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **ORTIZ** | Hello? |
| **FLORES** | What's up? |
| **ORTIZ** | Hey, they're the same ones? |
| **FLORES** | Uh, I'm opening it right now. |
| **ORTIZ** | Yeah. |
| **FLORES** | Hold on, I'm about to open the bag. Yeah. |
| **ORTIZ** | Alright, cool, [U/I], just… |
| **FLORES** | Huh? |

[18] In other affidavits in this investigation, **ORTIZ**' address was mistakenly listed as 2686 Bright St, Tulare, CA. This residence was subsequently confirmed to be 2680 Bright St, Tulare, CA with the correct address listed in this affidavit.

| | |
|---|---|
| **ORTIZ** | Alright, good looking out. I just want to make sure. |
| **FLORES** | Hey? |
| **ORTIZ** | Huh? |
| **FLORES** | Can I take one of these [U/I]? |
| **ORTIZ** | Yeah, yeah. |
| **FLORES** | Alright. |
| **ORTIZ** | [U/I] |
| | **[End of call]** |

70. During this phone call, **ORTIZ** asked **FLORES** if "they're the same ones" and **FLORES** responded, "I'm opening it right now." Based on these statements, I believe that the drug shipment had arrived, was in **FLORES**' possession, and was dropped off moments earlier by the occupant(s) of the black Toyota sedan. **FLORES** stated, "Hold on, I'm about to open the bag", confirming the drug shipment was in a bag, and then stated, "Yeah" that the drugs were "the same" as ones **ORTIZ** previously received. **ORTIZ** was pleased to hear this information stating, "alright, cool."

71. On October 3, 2023, the Honorable Antonio Reyes, Superior Court Judge for Tulare County, signed an order authorizing the installation of a tracking device on the black Toyota sedan with California license plate 7YYP143. On October 5, 2023, a tracker was installed on this vehicle.

72. A review of the tracker information being obtained from this vehicle indicated it was involved with travels consistent with transporting drugs. For example, on October 15, 2023, GPS tracker information indicated the black Toyota sedan departed Orange Cove, CA, a rural location in Fresno County, traveled to a residential area of Las Vegas, NV for approximately one hour, and then traveled to the Los Angeles, CA area before returning back to Orange Cove, CA. Based on my training and experience, I know that drug transporters will travel far distances, stay for short durations of time to offload a drug shipment, and then depart to another location. I believe that this is what occurred with the Toyota Corolla in Las Vegas because of the distance of travel compared to the duration of stay.

**2. Arrest of HERNANDEZ Utilizing the Drug Transport Vehicle**

73. On October 17, 2023, surveillance was being conducted on the black Toyota sedan with California license plate 7YYP143 in Orange Cove, CA. An individual was observed loading a large duffle bag into the trunk of the black Toyota sedan and the vehicle departed. Surveillance was conducted on the vehicle as it traveled west bound on Highway 180, continuing west of Kerman, CA toward Interstate 5. Based on the observations in Orange Cove, CA and the history of this vehicle as being used

to transport methamphetamine shipments, a vehicle stop was arranged with a marked patrol unit. While the vehicle continued to travel west bound on Highway 180, a CHP marked unit conducted a stop on the black Toyota sedan for speeding. The driver and sole occupant of the vehicle was identified as Alejandro **HERNANDEZ**-Diarte. During the stop, it was determined that **HERNANDEZ** did not have a valid driver's license and the vehicle was processed for tow, to include an inventory search of the vehicle. During a search of the vehicle, a duffel bag was located in the trunk of the vehicle and found to contain approximately 35 pounds of methamphetamine[19]. **HERNANDEZ** was taken into custody.

**H. <u>ORTIZ Distributes 18 Kilograms of Methamphetamine to Uncharged Co-conspirator 3</u>**

1. **Surveillance and Arrest of Uncharged Co-conspirator 3 on October 2, 2023**

74. On October 1, 2023, and as described above, **ORTIZ** received a shipment of drugs at his residence of 2680 Bright St, Tulare, CA. Intercepted communications indicated that the drug shipment was in a "bag" and maintained in **ORTIZ**' "garage."

75. On October 2, 2023, the following day, surveillance was being conducted at 2680 Bright St, Tulare, CA via a remote-controlled video camera. At approximately 8:45 PM, surveillance observed a 2023 Black Jeep Cherokee with California license plate 9HBY189 arrive at **ORTIZ'** residence. A registration check revealed that this vehicle is a rental vehicle. **ORTIZ** was observed exiting his garage and having a conversation with an individual subsequently identified as Uncharged Co-conspirator 3 near the garage door of 2680 Bright Street, Tulare, CA. Both **ORTIZ** and Uncharged Co-conspirator 3 were observed congregating near the rear of the Jeep with the trunk open. A duffle bag was observed being placed in the trunk of the Jeep Cherokee after which time Uncharged Co-conspirator 3 departed in the vehicle. Surveillance followed the Jeep Cherokee from the area of **ORTIZ'** residence to Highway 99 where it proceeded north bound.

76. At approximately 9:17 PM, a traffic stop was conducted by Visalia Police Department Officer Schiebelhut and the Jeep Cherokee yielded northbound 99 near Road 12 in Kingsburg, CA. Uncharged Co-conspirator 3 was identified as the driver and sole occupant of the vehicle. During a

---

[19] The methamphetamine seized from **HERNANDEZ** was submitted to the DEA Western Regional Laboratory where it was analyzed and returned positive for methamphetamine and contained 12,944 grams of actual methamphetamine.

subsequent search of the vehicle, approximately 35 individualized packages of suspected methamphetamine were located in a duffle bag located in the trunk of the vehicle. The total packaged weight of the suspected methamphetamine was 18.30 kilograms[20].

### 2. Intercepted Communications about Uncharged Co-conspirator 3 Arrest and Methamphetamine Seizure

77. Beginning October 3, 2023, a series of communications were intercepted between **ORTIZ**, using Target Telephone 3, and a currently unidentified male referred to as UM5116 using phone number XXX-XXX-5116[21], discussing the arrest of Uncharged Co-conspirator 3 and their involvement in the seized methamphetamine shipment. For example, at approximately 9:10 PM, a phone call was intercepted from **ORTIZ** using Target Telephone 3 to UM5116. The following is a partial transcript of this phone call:

| NAME | TRANSCRIPTION |
|---|---|
| **ORTIZ** | What they're doing is pulling him out of his room, they do the paperwork, and then they'll put him in the, uh, in the holding cell until either, uh, a taxi cab comes or if somebody calls and says, "Ay, we're going to pick him up. We're coming." They'll leave him right there. [Voices overlap] |
| UM5116 | Does he have [U/I] [Voices overlap] |
| **ORTIZ** | But he'll have paperwork. He got to have paperwork. |
| UM5116 | Yeah. |
| **ORTIZ** | Court, whatever, something. |
| UM5116 | Yeah. |
| **ORTIZ** | It, it'll state exactly what he busted for. Oh, I mean, it has the two charges online so, mean, he did get popped with work. |
| UM5116 | Yeah, says, it says, it says transportation and sales. |
| **ORTIZ** | Yeah. [Coughs] |
| UM5116 | Yep. |
| **ORTIZ** | So that shits just sitting there. I mean, those police, they, they loaded it up bro, that, that's a…[Voices overlap] |
| UM5116 | And shit, if that, if that's the case then I want my dope back. |
| **ORTIZ** | [U/I] [Laughs] |
| UM5116 | You feel me? Put, hey put that duffle bag back in the back boy and let me get my [U/I] [Voices overlap] |
| **ORTIZ** | Yeah. Another thing I was thinking….[Voices overlap] |
| UM5116 | You know what I'm saying? |
| **ORTIZ** | Another thing that got me paranoid is that I was putting them in there with no gloves and my fingerprints, if they hit my fingerprints, they already know what the fuck is going on. |
| UM5116 | Yeah. |
| **ORTIZ** | That's another… [Voices overlap] |

[20] A presumptive test was conducted on the methamphetamine seized which tested presumptive positive for methamphetamine and contained 15.17 kilograms of actual methamphetamine.

[21] The number has been obfuscated for privacy purposes.

| | |
|---|---|
| UM5116 | See, that's why, that's why you see me [U/I] [Voices overlap] |
| **ORTIZ** | I, I, I always got gloves, I know. I thought of that shit last night when you called me. That's the first thing that popped in my head. |
| UM5116 | Every time I, every time I ever went out there, I made sure I had gloves on. |
| **ORTIZ** | No, I remember. That's why I was trippin. I said, "I need to fucking use no gloves, I was just put them all in that bag." Wasn't even trippin. Well, cause it run so smooth. You guys aren't even from here, so…[Voices overlap] |
| UM5116 | Yeah. |
| **ORTIZ** | Something that is like, something I don't even think twice about, you know what I'm saying? |
| UM5116 | That's what, that's what just gets me, how, cause its always been just smooth so it's like how, like, I don't get it. You know? |
| **ORTIZ** | And then I'm always running around so, if they're gonna rip, I would have been got. There's no way they would just, all of a sudden, and nine at fucking night, they're going to decide to move, make a move. You know what I mean? [Voices overlap] |
| UM5116 | Yeah. Yeah for real. |
| **ORTIZ** | Yeah [U/I], that's the only think I've been trippin on. My sister thinks it's funny but I'm like, "this shit ain't funny, cause I'm going to go to jail for this shit. You ain't going to go to jail for this shit." |
| UM5116 | Yeah. |
| **ORTIZ** | She's all still running around, acting like its cool, like, and I'm like, "no, you, you can hustle all you want but I'm not doing shit right now. I'm going to just post up." |

78. During this portion of the phone call, **ORTIZ** informed UM5116 of what will occur with Uncharged Co-conspirator 3 in the Tulare County Jail. **ORTIZ** assures UM5116 that Uncharged Co-conspirator 3 will have "paperwork" proving his (Uncharged Co-conspirator 3's) arrest. Based on my training and experience, I know that a suspect who is arrested with a large shipment of drugs will need to prove their arrest to the owner of the drugs. This is usually done by providing the owner with arrest or court paperwork proving their arrest and seizure of the narcotics. I believe this was what UM5116 wanted. However, both **ORTIZ** and UM5116 believe Uncharged Co-conspirator 3 was in fact arrested and the drugs seized after discussing his online booking record which reflected the charges he was arrested for. **ORTIZ** and UM5116 then discussed the shipment of methamphetamine seized from Uncharged Co-conspirator 3. UM5116 stated, "I want my dope back", expressing he was who the methamphetamine shipment was destined for. UM5116 further expressed knowledge of how the methamphetamine was packaged stating, "put that duffle bag back." The methamphetamine shipment seized from Uncharged Co-conspirator 3 was in a duffle bag. **ORTIZ** stated that he was "paranoid" because "I was putting them in there with no gloves." **ORTIZ** then expressed concern that his fingerprints would be located by police on the methamphetamine stating, "if they hit my fingerprints, they already know what the fuck is going on." **ORTIZ** and UM5116 discussed previous drug shipments

during which UM5116 stated he would always wear "gloves." Both **ORTIZ** and UM5116 described the previous methamphetamine shipments as "smooth" and **ORTIZ** indicated that was why he did not wear gloves during this transaction. Toward the end of the conversation, **ORTIZ** referenced his sister who was "still running around acting like its cool." Based on my knowledge of this DFTO, especially the criminal relationship **ORTIZ** has with **FLORES**, I believe **ORTIZ** was referring to his sister continuing to sell methamphetamine while **ORTIZ** was concerned he would be going to jail.

79. An analysis of latent fingerprints located on the suspected methamphetamine packages was conducted at the DEA Western Regional Laboratory. Uncharged Co-conspirator 3's fingerprints were not located on the packaging. However, a fingerprint returning to **ORTIZ** was located on the packaging containing the suspected methamphetamine. I believe this information confirmed **ORTIZ** was in contact with the methamphetamine prior to the seizure from Uncharged Co-conspirator 3.

80. Based on the above information, I believe that **ORTIZ** supplied Uncharged Co-conspirator 3 with the suspected methamphetamine at his (**ORTIZ**') residence on October 2, 2023.

### I. <u>ORTIZ and FLORES Conspire to Distribute Two Pounds of Methamphetamine to DONALDSON and HICKS on October 21, 2023</u>

81. On October 21, 2023, at approximately 1:17 PM, a text message was sent from Cory **DONALDSON** using Target Telephone 2 to Angelica **FLORES** using phone number 559-378-5406 stating, "I. I really need to get some. But I have my daughter. All. Day. Can I send my partner who is half my business to pick up. He knows the get down and the spot he has been with me a few times. Just this one???"

82. During this investigation, **DONALDSON** has been established as a methamphetamine customer being supplied by **ORTIZ,** and **FLORES** is known to distribute methamphetamine on **ORTIZ'** behalf. Based on this information, I believe that **DONALDSON** was informing **FLORES** that he needs to get methamphetamine but wanted to send his "partner" to conduct the methamphetamine transaction. **DONALDSON** vouched for his partner's credibility to conduct the methamphetamine transaction stating, "he knows the get down" and "he has been with me a few times."

83. At approximately 5:14 PM, a phone call occurred to **ORTIZ** using Target Telephone 3 from **DONALDSON** using Target Telephone 2. The following is a transcript of this phone call:

| NAME | TRANSCRIPTION |
|---|---|
| | [Background: Static and voices] |
| **ORTIZ** | Hello? |
| **DONALDSON** | What's good, buddy? |
| **ORTIZ** | What up? |
| **DONALDSON** | So I got a little situation. So I need some like really bad. I've been out but… |
| | [Voices overlap] |
| **ORTIZ** | … yeah. |
| **DONALDSON** | … I'm at a birthday party and I was wondering if I could send a runner? |
| **ORTIZ** | Uh. |
| **DONALDSON** | [U/I] He's been with me a couple times. |
| **ORTIZ** | Hit her up, hit her up cause I'm not even in town. She'll take care of you. |
| **DONALDSON** | I'll call right now. |
| **ORTIZ** | Okay. |
| **DONALDSON** | All right. |
| | [End of call] |

84. During this phone call, **DONALDSON** informed **ORTIZ** that, "I need some like really bad" and "I've been out." Based on **DONALDSON** being a methamphetamine customer being supplied by **ORTIZ**, I believe that **DONALDSON** was attempting to obtain methamphetamine from **ORTIZ**. However, unlike their usual transactions, **DONALDSON** asked if he could "send a runner." Based on my training and experience, I know that **DONALDSON** was asking **ORTIZ** if a third party could complete the transaction and transport the methamphetamine on his (**DONALDSON**'s) behalf. **ORTIZ** responded by stating, "hit her up" and "she'll take care of you." Based on this statement, I believe that **ORTIZ** was agreeing to the methamphetamine transaction but was instructing **DONALDSON** to contact **FLORES**, his sister, to complete the transaction.

85. At approximately 5:15 PM, and immediately after his phone call with **ORTIZ**, a phone call was intercepted from **DONALDSON** using Target Telephone 2 to **FLORES** using phone number 559-378-5406. The following is a transcript of this phone call:

| NAME | TRANSCRIPTION |
|---|---|
| **FLORES** | [Background: Sneeze) Hello? |
| **DONALDSON** | Hello? Hey, I just spoke to your, to your brother but uh, I'm out and I need probably three but the thing is I don't, I can't get away right now. I was wondering if I could send a runner a guy that has been there before with me that knows how to get down, my partner. Just this once. |
| **FLORES** | Yes. Yeah just tell him to park at the store where you park at. |
| **DONALDSON** | Yeah he will know exactly where to go cause he was with me before so… |
| **FLORES** | All right. I'll, I'll let you know when he's on the way okay? |
| **DONALDSON** | All right, bye. |
| **FLORES** | All right, bye. |
| | **[End of call]** |

86. During this phone call, **DONALDSON** referenced the conversation he just had with **ORTIZ** stating, "I just spoke to your, to your brother." **DONALDSON** then ordered a quantity of "three" and then stated, "I was wondering if I could send a runner" which I believe was a third party to complete the methamphetamine transaction on his behalf. **DONALDSON** then vouched for the third party, referring to him as a "partner." **FLORES** agreed to conduct the transaction stating, "Yeah, just tell him to park at the store where you park at." Based on this phone call, I anticipated a methamphetamine transaction was to occur between **FLORES** and a third party sent by **DONALDSON**.

87. At approximately 5:34 PM, a phone call was intercepted to **DONALDSON** using Target Telephone 2 from an individual subsequently confirmed to be Cornell **HICKS** using phone number 559-410-5774[22]. The following is a partial transcript of this phone call:

| NAME | TRANSCRIPTION |
|---|---|
| **DONALDSON** | Hello? |
| **HICKS** | Talk to me. I'll talk back. |
| **DONALDSON** | Dude! [Chuckles] how fast can you get here to get to fucking Tulare and pick up for me? I already talked to her she said it's a go. Same spot, same everything. |
| **HICKS** | Where is the spot at again? |
| **DONALDSON** | Okay, you're going to go to "O" Street I mean uh, "E" Street and Bardsley, it's that gas station. Remember we parked right there uh, backed in. |
| **HICKS** | E. Street and Bardsley? |
| **DONALDSON** | Yeah, it's a little Arco and right behand there is a little plaza [U/I]… |
| | [voices overlap] |
| **HICKS** | … I remember, I remember, where we were last time. |
| **DONALDSON** | Yes, the very last time. Yes. She, just park in the same spot and I'll give you the money to get that then uh bring it back to me then we are good. |
| **HICKS** | Okay, let me, let me uh grab a shirt on [U/I] then I'm gone. |

88. During this phone call, **DONALDSON** asked **HICKS**, "Dude! [Chuckles] how fast can you get here to get to fucking Tulare and pick up for me? I already talked to her she said it's a go. Same spot, same everything." Based on the prior communication with **FLORES**, I believe that **DONALDSON** was asking **HICKS** to complete the methamphetamine transaction on his (**DONALDSON**'s) behalf. **DONALDSON** and **HICKS** then discuss the spot the transaction is to occur at with **HICKS** stating that he "remembers" based on a prior transaction he (**HICKS**) was at. **DONALDSON** then stated, "I'll give you the money to get that then uh bring it back to me then we are

[22] Phone number 559-410-5774 is subscribed to **HICKS**. The intercepted communications involving the user of phone number 559-410-5774 matched activity observed by surveillance and ultimately resulted in the arrest of **HICKS** with methamphetamine in the amount negotiated during intercepted communications. Based on this information, I believe that **HICKS** is the user of phone number 559-410-5774.

good." Based on these instructions, I believe that **DONALDSON** was to give **HICKS** the drug proceeds to complete the methamphetamine transaction with **FLORES** and then return to the methamphetamine to him (**DONALDSON**) once the transaction was completed. **HICKS** then agreed to conduct the transaction.

89. A series of communications continued to be intercepted during which **DONALDSON** coordinated the methamphetamine transaction between **FLORES** and **HICKS**. During one text message, **DONALDSON** informed **FLORES** that **HICKS** would be driving an "old tan Camry." **FLORES** changed location, directing **DONALDSON** to send **HICKS** to the "apartments." A text message was then intercepted from **DONALDSON** during which he directed **HICKS** to "2698 Bright St, Tulare, CA." This address is in the area of **ORTIZ'** actual residence of 2680 Bright St, Tulare, CA. Therefore, I believe **DONALDSON** was attempting to direct **HICKS** to the area of **ORTIZ'** residence without providing him (**HICKS**) with the actual residence.

90. Based on these intercepted communications, surveillance was conducted at this location via a remote-controlled video surveillance camera in anticipation of the methamphetamine transaction between **FLORES** and **HICKS**. Surveillance subsequently observed a tan Toyota Camry back out of the driveway of **ORTIZ'** residence after **FLORES**' BMW sedan arrived. Although the actual transaction between **FLORES** and **HICKS** was not observed, this vehicle matched the description provided by **DONALDSON** of **HICKS'** vehicle and was followed by surveillance from Tulare, CA, north bound on Highway 99 and then west bound on Highway 198 toward Armona, CA.

91. At approximately 7:21 PM, a phone call was intercepted from **DONALDSON** using Target Telephone 2 to **HICKS** using phone number 559-410-5774. During this phone call, **HICKS** provided his location as "almost to Hanford" which was consistent with surveillance observations of the Camry. Based on this and the above intercepted communications, it was believed that **HICKS** was in possession of methamphetamine destined for **DONALDSON** and a vehicle stop was arranged.

92. At approximately 7:26 PM, Deputy J. Brewster was driving a marked King's County Sheriff's Office patrol vehicle and wearing a KCSO Patrol Deputy uniform, while he was established on the north shoulder of CA-198 in the 5000-block monitoring traffic. Deputy Brewster observed the tan Camry and conducted a traffic stop on the vehicle for speeding. During the stop, **HICKS** was identified

as the driver of the vehicle. Also in the vehicle was an adult female passenger. A search was conducted which resulted in the seizure of approximately two pounds of methamphetamine[23] from under the front passenger seat.

93. Based on the above intercepted communications, surveillance, and seizure, I believe that **DONALDSON** had arranged for a methamphetamine transaction during intercepted communications with **ORTIZ** and **FLORES**. **DONALDSON** then arranged for **HICKS** to meet with **FLORES** to complete the methamphetamine transaction at **ORTIZ'** residence in Tulare, CA. I believe that the two pounds of suspected methamphetamine seized from **HICKS** during the subsequent car stop was from this transaction and was destined for **DONALDSON**.

### J. ORTIZ Distributes Five Pounds of Methamphetamine to Landon JONES and William BOSMA on October 24, 2024

#### 1. Intercepted Communications and Arrest of William BOSMA on October 24, 2023

94. On October 24, 2023, at approximately 4:31 PM, a phone call was intercepted to **ORTIZ** using Target Telephone 3 from Landon **JONES** using phone number 559-308-1122[24]. The following is a transcript of this phone call:

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **ORTIZ** | Hello? |
| **JONES** | Hey? |
| **ORTIZ** | Yes? |
| **JONES** | Can we pick up five from you? |
| **ORTIZ** | Uh, yeah, give like forty-five minutes though. |
| **JONES** | That's cool, that's cool. [Voices overlap] |
| **ORTIZ** | I'm just saying, uh, give me like, I'm just waiting on this guy somewhere real quick, and then I'll call you as soon as I'm on my way back to the house. |
| **JONES** | Yeah, it's cool, it's cool. |
| **ORTIZ** | Ok, it will probably less than that, but. [Voices overlap] |
| **JONES** | Hey, ok, hey, thank you. |

[23] A presumptive test was conducted on the suspected methamphetamine which returned presumptive positive for methamphetamine.

[24] Phone number 559-308-1122 is subscribed to Landon **JONES**. A November 10 2023 money transfer was located to **JONES** during which **JONES** listed phone number 559-308-1122 as his phone number. **JONES** has self-identified as "Landon" during intercepted communications while using phone number 559-308-1122. Based on this information, I believe that **JONES** is the user of phone number 559-308-1122.

| | |
|---|---|
| **ORTIZ** | Yeah, yeah. |
| **JONES** | Mm, by. |
| | **[End of call]** |

95. During this intercepted communication, **JONES** asked **ORTIZ** for a quantity of "five." **ORTIZ** agreed to the transaction but asked **JONES** to wait for forty-five minutes. Although no further description or price was discussed, I believe **JONES** was ordering five pounds of methamphetamine from **ORTIZ**. I make this conclusion based on multiple intercepted communications during which **JONES** and **ORTIZ** discussed multi pound methamphetamine transactions. Furthermore, based on this and subsequent communications described below, surveillance observed the transaction between **ORTIZ** and **JONES** resulting in the seizure of approximately five pounds of methamphetamine. This seizure confirmed that **JONES** was ordering methamphetamine from **ORTIZ** during this communication.

96. Beginning at approximately 5:29 PM, the following text message exchange occurred between **ORTIZ** using Target Telephone 3 and **JONES** using phone number 559-308-1122:

- **ORTIZ**: U can come by
- **JONES**: Ok
- **JONES**: On my way!
- **ORTIZ**: Ok

97. During this text message exchange, **ORTIZ** informed **JONES** that he could "come by", which I believe, combined with their initial intercepted phone call, was a confirmation of their pending transaction. **JONES** confirmed by stating, "On my way!"

98. Based on these intercepted communications, surveillance was conducted at **ORTIZ'** residence of 2680 Bright St, Tulare, CA via a remote-controlled video camera. At approximately 5:49 PM, a black BMW sedan arrived at **ORTIZ'** residence. Surveillance observed **JONES**[25] exit the passenger side of the BMW sedan and enter **ORTIZ'** garage. Minutes later, **JONES** returned to the BMW sedan carrying a brown box where he re-entered the vehicle as the passenger.

99. Surveillance followed the BMW sedan to multiple locations in Tulare and Visalia, CA.

[25] Detectives were familiar with JONES' appearance and identified him through the remote-controlled camera.

Surveillance observed **JONES** exit the BMW sedan at a residence in Tulare. Shortly after, the BMW sedan departed the residence and finally stopped at the Sequoia Lodge in Visalia, CA.

100. Based on the above intercepted communications and observations, an enforcement stop utilizing a marked Visalia Police Department patrol unit was arranged on the BMW sedan. At approximately 7:28 PM, surveillance observed the BMW sedan depart the Sequoia Lodge and followed the vehicle to a shopping center parking lot in the area of Mooney Blvd and Walnut Ave where the vehicle stop was attempted. The driver and sole occupant of the vehicle, subsequently identified as William "Bill" **BOSMA**, failed to yield and led marked units on a short pursuit before disabling his vehicle and fleeing on foot. **BOSMA** was taken into custody in the front yard of a residence near where his vehicle was located. During a subsequent search of the BMW sedan, the cardboard box observed being carried by **JONES** out of **ORTIZ'** residence was located. Inside of this cardboard box was approximately four pounds of methamphetamine. An additional one pound of methamphetamine was located in a plastic bag within the vehicle[26]. The combined weight of the suspected methamphetamine seized from the BMW sedan was approximately five pounds of methamphetamine.

101. On October 25, 2023, at approximately 4:12 PM, a phone call was intercepted to **ORTIZ** using Target Telephone 3 from **JONES** using phone number 559-308-1122. During this phone call, **JONES** informed **ORTIZ** that "Bill got busted" yesterday after leaving **ORTIZ'** residence. **JONES** then clarified stating Bill was arrested after a "high speed" chase in Visalia after **JONES** separated from him (**BOSMA**). Therefore, I believe **JONES** was informing **ORTIZ** about the arrest of **BOSMA** the day prior. Later in the conversation, **ORTIZ** and **JONES** speculated if the "cops" were "watching" them or if there was a wider "investigation." **ORTIZ** and **JONES** discussed how it was "weird" that nothing was being "posted." I know that local law enforcement departments will provide press releases for significant arrests and drug seizures. This was not being done in this investigation which **ORTIZ** and **JONES** found unusual.

102. Based on the above information, I believe that **JONES** ordered five pounds of methamphetamine from **ORTIZ** on October 24, 2023, and was subsequently observed by surveillance

[26] The methamphetamine seized from **BOSMA** was subsequently submitted to the Western Regional Laboratory, tested, and confirmed to be methamphetamine.

receiving the methamphetamine from **ORTIZ'** residence in a cardboard box. I believe that this methamphetamine was then seized during the arrest of **BOSMA** later that day. I believe that **JONES** then informed **ORTIZ** about the arrest of **BOSMA** and both (**ORTIZ** and **JONES**) became concerned that a wider investigation was occurring.

**2. ORTIZ Supplies Methamphetamine to JONES on other Occasions**

103. The above-described methamphetamine transaction was a reoccurring pattern during the wire intercepts conducted during this investigation. During the wire intercepts conducted during this investigation, pertinent drug related communications were intercepted during which **JONES** would order various quantities of methamphetamine from **ORTIZ**. **ORTIZ** would either directly distribute the methamphetamine to **JONES** or would arrange for **JONES** to obtain the methamphetamine from his sister, **FLORES**. Upon the wire intercepts being initiated, **ORTIZ** and **JONES** were in an established criminal relationship. Therefore, several of their transactions only referenced the quantity of methamphetamine to be transacted and the location or method it would be transacted. As established above, **JONES** was known to be a multi pound methamphetamine customer. Therefore, I believe the whole numbers referenced during their intercepted communications referred to pound quantities of methamphetamine. The following table is a summary of the transactions between **ORTIZ** and **JONES** identified during this investigation.

| **Date** | **Quantity** | **Description** |
|---|---|---|
| 10/04/23 | 5 lbs | **JONES** asked for 5 and **ORTIZ** said he would have his sister, **FLORES**, deliver it. |
| 10/12/23 | 5 lbs | **JONES** asked for 3 then increased the quantity to 5. **ORTIZ** met **JONES** on E & Bardsley to conduct the transaction. Surveillance observed this transaction. |
| 10/22/23 | 5 lbs | **JONES** originally has asked for 6 but **ORTIZ** said he only had 5 for **JONES.** Surveillance observed a pickup truck occupied by JONES arrive at ORTIZ' residence of 2680 Bright St, Tulare, CA indicating the transaction occurred at that location. |
| 10/22/23 | 0.5 lbs | **JONES** asked to bring the other half. |
| 12/18/23 | 2 lbs | **JONES** stated he needed two of them. |
| 12/20/23 | 2 lbs | **JONES** orders a quantity of two. **ORTIZ** directed **JONES** to **FLORES** |
| 12/23/23 | 2 lbs | **JONES** orders a quantity of two. **ORTIZ** directed **JONES** to **FLORES** |

104. The table set out above indicates that **ORTIZ** distributed approximately 21 pounds of methamphetamine to **JONES** during this investigation.

**K. ORTIZ Conspires with Arnold Huerta to Distribute Methamphetamine to Jennifer HUERTA**

**1. Distribution of Methamphetamine on December 15, 2023**

105. On December 14, 2023, at approximately 5:05 PM, a phone call was intercepted to **ORTIZ** using Target Telephone 3 from Arnold **HUERTA**[27] using phone number 559-820-3891. The following is a partial transcript of this phone call.

| NAME | **TRANSCRIPTION** |
|---|---|
| | **[Beginning of call]** |
| **A. HUERTA** | Hello? What's up, what's up… |
| | [Voices overlap] |
| **ORTIZ** | Aye, what up buddy? |
| **A. HUERTA** | …how you doin'? |
| **ORTIZ** | Good, good. Aye, my, my uh other people finally, finally fucking… |
| | [Voices overlap] |
| **A. HUERTA** | Oh, they did? |
| **ORTIZ** | …made it, uh… fuck, so I, I could do the two for uh… seventeen for you… |
| | [Voices overlap] |
| **A. HUERTA** | Okay, yeah. |
| **ORTIZ** | …whenever you need them. I also, I also got the same one's I gave you too but I got… |
| | [Voices overlap] |
| **A. HUERTA** | Oh, oh, oh okay… |

106. During this phone call, **ORTIZ** informed **A. HUERTA**, "I could do the two for uh…

[27] During intercepted communications, the user of phone number 559-820-3891 self-identified using the moniker, "Juice." The Visalia Police Department (VPD) has contact history with Arnold **HUERTA** and his moniker is listed as "Juice". On **A. HUERTA**'s California Driver's License, **A. HUERTA**'s address is listed as 2344 W. Walnut Ave, Visalia, CA. VPD Detective Jeff Dowling, who is assigned to this investigation, has had previous contact with **A. HUERTA** at 2344 W. Walnut Ave, Visalia, CA the latest being on January 6, 2020. During that contact, **A. HUERTA** self-identified with the moniker of "Juice". Based on previous contacts with **A. HUERTA**, Det. Dowling was able to listen to several intercepted communications with the user of phone number 559-820-3891 and confirmed the voice of the user of this phone is consistent with **A. HUERTA**'s voice. Based on this information, **A. HUERTA** was identified as the user of phone number 559-820-3891.

seventeen for you." I know, based on my training, experience, and knowledge of this investigation, that **ORTIZ** was selling pound quantities of methamphetamine for between $800 and $1,000. Therefore, the price quoted by **ORTIZ**, which would be a unit price of $850 per pound of methamphetamine, was consistent with the current illicit price of a pound of methamphetamine. Therefore, I concluded that **ORTIZ** was quoting **A. HUERTA** a price of $1,700 for two pounds of methamphetamine, or $850 per pound of methamphetamine. **A. HUERTA** agreed to the price by stating, "Okay, yeah." Based on this intercepted communication, I believe that **A. HUERTA** was purchasing pound quantities of methamphetamine from **ORTIZ**.

107. On December 15, 2023, at approximately 7:55 PM, a phone call was intercepted from **ORTIZ** using Target Telephone 3 to **A. HUERTA** using phone number 559-820-3891. The following is a transcript of this phone call.

| NAME | **TRANSCRIPTION** |
|---|---|
| | **[Beginning of call]** |
| **A. HUERTA** | [U/I] what are you doing? |
| **ORTIZ** | Nothing, just here about to go grab some food. |
| **A. HUERTA** | Oh, uhm, do, do, do, do you think I can send my sister? Just for one right now [U/I]. |
| **ORTIZ** | Yeah. |
| **A. HUERTA** | I'm, I'm, I'm, I'mma [PH] send the hundred bucks for you. |
| **ORTIZ** | Okay, uhm, tell her she, she can meet me at Me-N-Eds in Tulare. |
| **A. HUERTA** | [U/I] |
| **ORTIZ** | It's right across the, across the street from Wal-Mart. |
| **A. HUERTA** | Okay, perfect. She should go that way [U/I] right now. All right. |
| **ORTIZ** | All right. |
| | [End of call] |

108. During this phone call, **A. HUERTA** asked if he could send his "sister" for a quantity of "one." Based on my training, experience, and the established criminal relationship described above, I believe **A. HUERTA** was ordering one pound of methamphetamine from **ORTIZ** which his sister would obtain on his (**A. HUERTA**'s) behalf. **ORTIZ** agreed to the methamphetamine transaction by stating "yeah." The reference to "the hundred bucks" was likely a debt owed by **A. HUERTA** to **ORTIZ** and not full payment for the pound of methamphetamine. **ORTIZ** and **A. HUERTA** then discussed where to conduct the transaction with **ORTIZ** asking to meet at the "Me-N-Eds in Tulare." **A. HUERTA** agreed and stated, "She should go that way [U/I] right now", indicating his sister would be traveling to meet **ORTIZ** to conduct the methamphetamine transaction.

109. At approximately 8:03 PM and based on this intercepted communication, surveillance

responded to Me-N-Eds located in Tulare CA in an attempt to observe the methamphetamine transaction between **ORTIZ** and **A. HUERTA**'s sister. Surveillance observed a white colored Chevrolet sedan, bearing California plate CURLS85, parked in front of Me-N-Eds Pizza. This vehicle is registered to Lorraine **RENTERIA**. **RENTERIA** has been identified on multiple occasions during this investigation as the driver of this vehicle and, based on intercepted communications, is in a romantic relationship with **ORTIZ**. Surveillance subsequently observed a white Chrysler 300 sedan, bearing California license plate 7YOL999, which is registered to Elizabeth **HUERTA**, arrive and park next to **RENTERIA**'s Chevrolet sedan. Surveillance observed **ORTIZ**[28] exit the restaurant, leaving **RENTERIA** inside the restaurant, retrieve a large plastic bag from **RENTERIA**'s Chevrolet sedan, and hand it to the female in the driver's seat of white Chrysler 300 sedan. After this transaction, surveillance followed the white Chrysler 300 to 2344 W. Walnut Ave, Visalia CA, where surveillance observed the female exit the Chrysler 300 with the bag she obtained from **ORTIZ** and walk into the residence using the front door, which appeared to be unlocked. Surveillance observed that the female resembled the registered owner of the Chrysler 300, Elizabeth **HUERTA**. The Chrysler 300 did not make any stops between the transaction with **ORTIZ** and arriving at 2344 W. Walnut Ave, Visalia, CA.

110. Based on the above intercepted communications and surveillance, I believe that **A. HUERTA** had arranged for his sister to meet with **ORTIZ** at the Me-N-Ed's in Tulare, CA to purchase a pound of methamphetamine. I believe that **ORTIZ** supplied the methamphetamine to **A. HUERTA**'s sister who returned the methamphetamine to **A. HUERTA**'s known residence of 2344 W. Walnut Ave, Visalia, CA.

2. **Distribution of Methamphetamine on December 18, 2023**

111. On December 18, 2023, at approximately 8:30 PM, a phone call was intercepted to **ORTIZ** using Target Telephone 3 from **A. HUERTA** using phone number 559-820-3891. The following is a transcript of this phone call.

| NAME | **TRANSCRIPTION** |
|---|---|
| | **[Beginning of call]** |

[28] Alfonso **ORTIZ** is a primary target of this investigation and his CA driver's license photograph has been viewed on multiple occasions by law enforcement personnel assigned to this investigation. Alfonso **ORTIZ** has also been observed during multiple surveillances conducted throughout this investigation. Based on this basis of information, surveillance identified **ORTIZ** as the individual exiting the restaurant.

| | |
|---|---|
| **A. HUERTA** | Hello? What up, what we doing? |
| **ORTIZ** | Hey what up? |
| **A. HUERTA** | Laying down already? |
| **ORTIZ** | Just kicking back. |
| **A. HUERTA** | Oh shit. |
| **ORTIZ** | No. |
| **A. HUERTA** | Yeah. Yeah he… |
| | [Voices overlap] |
| **ORTIZ** | …no, no what's cracking? |
| **A. HUERTA** | … [U/I] that way, uh, same… |
| | [Voices overlap] |
| **ORTIZ** | … Yeah what you need? |
| **A. HUERTA** | … thing just 1 (one) for him. Uh, tomorrow I'll, I'll get the 2 (two) [U/I] |
| **ORTIZ** | All right yeah no worries. Um, yeah, yeah tell your cousin to swing by. |
| **A. HUERTA** | All right laters. |
| **ORTIZ** | All right man. |
| | [End of call] |

112. During this phone call, **A. HUERTA** indicated he needed the "same…thing just 1 (one) for him." Based on my training, experience, and their established criminal relationship, I believe that **A. HUERTA** was again ordering one pound of methamphetamine from **ORTIZ**. **ORTIZ** agreed to the transaction by stating "yeah no worries." **ORTIZ** then told **A. HUERTA** to have his "cousin" swing by. I believe that **ORTIZ** was mistaking **A. HUERTA**'s sister for a cousin. This is because **A. HUERTA** consistently sent his sister to meet with **ORTIZ** to conduct the methamphetamine transactions.

113. Approximately one minute after this phone call, a phone call was intercepted from **ORTIZ** using Target Telephone 3 to **A. HUERTA** using phone number 559-820-3891. During this phone call, **ORTIZ** directed **A. HUERTA**'s sister to his residence by stating, "Okay, all right. Fuck it nah, just come to my pad then." Based on this intercepted communication, surveillance was conducted at **ORTIZ'** residence in anticipation of the pending methamphetamine transaction between **ORTIZ** and **A. HUERTA**'s sister.

114. The following text messages were intercepted between **ORTIZ** using Target Telephone 3 and **A. HUERTA** using phone number 559-820-3891 to coordinate the pending methamphetamine transaction.

- **A. HUERTA**: She on her way
- **ORTIZ**: K my pad
- **A. HUERTA**: She in a truck.

115. Based on these intercepted texts, I believe that **ORTIZ** was directing **A. HUERTA**'s sister to his residence at 2680 W. Bright St, Tulare CA in order to conduct the methamphetamine transaction. In response, **A. HUERTA** was informing **ORTIZ** that his sister would be in a "truck."

116. At approximately 9:13 PM, surveillance observed a burgundy single cab Dodge Ram pickup truck arrive at **ORTIZ**'s residence. Utilizing a remote-controlled surveillance video camera, **ORTIZ** was observed exiting his garage and walked up to the driver's side of the Dodge Ram but, due to the low light conditions, surveillance was unable to see if anything was exchanged. **ORTIZ** was then observed by surveillance walking away from the truck and toward his residence. Due to the above-described communications, the observations made by surveillance, and based on my training and experience, I believe **ORTIZ** conducted a methamphetamine transaction with the female driver of the Dodge Ram. Surveillance followed the Dodge Ram from Bright St to 2344 W. Walnut Ave, Visalia, CA, **A. HUERTA**'s residence. A female exited the Dodge Ram and walked in the front door of the residence with a plastic grocery bag in her hand. I believe this observation was consistent with **A. HUERTA**'s sister obtaining the methamphetamine from **ORTIZ**, transporting the methamphetamine to 2344 W. Walnut Ave, Visalia, CA, and entering the residence with the methamphetamine.

**3. Distribution of one Pound of Methamphetamine on December 29, 2023 and Arrest of Jennifer HUERTA**

117. On December 29, 2023, beginning at approximately 5:05 PM, the following text message exchange was intercepted between **ORTIZ** using Target Telephone 3 and **A. HUERTA** using phone number 559-820-3891.

- **A. HUERTA**: Can my sis meet up
- **ORTIZ**: Yea how meaoy
- **A. HUERTA**: Just one for rite now we're does she go
- **ORTIZ**: my pad

118. During this text message exchange, **A. HUERTA** again asked if his "sis", or sister, could meet with **ORTIZ** for "one", which I believe is a reference to one pound of methamphetamine based on prior intercepted communications and transactions. **ORTIZ** directed **A. HUERTA**'s sister to his residence by stating, "my pad."

119. At approximately 6:23 PM, a phone call was intercepted to **ORTIZ** using TT3 from **A. HUERTA** using phone number 559-820-3891. During this phone call, **A. HUERTA** stated "she" was two minutes away and **ORTIZ** agreed. Based on the prior intercepted communications, I believe that **HUERTA** was informing **ORTIZ** that his sister was two minutes away from **ORTIZ**' residence to conduct the one-pound methamphetamine transaction.

120. Surveillance was again initiated in the area of **ORTIZ'** residence of 2680 Bright St, Tulare, CA in anticipation of a transaction. At approximately 6:28 PM, surveillance observed the white Chrysler 300 pull into **ORTIZ**'s driveway. As previously described, this is the same vehicle **ORTIZ** met with during the December 14, 2023 methamphetamine transaction at the Me-N-Eds restaurant in Tulare, CA. Utilizing a remote-controlled surveillance video camera, surveillance observed **ORTIZ** walking to the driver's side of the Chrysler 300 and then walk away. The Chrysler 300 then exited **ORTIZ**'s driveway and was followed by surveillance into Visalia, CA. Based on the above intercepted communications and observations, I believe that **A. HUERTA**'s sister occupied the white Chrysler 300 and was in possession of a pound of methamphetamine which she had obtained from **ORTIZ** on **A. HUERTA**'s behalf.

121. At approximately 6:43 PM, VPD Officer E. Gonzales conducted a stop on the Chrysler 300 in the 4000 block of south Mooney Blvd. The driver and sole occupant of the vehicle was identified as Jennifer **HUERTA**. A vehicle search was conducted and approximately one pound of methamphetamine[29] was located on the front passenger floorboard of the vehicle.

122. Based on the above intercepted communications, surveillance, and seizure, I believe that Jennifer **HUERTA** had obtained the one pound of suspected methamphetamine from **ORTIZ** at 2680 Bright Street, Tulare, CA, and was transporting the methamphetamine when she was stopped and arrested by the Visalia Police Department.

**L. <u>A. HUERTA Illegally Possesses Firearms and Ammunition on January 4, 2024</u>**

123. On December 30, 2023, beginning at approximately 12:45 pm, the following series of

[29] This methamphetamine was submitted to the Western Regional Laboratory, tested, and confirmed to be methamphetamine.

text messages were intercepted between Francisco **GARCIA** using Target Telephone 6[30] and Arnold **HUERTA** using phone number 559-668-5203[31].

- **A. HUERTA**: My boy it's juice
- **A. HUERTA**: Shit chilling my boy i got a strap bad ass one it's a nine compact with extended clip I got brand new 5 tool set of Dewalt drills n the box if Ur intere
- **A. HUERTA**: I'll take work for it
- **GARCIA**: OK what Brand is it
- **A. HUERTA**: Let me send u some Pic
- **A. HUERTA**: My boy

124. This last text message from **A. HUERTA** occurred at 10:18 PM. Beginning at 10:19 PM and the next intercepted communication on Target Telephone 6 were a series of MMS messages from phone number 559-423-7919 which depicted two handguns[32]. Phone number 559-423-7919 is an internet-based phone number, not serviced by a traditional cell phone company. I know, based on my training and experience, that such phone numbers can be used to transmit photo messages. Based on these MMS messages occurring immediately after **A. HUERTA**'s message stating, "My boy" and was in the same stream of communication during which **A. HUERTA** stated he was going to send **GARCIA** photographs of the firearms, I believe that the MMS messages also originated from **A. HUERTA**.

125. Based on my training and experience, the firearm in the photo appeared to be a manufactured firearm, which is commonly referred to as a "P80". A "P80" is a polymer frame that can be purchased legally and is 80 percent complete and requires someone to drill out the remaining 20 percent, making it an illegal firearm. Based on this information and the intercepted communications, I

---

[30] *See infra* fn. 48.

[31] I believe that the user of phone number 559-668-5203 was HUERTA because the user self identifies as "Juice", **A. HUERTA**'s known alias. Furthermore, and as will be further described, HEURTA's conversation with **GARCIA** indicates he is attempting to obtain methamphetamine which is consistent with his known role within this drug trafficking organization. Furthermore, **A. HUERTA**'s criminal history includes the illegal possession of firearms which is consistent with him illegally possessing firearms in the subsequently described communications. Lastly, it is likely that **A. HUERTA** would have changed his phone number after the arrest of Jennifer **HUERTA** to attempt to protect himself from identification.

[32] The wire intercept showed telephone company generated call records between **A. HUERTA**'s last text message and the beginning of the MMS messages. However, these telephone company generated messages do not represent actual communications.

believe that **A. HUERTA** was offering to sell **GARCIA** two firearms which he illegally possessed. Furthermore, I believe that **A. HUERTA**'s statement of "I'll take work for it", was a reference to a willingness to take drugs in exchange for the firearms.

126. A search warrant was sought for **A. HUERTA's** residence in Tulare County. On January 3, 2024, the Honorable Kerri Gilmore, Superior Court Judge for Tulare County, signed a search warrant for this residence. On January 4, 2024, this search warrant was executed by the VPD. At the time the search was executed, **A. HUERTA** was present at the residence along with three additional adults. One of the adults identified herself as **A. HUERTA**'s girlfriend. During a post Miranda statement, **A. HUERTA** identified his bedroom as the south/east bedroom and stated there may be methamphetamine in the bedroom. **A. HUERTA** denied having any firearms or ammunition. **A. HUERTA** admitted to previously being in possession of a firearm which he sold. **A. HUERTA** also admitted to concealing a small amount of methamphetamine in his anal cavity which was subsequently recovered as evidence.

127. In a north/west bedroom, officers located a P80 silver and black firearm loaded with six live rounds in a magazine and an additional ten RP Luger brand 9 mm rounds in a Ziplock bag. The firearm and ammunition were located in a black case on a TV stand in the room. The firearm seized matched the photograph captured during the intercepted communications between **A. HUERTA** and Francisco **GARCIA** on December 30, 2023. Officers also located a notebook with the name "Juice", **A. HUERTA**'s known moniker, on the cover in this room. **A. HUERTA**'s girlfriend was interviewed regarding the purpose and access of the north/west bedroom where the firearm and ammunition were located. **A. HUERTA**'s girlfriend stated the room was primarily being used for storage and that **A. HUERTA** keeps his tools in the closet of this bedroom. She also stated that she keeps coloring books in the closet of this bedroom. She further stated that she and **A. HUERTA** moved the TV stand into the room the night prior to the search. However, she denied knowledge of the black case where the firearm and ammunition were located. Based on this information, I believe that the firearm and ammunition located belonged to **A. HUERTA**. **A. HUERTA** has several felony convictions[33] and is prohibited from possessing firearms or ammunition. Also seized during this search warrant were two cell phones, one

[33] In 2018, HUERTA was convicted of possession of a controlled substance for sale in Tulare County, California, and sentenced to 2 years imprisonment.

form **A. HUERTA**'s person and the other from **A. HUERTA**'s bedroom, which were confirmed to be phone numbers 559-820-3891 and 559-668-5203[34]. As described above these phone numbers were used to contact **ORTIZ** and **GARCIA** as described above.

128. An agent with ATF reviewed the RP Luger brand ammunition and determined that it is not manufactured in the state of California.

### M. <u>Anthony OCHOA Transports 21 Pounds of Methamphetamine on December 16, 2023</u>

129. Communications were intercepted between **ORTIZ** using Target Telephone 4 and Yerlly **VEGA** using phone number 559-818-6591. **VEGA** was identified as the user of this phone number because he self-identified as "**VEGA**" during intercepted phone calls and he was subsequently arrested while in possession of this phone on December 20, 2023. On December 14, 2023, communications were intercepted indicating **VEGA** was directing a third party to travel to **ORTIZ'** residence with a shipment of drugs. Surveillance was conducted on **ORTIZ**' residence of 2680 Bright St, Tulare, CA and observed a white Nissan Altima with California plate 9FJF390 arrive and back into **ORTIZ**' garage. This vehicle is registered to Yerlly Maldonado **VEGA**. **OCHOA**[35] was observed by surveillance exiting the vehicle and entering **ORTIZ**' garage. At approximately 4:50 PM, **OCHOA** returned to the Nissan Altima and departed **ORTIZ**' residence. Surveillance followed **OCHOA** to **VEGA**'s known residence at the time of these communications[36].

130. On December 16, 2023, at approximately 10:50 AM, a phone call was intercepted to **ORTIZ** using **Target Telephone 4** from **VEGA**, using phone number 559-818-6591. The following is a transcript of this phone call.

---

[34] The two phones were confirmed to be phone numbers 559-820-3891 and 559-668-5203 by a VPD Detective familiar with this investigation calling each number and observing the seized phones ring and display the detectives phone number as the calling number.

[35] At the time of this surveillance, **OCHOA**'s identity had not been established. However, **OCHOA** was subsequently fully identified during his arrest on December 16, 2023 and his CA driver's license photograph obtained. I reviewed the surveillance video and photos from this December 14, 2023 delivery to **OCHOA**'s CA DMV photo and confirmed they were of the same person, **OCHOA**.

[36] **VEGA**'s 2020 Dodge Charger was being monitored via a GPS tracking device installed on the vehicle. While monitoring this device, **VEGA**'s vehicle has been observed parked at 12939 Tactacan overnight. Additionally, while conducting physical surveillance at 12939 Tactacan, investigators have seen **VEGA** at this address frequently. Based on all of this, I believe that 12939 Tactacan is **VEGA**'s residence.

| NAME | TRANSCRIPTION |
| --- | --- |
| | **[Beginning of call]** |
| **ORTIZ** | Hello? |
| **VEGA** | Hey, what's up Forty, it's me **VEGA**. Hey, how you doing boss? |
| **ORTIZ** | Good, good, what's cracking? |
| **VEGA** | Ah, not much, chilling, um, Beto just called me, he said your looking for some Nike? I, I…[Voices overlap] |
| **ORTIZ** | Yeah. |
| **VEGA** | I have five of them, man, but fucking, the last two the uh, people came with cash money and cashed me out right there and then I should get more on Monday. I'm [U/I] sorry about that boss. Yeah, my, my bad man. |
| **ORTIZ** | I've been calling this fool for like three days bro. |
| **VEGA** | Really? [Laughs] |
| **ORTIZ** | Fucking playing around and shit. |
| **VEGA** | Yeah, sorry about that, yeah, but Monday, Monday I'm sending my cousin back down. Uh… |
| **ORTIZ** | Alright. |
| **VEGA** | Get some more and shit. Um, but, um, what do you call it, your, your, your, your delivery, your, your package should be coming up pretty soon. My cousin's about an hour away, hour, hour and a half. |
| **ORTIZ** | Oh fuck, alright, let me know, cause I'm fucking, damn, alright. |
| **VEGA** | Alright, cool [U/I] thank you. [Voices overlap] |
| **ORTIZ** | I got a lot of shit going on this morning, but fucking just keep me posted. [Voices overlap] |
| **VEGA** | Yeah, for sure, for sure, yeah, sorry about that, and next time I get Nike, I will let you know man. |
| **ORTIZ** | Alright. |
| **VEGA** | For sure. Alright player, take of, take, take it easy. |
| | **[End of call]** |

131. During this phone call, **VEGA** again self-identifies and refers to the user of **Target Telephone 4** as "Forty", **ORTIZ'** known alias. **VEGA** stated that "Beto" had just "called" informing **VEGA** that **ORTIZ** was looking for some "Nike." The term Nike has been captured during multiple intercepted calls involving **VEGA**, **ORTIZ**, as well as **BETO** who is believed to be **Alberto ALVARADO**. During intercepted phone communications, **ALVARADO** described "Nike" as "powder" and a "brick." Based on my training and experience, I recognized both terms to refer to cocaine. This is because cocaine often has the consistency of powder and is commonly transacted in kilogram shaped bricks. Furthermore, I know that kilograms of cocaine are often stamped with popular company logos. I am aware of kilograms of cocaine stamped with the Nike company logo seized during other unrelated investigations. **VEGA** indicated that he was out of "Nike", or cocaine, and transacting the last "two", and should have more by "Monday", a reference to December 18, 2023. Regarding obtaining more cocaine, **VEGA** stated, "I'm sending my cousin back down." I believe **VEGA** was again

referencing **OCHOA** transporting drugs at his (**VEGA**'s) direction. **VEGA** then references a pending "delivery" to **ORTIZ** stating, "your, your package should be coming up pretty soon. My cousin's about an hour away, hour, hour and a half." This delivery surprised **ORTIZ** who stammers and instructs **VEGA** to keep him "posted" regarding the pending delivery. **VEGA** agreed and stated he would inform **ORTIZ** about the status of the "Nike", or cocaine.

132. The driveway of **ORTIZ**' residence was being monitored via a remote-controlled video surveillance camera which showed the following. At approximately 11:07 AM, the white Nissan Altima was observed backing up into the driveway leading to **ORTIZ**' residence of 2680 W Bright, Tulare, CA. As described above, this same activity was observed when **OCHOA** delivered methamphetamine to **ORTIZ** on December 14, 2023. At approximately 11:27 AM, the vehicle exited from **ORTIZ'** driveway. Minutes later, surveillance was conducted in the area of **ORTIZ**' residence in an attempt to locate the Nissan Altima. Surveillance located the vehicle parked, occupied by an individual later identified as **OCHOA**, approximately 250 yards west of **ORTIZ**'s residence.

133. **OCHOA** subsequently drove the vehicle northbound Highway 99. While driving Northbound Highway 99 near Avenue 280, TCSO Det. Matthew Morales observed the vehicle driving in excess of the posted speed limit of 70 miles per hour in violation of California Vehicle Code 22356(b). Det. M. Morales conducted a traffic enforcement stop on the Nissan Altima. Initially **OCHOA** did not yield but subsequently stopped the Nissan Altima near Plaza Drive and Hillsdale Court, in Visalia, CA.

134. Det. M. Morales contacted the driver of the vehicle who was identified as **OCHOA** from a California DMV Identification Card. **OCHOA** informed Det. M. Morales he did not have a valid driver license. Det. M. Morales later conducted a record check for **OCHOA**'s license status which returned suspended/revoked. In addition, **OCHOA** was found to be in possession of approximately 5 grams of suspected methamphetamine in his pant pocket. A search of **OCHOA's** car was executed and approximately 21 pounds of suspected methamphetamine[37] was located in the trunk of the vehicle.

135. Based on the above intercepted communication, surveillance, arrest, and search, I believe

[37] A presumptive test was conducted on the seized methamphetamine which returned presumptive positive for the presence of methamphetamine.

that **ORTIZ** utilized **Target Telephone 4** to negotiate a future cocaine transaction with **VEGA**. I believe that the "delivery" and "package" referenced by **VEGA** during the intercepted communication with **ORTIZ** was another shipment of methamphetamine which was again delivered by **OCHOA** in the Nissan Altima. I further believe that the methamphetamine in **OCHOA**'s vehicle belonged to this DFTO and, as will be described during further intercepted communications, ultimately belonged to **ALVARADO**, who referenced the seizure during a future intercepted communication.

**N. <u>Anthony OCHOA and Yerlly VEGA Transport Methamphetamine on December 20, 2023</u>**

**1. Arrest of Yerlly VEGA on December 20, 2023 while Transporting 30 Pounds of Methamphetamine.**

136. On December 20, 2023, a series of phone calls were intercepted between Alberto **ALVARADO** using Target Telephone 8[38] and a co-conspirator regarding a pending methamphetamine

---

[38] The following is an excerpt from the affidavit in support of Wire Intercept 1:24-SW-0036-JLT which describes the evidence obtained to date identifying the user of phone number 559-333-0004 (Target Telephone 8) and 559-216-2470 (Target Telephone 11) to Alberto **ALVARADO**.

*"During this investigation, a debriefing was conducted with a confidential source, hereafter referred to as CS4, who provided information on the drug trafficking activities of "**BETO**" a methamphetamine source of supply in Mexico who utilizes both US and Mexico phone numbers. CS4 identified **BETO's** phone numbers as 559-333-0004 (**Target Telephone 8**) and phone number 559-216-2470 During a review of a 2022 DEA Stockton Resident Office (SRO) investigation which resulted in the indictment of several co-conspirators, to include **ALVARADO**, phone numbers 559-854-2760 and 559-382-4544 were identified as possibly phone numbers used by **ALVARADO**. A review of subscriber records collected during the SRO investigation revealed that phone number 559-382-4544 has the same unique subscriber name of "OOOOO OOOOO" as **Target Telephone 8**. The address of "2128 N Mooney Blvd, Visalia, CA 93291-2443" is the subscriber address of record for both phone number 559-382-4544 and **Target Telephone 8**. Likewise, a review of the subscriber record for phone number 559-854-2760 revealed this phone has the same unique subscriber name of "OOOOO OOOOO" as phone number 559-216-2470. The address of 2244 E Mooney, Visalia, CA 93277-2202" is the subscriber address of record for both phone number 559-854-2760 and phone number 559-216-2470 (*Target Telephone 11) . *Although fictitious, these unique subscriber records between phones identified during the SRO investigation being the same as **Target Telephone 8** and phone number 559-216-2470 identified during this investigation indicates **ALVARADO** changed phone numbers from 559-382-4544 and 559-854-2760 to **Target Telephone 8** and phone number 559-216-2470 **Target Telephone 11**.*

***Target Telephone 8** and **Target Telephone 11** were intercepted during Wire Intercepts 1:23-SW-00292-JLT and 1:23-SW-00299-JLT. A comparison of the voice of the individuals using both phones by agents and monitors assigned to this investigation was conducted and this analysis confirmed both phones are being used by the same person, believed to be **ALVARADO**.*

*During the SRO investigation, an administrative subpoena was issued to PG&E for utility records for 40272 Road 130, Cutler, CA. This address is the listed address on **ALVARADO**'s California driver's license record. **ALVARADO** is also associated with this address through the CLEAR database, a law enforcement database which associated individuals to addresses and phone numbers through public records such as credit reports and court records. During a real property search, **ALVARADO** is listed as the buyer of this property. The administrative subpoena results from PG&E indicated utilities were subscribed to Maria **ALVARADO** with a listed phone number of 559-528-4335. Due to her date of birth being February 22, 1946, compared to **ALVARADO**'s date of birth of April 3, 1970, Maria **ALVARADO** is believed to be **ALVARADO**'s mother. This information was corroborated on December 14, 2023 when a phone call was intercepted between **ALVARADO** using **Target Telephone 8** and an individual believed to be Maria **ALVARADO** using phone number 559-528-4335. During this phone call, **ALVARADO** referred to Maria **ALVARADO** as his mother and Maria **ALVARADO***

shipment. This phone call occurred in Spanish and the following is an English translation[39].

| NAME | **TRANSLATION** |
|---|---|
| | **[Beginning of call]** |
| **ALVARADO** | Hello? |
| CO-CONSPIRATOR | What's up? |
| **ALVARADO** | Just here, what's up? |
| CO-CONSPIRATOR | How are we doing with the "waters"? |
| **ALVARADO** | **VEGA** is on the, on the way down there to get them. He'll get them right now in half an hour and then they'll drive. They'll be at the house in the evening. I'll call you. |
| CO-CONSPIRATOR | All right, then. So around six (6:00), seven (7:00)? |
| **ALVARADO** | I think so, but they're going to pick it up around two (2:00)… Yeah, they'll be at the house by six (6:00), six-thirty (6:30). I'll tell **VEGA** to call you at this number. |
| CO-CONSPIRATOR | All right, then. If not, I'll call you back around eight (8:00) or nine (9:00), if you don't call me back. |
| **ALVARADO** | Perfect. That way you can meet in the evening like last time, that's perfect. |
| CO-CONSPIRATOR | All right, then. |
| **ALVARADO** | I'll call you. |
| CO-CONSPIRATOR | Bye, bye. |
| **ALVARADO** | Bye. |
| | **[End of call]** |

137. During this intercepted communication, the co-conspirator inquired about the "waters." Based on the co-conspirator's role in this DFTO as a known drug customer being supplied by **ALVARADO**, I believe the co-conspirator was using the term as a code word for methamphetamine. Furthermore, the above reference to "waters" being methamphetamine was confirmed based on a subsequent seizure of approximately 30 pounds of suspected methamphetamine on December 20, 2023, associated with this intercepted communication. **ALVARADO** responded that "**VEGA** is on the, on the way down there to get them." Based on prior intercepted communications, I knew that "**VEGA**" was a reference to Yerlly **VEGA**, who at the time of this communication was known to transport and distribute methamphetamine on behalf of **ALVARADO**. During the remainder of the intercepted communication, **ALVARADO** and the co-conspirator discussed when co-conspirator was to meet **VEGA** upon his

*referred to **ALVARADO** as her son. This information further indicated the user of **Target Telephone 8** is being used by **ALVARADO**. 134. Lately, **ALVARADO**'s CLEAR record lists one of his aliases as "**BETO**", the name he was consistently referred to during this investigation as well as intercepted communications. Based on this information, I believe that that the user of **Target Telephone 8** and **Target Telephone 11** is **ALVARADO**."*

[39] During this investigation, investigators were assisted by bilingual (English and Spanish) civilian monitors who assisted in listening and reviewing interceptions that occurred in Spanish. The monitors prepared transcripts of these interpretations. In this affidavit, if an intercepted communication occurred in Spanish, the resulting transcript will be labeled as a Translation.

(**VEGA**'s) return. The co-conspirator indicated he could meet **VEGA** around 8:00 PM and 9:00 PM to which **ALVARADO** responded, "Perfect. That way you can meet in the evening like last time, that's perfect."

138. Based on the above intercepted communications, I believed that **VEGA** was actively involved in transporting methamphetamine on **ALVARADO**'s behalf. However, **VEGA**'s exact location was unknown. In an attempt to identify **VEGA**'s location, a search of a plate reader program was conducted for vehicles frequently observed during surveillance at **VEGA**'s identified residence on Tactacan Ave, Orosi, CA. This included searching for a light gray Chevrolet sedan with California license plate 9GJY311, previously observed parked at the Tactacan address. The plate reader program revealed that this vehicle was captured by the Corona Police Department at approximately 12:36 PM on December 20, 2023. I believed this result was significant because of **ALVARADO**'s statement that **VEGA** was "on the way down there to get them." I believed that this vehicle being in the Los Angeles, CA area less than an hour prior to the phone call between **ALVARADO** and the co-conspirator indicated the Chevrolet sedan may be actively used to transport methamphetamine.

139. To assist in identifying the location of **VEGA**, precise location search warrant 1:23-sw-00311-EPG[40] was activated on December 20, 2023, for phone numbers 559-818-6591 and 559-590-4675, identified during this investigation as being used by **VEGA**. Precise location information received from phone number 559-590-4675 was accurate enough to determine the phone's location and placed the user of the phone on Interstate 5, between Burbank, CA and San Fernando, CA. Additional precise location information from phone number 559-590-4675 indicated the phone was traveling north bound on Interstate 5 toward the Central Valley.

140. Associated with the above information, vehicle tracker information[41] was being obtained from a Dodge Charger with California license plate #8ZWR065, identified as being used by **VEGA**, which indicated the vehicle began to travel south bound on Highway 99 and then Interstate 5. Precise

[40] On December 19, 2023, the Honorable Erica P. Grosjean, US Magistrate Judge for the Eastern District of California, signed Search Warrant 1:23-sw-00311-EPG authorizing the collection of precise location information for phone numbers 559-818-6591 and 559-590-4675.

[41] On December 12, 2023, the Honorable Ricky Tripp, Superior Court Judge for Tulare County, signed a court order authorizing the installation and monitoring of vehicle tracking devices on multiple vehicles to include **VEGA**'s maroon Dodge Charger with California license plate #8ZWR065.

location results from phone number 559-818-6591 indicated the phone was traveling in concert with vehicle tracker results from the Dodge Charger.

141. Surveillance was able to determine that the Chevrolet sedan and the Dodge Charger converged at the Tejon Outlets located off of the Laval Rd exit on Interstate 5, south of Bakersfield, CA. At this location, surveillance made the following observations. At approximately 9:08 PM, surveillance located **VEGA** and Anthony **OCHOA** together in a store at the Tejon Outlets. Both were identified based on their previously viewed California Driver's license or recent booking photographs. From the store, surveillance observed **VEGA** and **OCHOA** enter the Dodge Charger which drove to where the Chevrolet sedan was parked. The vehicles parked trunk to trunk. Surveillance observed **OCHOA** move a large cardboard box from the Chevrolet sedan to the Dodge Charger. **OCHOA** then entered as the driver and sole passenger of the Chevrolet sedan and **VEGA** entered as the driver and sole occupant of the Dodge Charger. Both vehicles then departed the Tejon Outlets traveling in tandem, northbound Interstate 5 toward Bakersfield, CA.

142. While the above information was being observed and received, communications continued to be intercepted between **ALVARADO** using Target Telephone 8 and the co-conspirator indicating the methamphetamine shipment was still in transit.

143. Based on the intercepted communications, precise location information, vehicle tracker information, and surveillance, I believed that the vehicles being utilized by **VEGA** and **OCHOA** contained controlled substances and vehicle stops were arranged on both vehicles. The first vehicle stop occurred on **OCHOA** operating the Chevrolet sedan. During this stop, it was determined that **OCHOA** did not have a valid driver's license and the vehicle was searched with negative results and towed. It should be noted that precise location results from phone number 559-590-4675 remained in the area of the stop of **OCHOA** as **VEGA** continued north bound on Highway 99 toward Bakersfield, CA. As a result, I believe that **OCHOA** was using phone number 559-590-4675 on December 20, 2023.

144. Surveillance was maintained on **VEGA** driving the Dodge Charger. A vehicle stop was arranged on this Dodge Charger as it traveled into Tulare County, exited Highway 99. At approximately 10:42 AM, the Dodge Charger was stopped by a Tulare County Sheriff's Office marked unit on Road 152, south of Avenue 224. The Dodge Charger was then searched resulting in the seizure of

approximately 30 pounds of methamphetamine[42] in a cardboard box located in the trunk of the vehicle. The precise location results being obtained from phone number 559-818-6591 remained in the area of the stop of **VEGA** confirming he was the user of this phone on December 20, 2023.

145. Based on the above information, I believe that the box transferred by **OCHOA** from the Chevrolet sedan to the Dodge Charger at the Tejon Outlets contained 30 pounds of methamphetamine which was subsequently seized in Tulare County during the stop and arrest of **VEGA**.

### 2. Intercepted Communication Between VEGA and ALVARADO Regarding Drug Seizures

146. On December 22, 2023, at approximately 10:47 AM, a phone call was intercepted to **ALVARADO** using Target Telephone 8 from **VEGA** using phone number 559-967-3089[43]. This phone call occurred primarily in Spanish and the following is an English translation. The following is a partial transcript of this phone call.

| NAME | TRANSLATION/TRANSCRIPTION |
|---|---|
| **ALVARADO** | Hey, **VEGA**. |
| **VEGA** | Hey, boss, it's me. It's **VEGA**. This, this is my new number for right now. |
| **ALVARADO** | Okay **VEGA**, that's good that you are calling. I was talking to **DON ROBERTO**… |
| | [Voices overlap] |
| **VEGA** | …Yeah. |
| | [Voices overlap] |
| **ALVARADO** | … right now, barely. |
| **VEGA** | Yeah, I'm, I'm… |
| **ALVARADO** | … listen. |
| **VEGA** | I'm on my way home. |
| **ALVARADO** | You see the, you see the paperwork? Did you see the paperwork that came out? |
| **VEGA** | What paper, what paper boss? Tell me. |
| **ALVARADO** | It came out on the news, you came out on the news, you came out on the uh Detective [PH] thing. That they stopped you at ten (10:00), ten-fifty (10:50) and they put the pictures of the top of the hood and they took a picture of you and if someone knows something about you or about this to call at a number. |
| **VEGA** | Oh, no, no, I have not seen it boss. I've been without a telephone. |
| **ALVARADO** | Right now, right now that you get WhatsApp, send it to me and I will send it to you so you can see it. |
| **VEGA** | Okay, boss. |
| **ALVARADO** | They did stop you and everything. |

[42] The methamphetamine seized on this date was submitted to the Western Regional Laboratory, tested, and determined to be methamphetamine.

[43] **VEGA** was identified as the user of phone number 559-967-3089 based on a voice comparison of this phone call with prior intercepted communications in which **VEGA** was a known participant. Investigators and monitors who conducted this analysis confirmed that the **VEGA** intercepted during this phone call was the same voice as the **VEGA** during prior known intercepted phone calls. Furthermore, **ALVARADO** referred to the user of phone number as 559-967-3089 as "**VEGA**" and the context of the phone call matched the circumstances of **VEGA**'s arrest on December 20, 2023.

| | |
|---|---|
| **VEGA** | Yeah. |
| **ALVARADO** | Yeah uh… |
| | [Voices overlap] |
| **VEGA** | … I told you boss, I don't have to lie to you. I don't have to lie to you. |
| **ALVARADO** | No I know you [U/I] lies, I know you would not. It came out on channel thirty (30), your name and everything. You're famous. You came out on Channel thirty (30). |
| **VEGA** | Again? Fuck! |
| **ALVARADO** | Yes. You came out last night and came out this morning too. You came out twice. [Background: voices] |
| **VEGA** | Fuck. |
| **ALVARADO** | But what I think and what my attorney thinks, **VEGA**, because I sent it right away and the DA did not press charges. You are right. We do not know why, but the attorney says that the only way that the DA does not press charges is because they are going to investigate you or they did something wrong. On the stop. |
| **VEGA** | They did something wrong on the stop, boss. I kept… |
| | [Voices overlap] |
| **ALVARADO** | Yes. |
| **VEGA** | … trying to tell you when I was talking to you, they did something wrong because… |
| | [Voices overlap] |
| **ALVARADO** | … Yes. |
| **VEGA** | … they weren't supposed to stop me. There, there wasn't a reason why they should have stopped me first and foremost. Second of all, when, when… |
| | [Voices overlap] |
| **ALVARADO** | [U/I] |
| **VEGA** | … when they stopped me, there, there's a law here in, in the United States that when they stop you… |
| | [Voices overlap] |
| **ALVARADO** | … yes, but… |
| | [Voices overlap] |
| **VEGA** | Uh-huh. |
| **ALVARADO** | But don't get it out of your mind, **VEGA** that maybe they are watching you. |
| **VEGA** | Yeah. |
| **ALVARADO** | Relax. |
| **VEGA** | …that's why I haven't been home. |

147. During this portion of the conversation, **ALVARADO** informed **VEGA** that he was talking to "DON ROBERTO", subsequently identified as Roberto SORIA. This statement becomes more relevant later in the conversation when, as further described below, SORIA was actually intercepted communicating during this phone call with **VEGA**. **ALVARADO** then questioned if **VEGA** had seen the "paper" and the "news." **ALVARADO** informed **VEGA** that his arrest had made the news to include "Channel thirty", the local ABC affiliate. **ALVARADO** stated he sent the information to **VEGA**'s arrest to his (**ALVARADO**'s) attorney who concluded that **VEGA** was not charged because, "they are going to investigate you or they did something wrong." **VEGA** attempted to convince

**ALVARADO** that the police did something wrong on the stop but **ALVARADO** concluded, "they are watching you" and that **VEGA** needed to "Relax." Based on this statement, **ALVARADO** expressed a belief that law enforcement was conducting a larger investigation into **VEGA**'s drug trafficking activities.

148. Following alerting **VEGA** to his (**ALVARADO**'s) knowledge of the arrest, **VEGA**, **ALVARADO**, and SORIA participated in a lengthy intercepted communication during which various aspects of this DFTO to include an accounting of what drugs and drug proceeds were being held by **VEGA** and how drugs were to be stored, transported and distributed in the future. During this intercepted communication, **ALVARADO** was directing **VEGA** and SORIA, indicating he was in a command position to make decisions on how this DFTO would operate.

149. An example during the same intercepted communication is as follows.

| NAME | **TRANSLATION/TRANSCRIPTION** |
|---|---|
| **ALVARADO** | … much "work" do you have? |
| **VEGA** | Um, well I had, I had eight (8), eight (8), eight (8), up here and then I have the, the, the "Converse". |
| **ALVARADO** | Good. |
| **VEGA** | I'm, I'm, I'm almost still [U/I] |
| **ALVARADO** | Yeah, don't count the "Converse", the "Converse" are a different deal, bro. |
| **VEGA** | Okay. Okay, well, I had, I had, I have uh, I have eight (8), eight (8), eight (8), eight (8) of the "Clear", Tiny owes me four thousand (4,000), right. Tiny owes me four thousand (4,000), from, from, from, from the same bill, which his, his, his, his payments is up today for that. |
| **ALVARADO** | Okay. So, so, so Tiny owes you four thousand (4,000) dollars? |
| **VEGA** | Yeah. |
| **ALVARADO** | And plus you have eight (8) of them? |
| **VEGA** | Yeah, I have… I had eight (8) of them, but my cousin gave Tiny, my cousin gave Tiny six (6) and I ordered him to only give him one (1). He gave him six (6), why, I'm not sure. I gotta, I gotta, I gotta get home. I gotta see what the, what, what's going on. I haven't been home for the same reason that I wanted to make sure everything is good. You know? Because I think that I'm more valuable out here, than locked up. |

150. During this portion of the phone call, **ALVARADO** asked **VEGA** for an accounting of how much "work" **VEGA** was in possession of. I know, based on my training and experience, that the term work is a common code word used to either refer to drugs or the act of drug trafficking. In this context, I believe **ALVARADO** was asking how much drugs **VEGA** was in possession of. **VEGA** responded that he had a quantity of "eight" and the "Converse." **ALVARADO** dismissed the "Converse", stating it was a "different deal", which, as previously described, indicated Converse was a

code word for a different type of drug other than methamphetamine or cocaine. **VEGA** then clarified that he had "eight" of the "clear", a term clear is a common code word used to refer to methamphetamine. Therefore, I concluded that **VEGA** was in possession of eight pounds of methamphetamine. **VEGA** then indicated that "Tiny owes me four thousand" and was in possession of "six." As previously described, Tiny is Joshua **BROCK's** moniker, a Target Subject in this investigation and a multi-pound methamphetamine drug customer. Based on this information, I believe that **VEGA** was informing **ALVARADO** that **BROCK** owed $4,000 in drug proceeds and was in possession of an additional six pounds of methamphetamine.

151. Later during the same intercepted conversation, the following exchange occurred:

| NAME | **TRANSLATION/TRANSCRIPTION** |
|---|---|
| **ALVARADO** | …we have twenty (20) coming in, we have twenty (20) coming from, from him. And we have twenty (20) coming from… We have six (6) from, from the other guy, plus you got the "Converse". We can get out of this bill a little bit. A little bit we can get out off this bill, dog. Now the ten thousand (10,000), uh, we have to call Panchito right now, me and you and tell him "Okay, Panchito. Listen, bro. I know I told you I was going to pay you Friday, but they fucking busted me. They stopped me, watta-watta-watta [PH], uh, can I, can I… I know it sounds ugly, but I need time, bro. I need time. I can pay you on Tuesday. I'm not gonna drive out there today, I only got ten thousand (10,000) dollars, uh, they're gonna pay me late this afternoon, and, and, and I really can't go. Bro, I'm not gonna… I got you. Don't trip, I got you." So, we should be good. We should be good, we should be good, we should be good with that. You know what I mean? What do you think? [Aside: Give me the five hundred (500)] |
| **VEGA** | Yeah, yeah, yeah, yeah with Tuesday yeah, but I mean I could talk to him like [U/I]… |
| | [Voices overlap] |
| **ALVARADO** | Yeah. |
| **VEGA** | I, I, I, I, I would not rob you guys and I would not lie to you. |
| **ALVARADO** | No, no, no, no, no…. All you need to do, I just need to buy time, bro. Right now, I bought time with Hugo. I sent Hugo the picture and I said "Hugo, we're gonna need to pay you and he gots about ten to twelve thousand (10,000-12,000)", which I'm not wrong, you got it. But, I gotta pay Panchito first. I gotta pay Panchito first. Hu-hu-hugo's family, we'll push him off. Hugo's family, we'll push him off. And then the fifty (50), now you lost twenty (20) and thirty (30) and it's okay, **VEGA**, we're gonna have to get em' back me and you. We're gonna get em' back! |
| **VEGA** | Yeah. |
| **ALVARADO** | Fifty (50), fifty (50) times seven hundred (700) is thirty-five thousand (35,000). If I sell my car and if I sell my Razor, I can help you with fifteen, twenty thousand (15,000 – 20,000) dollars. And then you're gonna owe fifteen (15). And yes, you're gonna owe me! I get it! But you're gonna have to just move real slow and you're gonna have to change the things you're doing! You're cousin is not gonna be able to help you no more. He's bad luck! Because every time they pull him over, bro, we lose things! |

152. During this portion of the phone call, **ALVARADO** referred to two individuals "Panchito" and "Hugo", to which money was owed. These two co-conspirators are currently unidentified. Regarding Panchito, **ALVARADO** instructed **VEGA** to tell Panchito the following: "Okay, Panchito. Listen, bro. I know I told you I was going to pay you Friday, but they fucking busted me. They stopped me." **ALVARADO** further instructed **VEGA** to ask Panchito for more time to pay the debt. I know, based on my training and experience, that methamphetamine is often supplied on credit, referred to as fronting. The methamphetamine source supplying the methamphetamine expects to get paid after the methamphetamine is sold and the drug proceeds generated. If the methamphetamine shipment is seized by law enforcement, the drug debt owed to the source of supply still exists and must be paid before additional methamphetamine is supplied or harm comes to the individual who accepted the methamphetamine on credit. In the current situation, **ALVARADO** and **VEGA** accepted methamphetamine on credit and are devising a solution to postpone paying Panchito, their methamphetamine source of supply, for the lost shipment of methamphetamine. **VEGA** reassured **ALVARADO** that he would not "rob" or "lie to you" regarding the seized methamphetamine. **ALVARADO** then refers to "Hugo" and informed **VEGA** of how he "bought time" with Hugo by sending him "the picture." I believe **ALVARADO** was referring to the photograph released to the media by the Tulare County Sheriff's Office depicting the seized methamphetamine. I believe that **ALVARADO** sent Hugo this photo to prove the methamphetamine was seized by law enforcement and not stolen by **VEGA**. However, **ALVARADO**'s statement indicated Hugo was also owed money because of the seized methamphetamine, indicating he (Hugo) was also a methamphetamine source who supplied **ALVARADO** and **VEGA** with methamphetamine on credit. Between Panchito and Hugo, **ALVARADO** stated, "I gotta pay Panchito first" and, utilizing Hugo's family, "we'll push him off", or pay the drug debt owed to Hugo later. Regarding the methamphetamine which **VEGA** had lost, **ALVARADO** made the following statement: "And then the fifty, now you lost twenty and thirty and it's okay, **VEGA**, we're gonna have to get em' back me and you. We're gonna get em' back!" I believe **ALVARADO**'s reference to "thirty" was the seizure of approximately 30 pounds of suspected methamphetamine seized directly from **VEGA** on December 20, 2023. I believe **ALVARADO**'s reference to twenty was the seizure of approximately 21 pounds of suspected methamphetamine seized

from **OCHOA**, **VEGA**'s cousin, on December 16, 2023. Together, both seizures totaled approximately 50 pounds of suspected methamphetamine, the amount **ALVARADO** indicated was owed. **ALVARADO** did an accounting of the total drug debt owed by multiplying "fifty", the total amount of methamphetamine seized, by "seven hundred", a reference to $700 per pound of methamphetamine. By multiplying these two numbers, **ALVARADO** successfully concluded that "thirty-five thousand", or $35,000 in drug proceeds were owed. **ALVARADO** indicated that he planned to sell his "car" and "Razor" to help pay the drug debt but that **VEGA** would owe $15,000 of the debt. **ALVARADO** indicated that **VEGA** would need to "move slow" and "change the things you're doing." I believe this was a reference to **VEGA** continuing to distribute drugs on **ALVARADO**'s behalf although in smaller amounts and changing his drug distribution tactics to avoid law enforcement detection. Lastly, **ALVARADO** stated **VEGA**'s cousin would no longer be able to "help" stating, "He's bad luck" and "every time they pull him over, bro, we lose things." I believe **ALVARADO** was referring to **OCHOA** who **VEGA** had previously referred to as his cousin during intercepted communications.

153. Based on the above information, I believe that the methamphetamine seized from **VEGA** on December 20, 2023, as well as the methamphetamine previously seized from **OCHOA** on December 16, 2023, was owned by **ALVARADO** who had accepted the drugs on credit. **ALVARADO**'s communications during this subsequent intercepted communication indicated he was in command of this DFTO.

## O. <u>Lorraine RENTERIA Assists ORTIZ in Furtherance of this Conspiracy</u>

### 1. ORTIZ uses RENTERIA's Residence and Vehicle to Distribute Methamphetamine

154. During this investigation, multiple communications were intercepted between **ORTIZ** using Target Telephone 4 and Lorraine **RENTERIA** using phone number 559-697-7126[44]. The intercepted communications indicated **ORTIZ** and **RENTERIA** were in a romantic relationship.

[44] Phone number 559-697-7126 is subscribed to Lorraine **RENTERIA** with a listed address of 542 S. D St, Tulare, CA. This is also **RENTERIA**'s address per her CA DMV record as well as the registration address of her white Chevrolet Malibu sedan with personalized license plate #CURL85. Multiple communications were intercepted during which the user of phone number 559-697-7126 coordinated meeting with **ORTIZ,** and **RENTERIA** was identified by surveillance by her CA DMV photo, meeting with **ORTIZ**. Based on this information, **RENTERIA** was identified as the user of phone number 559-697-7126.

155. During the course of this investigation, **ORTIZ** periodically utilized **RENTERIA**'s residence as well as her vehicle to distribute controlled substances. For example, on October 20, 2023, a series of communications were intercepted between **ORTIZ** using Target Telephone 3 and Arnold **HUERTA** using phone number 559-820-3891. During the communications on October 20, 2023, **A. HUERTA** asked if his "sister" could meet with **ORTIZ**. While the purpose of the meeting was not stated, this intercepted communication fit a pattern of methamphetamine distribution during which **HUERTA** would send his sister to meet **ORTIZ** to conduct the methamphetamine transaction on his behalf. **ORTIZ** responded to **HUERTA** to have his (**HUERTA**'s) sister meet him at "542 s d street", **RENTERIA**'s residence, to complete the methamphetamine transaction.

156. Another example occurred on the same date. During a series of intercepted communications on October 20, 2023, **ORTIZ** directed Joshua **BROCK**, also an established methamphetamine customer, to meet him at "542 south d st" for a quantity of "one." These communications are consistent with **BROCK** ordering a pound of methamphetamine from **ORTIZ** and then meeting **ORTIZ** at **RENTERIA**'s residence to complete the transaction.

157. As previously described, on December 15, 2023, a series of communications were intercepted during which **A. HUERTA** ordered two pounds of methamphetamine form **ORTIZ** and arranged for his sister to complete the transaction. **ORTIZ** subsequently met with **A. HUERTA**'s sister at the Me-N-Eds restaurant located in Tulare CA and obtained the methamphetamine from a white Chevrolet sedan with CA license plate CURLS85, a vehicle registered and known to be used by **RENTERIA**. This vehicle is registered to **RENTERIA** at 542 S. D St, Tulare, CA. .

158. Based on this information and communications between **RENTERIA** and **ORTIZ** and **RENTERIA's** assistance in drug transactions as set forth below, I believe that **RENTERIA** knew about **ORTIZ'** drug trafficking activity, knowingly joined the conspiracy, and allowed her residence and vehicle to be periodically used by him in furtherance of this conspiracy.

2. **ORTIZ uses RENTERIA's vehicle to store methamphetamine.**

159. On December 15, 2023, at approximately 7:25 am, ORTIZ, using Target Telephone 4, began a text message conversation with **RENTERIA**, using 559-697-7126,

- **RENTERIA** "Lmaooo my son said u leaving town u have your bags packed. You didn't

take anything off yesterday"

- **ORTIZ** "(two smiley face emojis) what bags u got packed"
- **RENTERIA** "Suit case in the back"
- **RENTERIA** "Lol"
- **ORTIZ** "Oh fuck"
- **ORTIZ** "I forgot'
- **RENTERIA** "I have both of them"
- **ORTIZ** "Ok I'll take them off when u come over tonight"

160. During this intercepted text message conversation, **RENTERIA** tells **ORTIZ** that her son had asked if she was going out of town because her bags were packed**.** RENTERIA then asks **ORTIZ** "You didn't take anything off yesterday," to which **ORTIZ** responds "(two smiley face emojis) what bags u got packed." **RENTERIA** clarifies that she is alerting **ORTIZ** about his "suitcase in the back." **ORTIZ** responds, "Oh fuck," and "I forgot." **RENTERIA** tells **ORTIZ** that she has "both of them," and **ORTIZ** tells **RENTERIA** that he will "take them off when u come over tonight." Based on my training and experience, along with observations made during this case, I know that **ORTIZ** commonly receives and stores shipments of methamphetamine in large suitcases and duffle bags; therefore, I believe that when **RENTERIA** told **ORTIZ** that he had left two of his suitcases in her vehicle, **RENTERIA** was telling **ORTIZ** that he had left two suitcases of methamphetamine in her trunk.

3. **RENTERIA drives ORTIZ to deliver methamphetamine on December 18, 2023**

161. At approximately 5:37 PM, a phone call was intercepted from **ORTIZ** using Target Telephone 4 to **RENTERIA** using phone number 559-697-7126. During this phone call, **RENTERIA** stated she would be arriving to **ORTIZ**' residence.

162. At approximately 5:39 PM, a white sedan was observed via a remote-controlled surveillance camera arriving at **ORTIZ**' residence. This observation was consistent with **RENTERIA** arriving at **ORTIZ**' residence to deliver the just purchased replacement phone for Target Telephone 3.

163. On December 18, 2023, at approximately 6:15 pm, Landon **JONES**, using 559-308-

1122, called **ORTIZ**, using Target Telephone 3. The following is a partial transcription of that call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| JONES | I need two of them. |
| ORTIZ | Who's this? |
| JONES | Bomber, Landon. |
| ORTIZ | Oh. |
| | ….. |
| ORTIZ | Can you, uh, can you meet me at the AM/PM? |
| JONES | Is that on Caldwell? |
| ORTIZ | Uh-huh. |
| JONES | Or Cartmill, Cartmill or whatever? |
| ORTIZ | Uh-huh. |
| JONES | Yeah, yeah, um, you want me to, uh, text you when I'm, uh, getting ready…[Voices overlap] |
| ORTIZ | Call me [U/I]. |
| JONES | …when I'm getting ready to leave? |
| ORTIZ | Yeah, just call me though. |
| JONES | Ok, alright, will do. [Voices overlap] |
| ORTIZ | Alright, alright. |
| JONES | Alright. |
| | **[End of call]** |

164. Here, **JONES** called **ORTIZ** and asked for "two of them." **ORTIZ** asked who was calling, and **JONES** clarified that it was "Bomber, Landon." Based on observations made during this case, I know that Landon **JONES** moniker is "Bomber." I also know that drug customers who have a preestablished relationship with their suppliers will often order a specific amount of narcotics without referencing what they intend to purchase. The supplier will know what it is they are ordering based upon their preestablished relationship and past transactions. Based on this, I believe that **JONES** called **ORTIZ** and ordered two pounds of methamphetamine. **ORTIZ** asks **JONES** if **JONES** could meet him at the AM/PM on Cartmill, and **ORTIZ** confirmed that would be OK. **ORTIZ** requested **JONES** call him when **JONES** was getting ready to leave. Based on this agreed upon interception surveillance was established at the AM/PM located in Tulare, CA.

165. On December 18, 2023, at approximately 6:34 pm, Det. Jeff Dowling observed, via a remote-controlled video camera, a white sedan back out of **ORTIZ'** driveway. As surveillance followed

the white sedan away from **ORTIZ**' residence, investigators observed that the vehicle was a white Toyota Camry with California license plate 8FHG382, registered to [Female 1].

166. On December 18, 2023, at approximately 6:46 pm, Det. Jeff Dowling observed the white Camry, via a remote-controlled video camera, arrive at 182 Prosperity Ave, Tulare, CA, and park in front of apartment 9. Over the course of this investigation, it was determined that **FLORES** lives at 190 W. Prosperity, Apartment 10, and Uncharged Co-conspirator 5 lives at 182 W. Prosperity, Apartment 9. Det. Dowling observed via a remote-controlled video camera, **RENTERIA** walk to **FLORES**' apartment from the target vehicle and **ORTIZ** walk to Uncharged Co-conspirator 5's apartment door, and use a key to let himself in. At approximately 6:47 pm, via a remote-controlled video camera, Det. Dowling observed **RENTERIA** walk from **FLORES'** apartment to Uncharged Co-conspirator 5's apartment and enter. At approximately 6:52 pm, via a remote-controlled video camera, Det. Dowling observed **FLORES** walk from her apartment to Uncharged Co-conspirator 5's apartment and enter. Based on observations made during this case, investigators have consistently observed either **ORTIZ** or **FLORES** enter Uncharged Co-conspirator 5's apartment empty handed, and exit with a grocery bag in their hands. Both **ORTIZ** and **FLORES** have been observed delivering methamphetamine to customers in groceries throughout this investigation, and seizures from customers have also shown that they provide methamphetamine to customers within grocery bags; therefore, I believe that **ORTIZ** uses Uncharged Co-conspirator 5's apartment as a methamphetamine stash location. Based on this information, I believe that **RENTERIA** drove **ORTIZ** to Uncharged Co-conspirator 5's apartment in order for him to pick up the methamphetamine to sell to **JONES**.

167. On December 18, 2023, at approximately 6:56 pm, a phone call was intercepted from **JONES**, using 559-308-1122, to **ORTIZ**, using Target Telephone 3. The following is a partial transcript of that call.

| | |
|---|---|
| JONES | Ok, can you meet me down there? [Voices overlap] |
| ORTIZ | Yeah, how long? |
| JONES | Uh, I'm going to leave right now. |
| ORTIZ | Ok, I'll be there. I'm leaving now too then. |
| JONES | Ok, alright. |
| ORTIZ | Alright. |
| JONES | Alright, by. |

| | |
|---|---|
| | **[End of call]** |

168. During this intercepted call, **JONES** asked **ORTIZ** if he could meet him "down there," and **ORTIZ** said yes "how long?" **JONES** told **ORTIZ** that he was going to leave "right now," and **ORTIZ** said "I'm leaving now too then." Based on the interceptions, I believe that **JONES** was asking **ORTIZ** if he could meet at the AMPM on M Street in Tulare, and **ORTIZ** confirmed.

169. On December 18, 2023, at approximately 7:08 pm, a text message was intercepted from **JONES**, using 559-308-1122, to **ORTIZ**, using Target Telephone 3, during which **JONES** told **ORTIZ** "I'm here." At approximately 7:08 pm, a text message was intercepted from **ORTIZ**, using Target Telephone 3, to **JONES**, using 559-308-1122, during which **ORTIZ** told JONES "3min away"

170. On December 18, 2023, at approximately 7:09 pm, via a remote-controlled video camera, Det. Dowling observed **ORTIZ** and **RENTERIA** exit Uncharged Co-conspirator 5's apartment, **RENTERIA** got in to the driver's seat, and **ORTIZ** into the passenger seat of the target vehicle. Additionally, Det. Dowling observed **ORTIZ** carrying a weighted plastic bag in his hand. Based on this observation, I believe that **ORTIZ** and **RENTERIA** had picked up methamphetamine to deliver to **JONES**, and was the passenger in **RENTERIA**'s vehicle while **RENTERIA** drove.

171. On December 18, 2023, at approximately 7:12 pm, **ORTIZ**, using Target Telephone 3, called **JONES**, using 559-308-1122. The following is a synopsis of that call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| JONES | Hey, uh…[Voices overlap] |
| ORTIZ | [U/I] |
| JONES | I'm right up here, I'm paying for, uh, some candy and then I'll walk right out there. I'm, I'm parked in the front right here, the white truck. [Voices overlap] |
| ORTIZ | Ok |
| JONES | Alright. |
| ORTIZ | Ok, I'm right here at the light. [Voices overlap] |
| JONES | Ok. |
| | **[End of call]** |

172. On December 18, 2023, at approximately 7:14 pm, Det. Kyle Dias observed a white Chevy Pickup in the parking lot of the AM/PM convenience store located at 3002 North M ST, Tulare, CA. At approximately 7:15 pm, Det. Kyle Dias observed Landon **JONES** walk to the front passenger

side white Camry, reach inside, and depart holding a plastic bag in **JONES'** hand. At approximately 7:16 pm, Det. Kyle Dias observed **JONES** walk from the white Camry and enter the passenger door of the white Chevy Pickup identified above with the plastic bag in hand. Both vehicles departed the parking lot and parted ways. Based on my training and experience, along with observations made during this investigation, I believe that **RENTERIA** drove **ORTIZ** to **ORTIZ**' stash location on Prosperity, and then drove **ORTIZ** to conduct a methamphetamine transaction with Landon **JONES** at the AMPM, all in furtherance this conspiracy to distribute methamphetamine.

### 4. RENTERIA assists ORTIZ to Obtain a New Phone to Avoid Law Enforcement Detection on December 18, 2023

173. On December 18, 2023, **ORTIZ**, while working at Woodville Landfill, a work site for the Tulare County Sheriff's Office Day Reporting Center (hereinafter referred to as DRC) program, was contacted by a TCSO Deputy. The Deputy was conducting a work site check and observed **ORTIZ** sitting in the driver's seat of a Tulare County work truck. While approaching **ORTIZ**, the Deputy observed that **ORTIZ** was attempting to hide something, so the Deputy asked **ORTIZ** to exit the vehicle, searched **ORTIZ**, and searched the vehicle. Inside the county work truck, the Deputy located an iPhone (Target Telephone 4) and a flip phone (Target Telephone 3), questioned **ORTIZ** as to the ownership of the phones, and **ORTIZ** stated that the iPhone was his, but he did not know who the flip phone belonged to. The Deputy confiscated the two phones and turned them in to the Woodville Landfill front office. Once this was determined to have occurred, a ruse was initiated during which the Deputy re-contacted **ORTIZ** in an attempt to return his seized cell phones to him. During the ruse, the Deputy apologized to **ORTIZ** for confiscating his phones, indicated she would return them, and asked **ORTIZ** not to report that his phones had been initially taken. However, the Deputy found out that a supervisor for Woodville Landfill returned both phones to **ORTIZ** before **ORTIZ** departed Woodville Landfill for the day. This activity generated significant pertinent communications during which **ORTIZ** became concerned that his activities were being monitored by law enforcement.

174. At approximately 2:57 PM, a phone call was intercepted from **ORTIZ** using Target Telephone 4 to **RENTERIA** using phone number 559-697-7126. During this phone call, **ORTIZ** described in detail the initial seizure of his phones, his interaction with the Deputy, and the Deputy

attempting to obtain his phones. During this intercepted conversation, the following exchange occurred.

| NAME | TRANSCRIPTION |
|---|---|
| **RENTERIA** | Mm… I think she got information off your phone. |
| **ORTIZ** | Yeah, she probably came to get it back. I can't get it… and then, she came to get it back and they fucked up and gave it to me. And now she's stuck with just like, whatever she's seen. Nothing else. |
| **RENTERIA** | Oh, I see what you're saying. But she could still get it from you. |
| **ORTIZ** | No, the phone is gone. You know, the boss threw it away. I told him… he asked me if it was mine and I said no. He snapped it in half and was like, "Fuck it. It if ain't yours, it ain't mine. And then snapped it in half and threw in the trash. And yeah, "I don't know who's phone that is." And then uh, I go, the iPhone is mine though. He just told me to put in my car. |

175. **RENTEREIA** warned **ORTIZ** that the deputy got information "off your phone." **ORTIZ** believed the deputy re-contacted him to "get it back", or get the phones back from him. **RENTERIA** warned **ORTIZ** that the deputy could still seize the phones from him. **ORTIZ** indicated that "the boss threw it away" and "snapped it in half." Based on **ORTIZ** continuing to use Target Telephone 4, I believe that Target Telephone 3 had been discarded after **ORTIZ** denied ownership.

176. Later in the conversation, the following exchange occurred regarding **ORTIZ**' phones.

| NAME | TRANSCRIPTION |
|---|---|
| **ORTIZ** | Anyways… all I gathered out of all of this is that they're…either one of these phones is tapped or they're watching me. I'm saying there's no reason for the lady to come back and say that. |
| **RENTERIA** | No, yeah, for sure. |

177. **ORTIZ** informed **RENTERIA** that he believed one of his phones was "tapped", or a wire intercept was occurring or that law enforcement was "watching me." **RENTERIA** agreed with **ORTIZ**' assessment stating, "No, yeah, for sure." Based on this statement, I believe that **RENTERIA** was aware of the criminal activity occurring over **ORTIZ**' phone and was agreeing that he was likely being monitored by law enforcement.

178. At the end of the conversation, the following exchange occurred between **ORTIZ** and **RENTEREIA**.

| NAME | TRANSCRIPTION |
|---|---|
| **ORTIZ** | Uh, if you could go to a Visalia Walmart, right there… |
| **RENTERIA** | Uh-huh. |
| **ORTIZ** | … and, and grab me two little flip phones. |
| **RENTERIA** | Cakes did all that already. |
| **ORTIZ** | I know. She was only able to get one. And then she went to Dollar Tree to get hers like a fucking idiot… and it don't work. |
| **RENTERIA** | No, she has to call. I was on the phone with them. |

| | |
|---|---|
| **ORTIZ** | She said she got the number to work but she can't get the phone on. |
| **RENTERIA** | Uh-huh. |
| **ORTIZ** | I need… I just need one… I need one, at least. Cause I got one but uh, I need another one. |
| **RENTERIA** | Okay. |
| **ORTIZ** | Or if you can just look, or you can look it up and call that Walmart, the Verizon flip phone. Just the cheapest phone they got. |
| **RENTERIA** | Um, you want me to go to Visalia Walmart, cause they're not here in Tulare? |
| **ORTIZ** | [U/I]. |
| | [Voices overlap] |
| **RENTERIA** | No, Cakes got the last one. |
| **ORTIZ** | Yeah, yeah. So call her and… yeah. The one Visalia Walmart. I mean you could Google or you can call them and they could check if you like. Fuck! That shit is just fucking my whole day up. [Aside: What's up, brother?] Uh… you got any money or no? So I… I'll try to give you some money. I got mo… I got money too. |
| **RENTERIA** | What do you want me to do? |
| **ORTIZ** | Uh, just… uh, call Cakes and tell her to give you two two hundred dollars. I'll call her right now and tell her so you could get… and… so you can go to Walmart and check them out. |
| **RENTERIA** | All right. |
| **ORTIZ** | All right. I'll call you… I'll tell her to call you right now. |
| **RENTERIA** | Okay. |
| **ORTIZ** | [U/I]. |
| **RENTERIA** | Oh, fucking [U/I]. |
| | **[End of call]** |

179. During this portion of the conversation, **ORTIZ** asked **RENTERIA** to obtain a replacement phone for him at the "Visalia Walmart." **ORTIZ** explained that "I got one but uh, I need another one." Based on Target Telephone 3 being discarded, I believe that **ORTIZ** was asking **RENTERIA** to obtain a new cell phone to replace Target Telephone 3. **RENTERIA** agreed to do this.

180. A subsequent review of the Walmart surveillance video system was conducted for the date of December 18, 2023, which revealed the following. At approximately 4:33 pm, **RENTERIA** was observed entering the store with hair pulled back and parted down the middle, wearing glasses, a gray "Tupac" shirt, and gray medical scrub pants. **RENTERIA** entered the electronic department at Walmart and purchased two Verizon "flip" phones. A copy of the receipt for this purchase was provided which showed that the phones were purchased for $38.88 each, for a total of $86.54. **RENTERIA** paid for this purchase in cash and, per Walmart, it was the only purchase on December 18, 2023 for two Verizon "flip" phones.

181. At approximately 4:38 PM, while **RENTERIA** was at the Walmart, a phone call was intercepted to **ORTIZ** using Target Telephone 4 from **RENTERIA** using phone number 559-697-7126.

During this intercepted communication, **RENTEREIA** initially indicated there were no flip phones but then corrected herself as a store employee located them for her. This intercepted communication further confirmed **RENTERIA** was at the Walmart store to purchase **ORTIZ** a replacement phone for Target Telephone 3.

182. At approximately 5:37 PM, a phone call was intercepted from **ORTIZ** using Target Telephone 4 to **RENTERIA** using phone number 559-697-7126. During this phone call, **RENTERIA** stated she would be arriving to **ORTIZ**' residence.

183. At approximately 5:39 PM, a white sedan was observed via a remote-controlled surveillance camera arriving at **ORTIZ**' residence. This observation was consistent with **RENTERIA** arriving at **ORTIZ**' residence to deliver the just purchased replacement phone for Target Telephone 3.

184. At approximately 6:06 PM, a text message was received from Verizon to Target Telephone 3 stating, "a new SIM card or device is being activated on your line." After this message, **ORTIZ** continued to use Target Telephone 3 to make and receive pertinent drug trafficking related communications in furtherance of this conspiracy. Based on this information, I believe that **RENTERIA** provided **ORTIZ** with the new Verizon flip phone after arriving at his residence, and a short time later, **ORTIZ** activated the phone to begin using in furtherance of this conspiracy.

185. Based on this information, I believe that **RENTERIA** was aware of **ORTIZ**' use of Target Telephone 3 in this conspiracy, was aware that **ORTIZ** had discarded the phone after becoming concerned that he was being monitored by law enforcement, and agreed to purchase and provide him with a replacement phone which **ORTIZ** used to continue his criminal activity.

### 5. ORTIZ and RENTERIA Discuss Using Drug Proceeds to Purchase a Residence

186. On January 6, 2024, a series of phone calls were intercepted interacting **ORTIZ** was attempting to purchase a residence with **RENTERIA**. However, **ORTIZ** and **RENTERIA** discussed an issue in attempting to legitimize cash in order to complete the purchase of a residence. During an intercepted communication at approximately 12:34 PM, the following exchange occurred during which **RENTERIA** recounts her conversation with an unnamed realtor to **ORTIZ**.

| NAME | TRANSCRIPTION |
|---|---|
| RENTERIA | And then, I was like, "Yeah, I'm gonna be real honest with you. You just tell me what |

| | |
|---|---|
| | I would have to do or need to do", so I was just like telling him, I was being real honest. I was like "Look, I have the, I have the money put away", I was like "I have you know down payment and what not. What I don't want to do is, you know, apply for these loans and everything when I really don't need them, you know? Is that a faster way of me getting into what I want?" and he says "Yes and no". He says "Yes, uh if your credit score is good then you bringing your own money is way faster", he said "I'm gonna be real honest with you" he said "The only problem you're gonna run into is now you're gonna need a person to back you up on that money". |
| **ORTIZ** | Yeah. |
| **RENTERIA** | He's all like "You need somebody to write you a letter and they're gonna look into their bank statements" stating like "Oh okay. Yeah, he makes enough or she makes enough to, to, give this person this much money" or "Yes, over the years yes I did make enough to save up to that much money that I'm gonna put down to my home". I said, "I've been working since I was nineteen (19)" who is, who is for anybody to tell me that I haven't been saving since then? He goes "And that's a good thing. All we gotta do is look at your work history, how much you were bringing in, how much you were putting away and then just add it up to what you're gonna put down". He's like "If you've been doing that since you were nineteen (19), honestly, I don't think I'll have a problem. It's just how much you're gonna do", and I was like "Okay", but he was like "I can tell you how much and how much not to do." And so I was like "Okay" and then he was like… |
| | [Voices overlap] |
| **ORTIZ** | They, they always want to know why it's not in your bank account [U/I] |
| | [Voices overlap] |
| **RENTERIA** | Right and he goes, he says my dad, he, he told me, he goes "My dad did the same thing you're doing" he's all "He has all his money, uh, in a safe". And I was like "Okay, well that's how I do it" I was like "I just don't like for my money to be in the bank because I'm gonna keep it honest with you. I'm a girl, I like to shop. If I don't see it in my bank, I don't swipe my card". He's like "You're… Okay. I get it." he's like "I have, my sisters are the same way" he says, he's like "Uhm, but uhm" and he just started asking me about my job and what income or whatever, he goes "Honestly, what you're telling me right now, I don't understand why you don't have a home already" and I was like "Well, it's a lot" Like damn, like you know?". And I go "and plus I'm by myself" he's like "Yeah, I get it" [Coughs]. He's all "But uhm, you qualify for everything on my table right now because of your credit score and then, you know, all of the above" and I said "Yeah, but I don't know. Right now I just, I just want this home!" |

187. **RENTERIA** informed **ORTIZ** that, although she had good credit, using cash to purchase a residence would require a "person to back you up on that money." **RENTERIA** indicated she would attempt to use her work history to account for a large sum of currency. **RENTERIA** stated, "who is for anybody to tell me that I haven't been saving since then? In other words, **RENTERIA** was stating that disproving the large sum of currency did not come from her work history would be difficult. **RENTERIA** further described how she could justify using cash to purchase a home stating, "I just don't like for my money to be in the bank…"

188. Later in the conversation, **ORTIZ** made the following statements revealing the true source of the cash **RENTERIA** was attempting to use to purchase a home.

| NAME | TRANSCRIPTION |
|---|---|
| **ORTIZ** | I can literally, I can literally put a hundred thousand (100,000) down on a home and then pay eight thousand (8,000) from there, you know? |
| **RENTERIA** | Yeah. |
| **ORTIZ** | So that shit will be, fucking, you figure every year that's, eight thousand (8,000), that's gonna be like one hundred (100)… It'll literally only take like three (3) years to fucking… |
| **RENTERIA** | Yeah. |
| **ORTIZ** | If everything were to work out perfect, like [U/I]. |
| **RENTERIA** | Yeah. |
| **ORTIZ** | [U/I] work out perfect, but… |

189. During this portion of the conversation, **ORTIZ** indicated that he was willing to put a $100,000 toward the purchase of the residence and make $8,000 payments. During this investigation, **ORTIZ** has generated a significant amount of US currency from the sale of methamphetamine. I believe he was referring to these drug proceeds when discussing these amounts of money. Since **ORTIZ**' drug proceeds are in cash, **RENTERIA** was attempting to devise a plan earlier in the conversation to legitimize **ORTIZ**' drug proceeds, falsely accounting for the drug proceeds as being generated from work history.

190. Although future intercepted communications did not confirm **RENTERIA** and **ORTIZ** further initiated the purchase of a residence, this intercepted phone call confirmed **RENTERIA**'s knowledge of **ORTIZ**' illegitimate income and her desire to use **ORTIZ**' drug proceeds to purchase a residence.

### P. <u>UM5675 Arranges Methamphetamine Transaction with ORTIZ Resulting in the Arrest of Jesus MARIN on January 6, 2024 with 5 Pounds of Methamphetamine</u>

191. On January 6, 2024, at approximately 10:24 AM, a phone call was intercepted to **ORTIZ** using Target Telephone 4 from UM5675 using phone number 818-665-5675[45]. The following is a partial transcription of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **ORTIZ** | Hello. |
| UM5675 | Hey. [Background: noise] What it do? |
| **ORTIZ** | Chilling. Hey, those fools already in town or what? |
| UM5675 | Uh, there gonna be… this fool is gonna be here at eleven, thirty (11:30) fucking… |

[45] Phone number 818-665-5675 is subscribed to Jacqueline BAEZ with a listed address of 32128 Springville Ave, Springville, CA. This is a fictitious address and the user of this phone has not been confirmed and therefore referred to UM5675.

| | |
|---|---|
| | [Voices overlap] |
| **ORTIZ** | Okay. |
| | [Voices overlap] |
| UM5675 | It's my uncle. I have these fools say this is the fucking same shit. I thought it was my cousin. |
| **ORTIZ** | Who? |
| UM5675 | This fool. My… |
| | [Voices overlap] |
| **ORTIZ** | Who? |
| | [Voices overlap] |
| UM5675 | …fucking uncle. |
| **ORTIZ** | Who, the white guy? |
| UM5675 | Yeah. |
| **ORTIZ** | That foo… cause you're gonna wanna look at it anyway. I already know. |
| | [Voices overlap] |
| UM5675 | So, yeah. He did, he's like, "Man, can you make sure they're big chunks and whoopte woo [PH]." |
| | [Voices overlap] |
| **ORTIZ** | What does he want, ten (10) of them or what? |
| UM5675 | I don't know. I think twenty (20), possibly. Hopefully. |
| | [Voices overlap] |
| **ORTIZ** | All right. Whenever he links up with you, just let me know. |
| UM5675 | All right, fucking… |
| | [Voices overlap] |
| **ORTIZ** | Oh, but you could drive uh… drive your own car over here cause where, where I'm at, he could just jump right on the freeway and head back home. |
| UM5675 | Oh, yeah, yeah. Nah, uh, I'ma take uh… I'm in the truck right now. I'm onna just go that way in there and then uh… fucking [Background: voices] uh…that way he could just mob back. |
| **ORTIZ** | Okay. |
| UM5675 | I ain't trying to be stuck with this fool all day. |

192. During this portion of the phone call, UM5675 informed **ORTIZ** that a third party, referred to UM5675 as his "uncle", would be there around 11:30 AM. UM5675 stated his uncle wanted UM5675 to ask **ORTIZ** to, "make sure they're big chunks." I know, based on my training and experience, that the term "chunks" is used to refer to methamphetamine that has large crystals as opposed to methamphetamine with a powder consistency which is less desirable. Based on this statement, I believe that UM5675 was attempting to broker a methamphetamine transaction between **ORTIZ** and his uncle. **ORTIZ** and UM5675 then discussed the amount of methamphetamine UM5675's uncle wanted to purchase with the amounts of "10" and "20" being discussed. Based on **ORTIZ** being established in this investigation as a multi pound methamphetamine supplier, I believe

these amounts were indicative of pound quantities of methamphetamine which would be transacted during the pending deal. UM5675 indicated he would be in his own vehicle which he described as a "truck."

193. Later in the same conversation, **ORTIZ** and UM5675 discussed the price per pound of methamphetamine during which **ORTIZ** quoted a price of "eight fifty", or $850 per pound of methamphetamine, a price he has consistently sold methamphetamine for during this investigation. UM5675 made statements indicating his uncle would be traveling from south of their location to conduct the transaction. UM5675 stated "Shit! So as far as I know, fucking I told him nine, and if this fool wants to do any haggling with me and some shit I'll fucking… I'll, I'll, you know, I'll, I'll take care of that with him. Cause I need to uh, I need to get my money for this nigga wasting all my time. He swears that he's, he's never made his way no two, three, four hours before bro." Based on this statement, I believe that UM5675 intended to make a profit off the pending methamphetamine transaction between **ORTIZ** and his uncle and that his uncle would be traveling from multiple hours away to complete the transaction. At the end of their conversation, UM5675 asked for **ORTIZ**' address indicating the transaction would occur at that location.

194. In anticipation of this transaction, surveillance was being conducted at **ORTIZ**' residence of 2680 Bright St, Tulare, CA via a remote-control video surveillance camera. At approximately 2:02 PM, surveillance observed a black, older model Chevrolet pickup truck with personalized CA plate "TEDDY M" arrive and park behind **ORTIZ**' vehicle. This vehicle is registered to Uncharged Co-Conspirator 4 with a listed address in Gardena, CA. Uncharged Co-Conspirator 4's California driver's license photo was subsequently obtained which matched the description of the individual who exited this vehicle and participated in a meeting with **ORTIZ**. Furthermore, a social media photo was located depicting Uncharged Co-Conspirator 4 standing in front of this same pickup with his family. Based on this information, Uncharged Co-Conspirator 4 was believed to be the individual who arrived and participated in the following transaction.

195. At approximately the same time as the arrival of the black Chevrolet pickup truck, a white Ford F-150 pickup with CA license plate 99649S3 pull into **ORTIZ**' driveway behind the black Chevrolet pickup. This vehicle is registered to Jesus **MARIN**. The driver of this vehicle was

subsequently positively identified as **MARIN** during his subsequent stop and arrest. Uncharged Co-Conspirator 4 and **MARIN** were observed meeting with **ORTIZ** by the garage of **ORTIZ**' residence. Both vehicles then repositioned with Uncharged Co-Conspirator 4's black Chevrolet pickup parking on the street near **ORTIZ**' residence and the white Ford F-150 pickup backed down **ORTIZ**' driveway and parking in front of **ORTIZ** garage. The back bed cover of the vehicle was raised obscuring the view of surveillance. However, based on the above intercepted communications and surveillance, I believe that **MARIN** was the uncle who had traveled to **ORTIZ'** location to obtain the methamphetamine and that Uncharged Co-Conspirator 4 was UM5675, the individual who brokered the transaction.

196. At approximately 12:33 PM, the meeting between **ORTIZ**, Uncharged Co-Conspirator 4, and **MARIN** concluded, the bed cover of **MARIN**'s Ford pickup was closed and he departed the area followed by surveillance. Surveillance followed **MARIN** south on Highway 99. Based on the above intercepted communications, surveillance, and meeting between Uncharged Co-Conspirator 4, **MARIN**, and **ORTIZ**, a vehicle stop was arranged on the Ford F-150 pickup.

197. This vehicle stop was conducted at approximately 1:04 PM in the city of Delano by a Tulare County Sheriff's Office marked patrol unit. During the stop, **MARIN** was identified by his California driver's license. A search of the Ford F-150 was conducted resulting in the seizure of approximately five pounds of methamphetamine[46] from the bed area of the pickup. I believe that the methamphetamine seized from **MARIN** was supplied by **ORTIZ** during their observed meeting and that Uncharged Co-Conspirator 4 had brokered the transaction between the two.

### Q. <u>Francisco GARCIA Involvement in Methamphetamine Trafficking</u>

#### 1. GARCIA Distributes Approximately 1.86 kilograms of Methamphetamine to Cornell HICKS and HICKS Arrest on December 23, 2023.

198. On December 23, 2023, at approximately 1:22 PM, a phone call was intercepted from Cornell **HICKS** using phone number 559-410-5774[47] to Francisco **GARCIA** using Target Telephone

[46] This methamphetamine was subsequently submitted to the Western Regional Laboratory where it was tested and confirmed to be 2224.2 grams of methamphetamine with a purity of 98% +/- 7%.

[47] As previously described, this cell phone is subscribed to and used by **HICKS**.

6[48]. The following is a partial transcription of that call.

| NAME | TRANSCRIPTION |
|---|---|
| **GARCIA** | Hello? |
| **HICKS** | Hello? |
| **GARCIA** | What's up my guy? |
| **HICKS** | Hey, how's it going? |
| **GARCIA** | Man, cool, cool. |
| **HICKS** | Trying to uh [sniffles] trying to plug in [coughs]. |
| **GARCIA** | Oh yeah? Um yeah uh, well, why whats up, wa, wa, wa, wa, what you got, What you got going, what you looking for? |
| **HICKS** | I, well, I got uh twenty-eight (28). I was tryin' to get three (3), I don't know… |
| | [Voices overlap] |
| **GARCIA** | [U/I] |
| **HICKS** | … If I can probably get it for that or twenty-nine (29) something like that. |
| **GARCIA** | You're tryin' to get three (3)? |
| **HICKS** | Yup. |
| **GARCIA** | You only have twenty-right (28) right now you said? |
| **HICKS** | Yeah. |
| **GARCIA** | Okay, um [smacks mouth] I ain't gonna lie I was doing em for three (3) fucking uh cause right now they kinda already put a stop to it. |
| **HICKS** | Okay. |
| **GARCIA** | Because of Christmas and everything, but uh… |
| **HICKS** | Let me count my cash up real quick while I got you on the phone see if I got that [U/I] if not I gotta collect some money. |

199. During this phone call, **HICKS** indicated he was trying to obtain a quantity of "three" for "twenty-eight." This quantity and price is consistent with three pounds of methamphetamine for $2,800, or $933 per pound. Based on my training and experience, this price is consistent and within the range of

[48] The following is an excerpt from the affidavit in support of Wire Intercept 1:23-SW-00292-JLT which described how **GARCIA** was identified as the user of Target Telephone 6. *"…a series of drug related communications were intercepted during Wire Intercept 1:23-CR-00225-ADA between **ORTIZ** using Target Telephone 3 and co-conspirator referred to only as "Cisco" using phone number 661-520-8147 (Target Telephone 6). On October 24, 2023, and based on these intercepted communications, the Honorable Erica P. Grosjean, U.S. Magistrate Judge for the Eastern District of California signed Court Order 1:23-sw-00257-EPG authorizing the collection of precise location information from Target Telephone 6. On October 26, 2023, precise location results began to be received from Target Telephone 6 which consistently placed the user of the phone at apartments located at 1128 N. J St, Tulare, CA. In the morning of October 27, 2023, surveillance was conducted at 1128 N. J St, Tulare, CA and documented multiple vehicles at the location to include a maroon Ford pickup truck with CA license plate #84290S3 which is registered to Francisco **GARCIA** with a listed address of 370 W Beechwood Dr, Tulare, CA. On the same date, at approximately 4:05 PM, surveillance observed the maroon Ford pickup leaving 1128 N J St, and followed the vehicle. Over the course of the next 90 minutes, surveillance followed the maroon Ford pickup while it made several stops in and around Tulare, CA. During this time, it was determined that Target Telephone 6 was moving in conjunction with the Ford pickup. The driver of the Ford pickup was photographed and subsequently compared to a Tulare County booking photo of Francisco **GARCIA** resulting in a positive match and identification. Therefore, it was concluded that Francisco **GARCIA** was the driver of the Ford pickup and moving in conjunction with the precise location results being received from Target Telephone 6. Based on this information, I believe that Francisco **GARCIA** is the user of Target Telephone"*

the price for a pound of methamphetamine. **GARCIA** initially expressed hesitance, stating he was "doing em for three." I believe **GARCIA** was providing **HICKS** with a counteroffer of $3,000 for the three pounds of methamphetamine. **HICKS** responded that he needed to "count my cash up real quick" which I believe was a reference to counting his drug proceeds to determine if he had enough to complete the transaction. Later in the conversation, **HICKS** informed **GARCIA** that he had the "three", a reference to $3,000 and then negotiated on where to meet to conduct the transaction. **GARCIA** and **HICKS** agreed to conduct the transaction at the Caldwell exit off of Highway 99 in Visalia, CA.

200. Based on this intercepted communication and in anticipation of this transaction, surveillance was initiated at this location. Surveillance was also being conducted at **GARCIA**'s residence of 1128 N. J St, Tulare, CA via a remote-controlled surveillance video.

201. On December 23, 2023, at approximately 1:52 pm, Det. Chris Faiman observed, via a remote-controlled video camera, a white Kia sedan arrive at **GARCIA's** residence at 1128 North J Street in Tulare, CA49. Two unidentified males exited the vehicle, and the passenger went into the western most door at 1128 North J street, Tulare, CA. At approximately 1:55 pm, an unidentified male exited the western most door of 1128 North J St, entered the white Kia's passenger side, and the vehicle departed out of the camera's view.

202. At approximately 1:57 pm, precise location information was received from Target Telephone 6 with a 41-meter certainty factor, placing Target Telephone 6 on North J St, approximately one kilometer north of **GARCIA's** residence at 1128 North J St, Tulare, CA. Based on this information, I believe that **GARCIA** was travelling in the white Kia that had been observed at 1128 North J St.

203. At approximately 1:58 pm, **GARCIA**, using Target Telephone 6, texted HICKS, using 559-410-5774, and asked "How long till you there".

204. At approximately 2:29 pm, **HICKS**, using 559-410-5774, texted **GARCIA**, using Target Telephone 6, "Here".

205. At approximately 2:30 pm, a phone call was intercepted from **GARCIA** using Target

[49] 1128 North J St, Tulare, CA has been identified as GARCIA's residence over the course of this investigation. Vehicles registered to GARCIA have been observed at this location during the early morning and late evening. Additionally, GARCIA has been seen, via camera, entering and exiting the residence during the early morning hours.

Telephone 6 to **HICKS** using phone number 559-410-5774. The following is a transcription of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **GARCIA** | Behind you. |
| **HICKS** | I'm right here, you behind me? |
| **GARCIA** | Yep. |
| **HICKS** | All right. |
| | **[End of call]** |

206. On December 23, 2024, at approximately 2:28 pm, precise location data was received for Target Telephone 6 with a 14-meter certainty factor, placing Target Telephone 6 just to the south of "Dutch Brothers" coffee shop located in Visalia, CA. Based on this information, I believe that **GARCIA**, with Target Telephone 6, was in the vicinity of the meeting location that had been agreed to.

207. On December 23, 2023, at approximately 2:31 pm, TCSO Detective Kyle Dias observed a beige Toyota Camry[50] pull up directly behind a white Kia sedan[51].

208. At approximately 2:33 pm, Det. Dias observed **HICKS** place something in the rear driver's side door of the Camry, obtain a bag from the Camry, and walk to the Kia sedan. **HICKS** exited the Kia sedan, returned to the Camry's driver's seat, and exited the parking lot.

209. At approximately 2:36 PM, TCSO Deputy Dennis Birkner, operating a marked patrol unit, initiated a vehicle stop on **HICKS** in the vicinity of Caldwell Ave and Akers St, Visalia, CA. During the stop, it was determined that **HICKS** was under the influence of a controlled substance and detained. During a subsequent search of the vehicle, a loaded 9mm handgun firearm, which was reported stolen, was located in the trunk of **HICKS**' vehicle. Additionally, approximately 195 grams of methamphetamine[52] and a locked briefcase was located in the vehicle. The locked briefcase was seized

[50] Over the course of this investigation, HICKS has been observed driving a beige Toyota Camry with California License Plate 7JUS069. On October 21, 2023, and as part of this investigation, a traffic stop was conducted by King's County Sheriff's Office on a beige Toyota Camry with California License plate 7JUS069, pursuant to that traffic stop, investigators seized approximately two pounds of methamphetamine, and arrested HICKS, who had been the driver of the aforementioned vehicle.

[51] After reviewing footage from the remote-controlled video camera at 1128 North J ST, Tulare, CA, comparing it to a picture of the white Kia that arrived at the narcotics transaction, and comparing precise location information over Target Telephone 6, I believe that it is in fact the same white Kia.

[52] This methamphetamine was subsequently submitted to the Western Regional Laboratory where it was tested and

pending obtaining a search warrant for it.

210. On December 27, 2023, the Honorable Antonio Reyes, Superior Court Judge for Tulare County, signed a search warrant authorizing the search of **HICKS'** locked briefcase. On the same date, the briefcase was opened and deputies located approximately 1.86 kilograms of methamphetamine[53]. This amount is consistent with the three pounds of methamphetamine **HICKS** previously ordered from **GARCIA** during intercepted communications.

211. Based on the above intercepted communications, surveillance, and seizure, I believe that **HICKS** ordered three pounds of methamphetamine from **GARCIA** and then meet with **GARCIA** in Visalia, CA to complete the transaction. During this meeting, **GARCIA** supplied **HICKS** with three pounds of methamphetamine which was subsequently seized.

2. **GARCIA Purchases 10 Pounds of Methamphetamine from ORTIZ and FLORES on February 20, 2024 and is Subsequently Arrested.**

212. On February 19, 2024, the following series of text messages were intercepted between **ORTIZ** using Target Telephone 10 and an individual subsequently identified as Francisco **GARCIA** using phone number 661-900-3045[54].

- **ORTIZ**: Hey there is some 725 in town if you want to look at them.
- **GARCIA**: Ok my boy I just got some 15 ...but got complaints already I'm count up my chips to atleast get 10
- **ORTIZ**: Ur boy got that gas smell seen it today all chunks tho
- **GARCIA**: Yea ...you have some cleaner ones
- **ORTIZ**: Yea my people gave me extra i didnt need on a front and i dont like fronts so im jus saling them cheap so i can pay them
- **GARCIA**: Ok

---

confirmed to be 185.1 grams of methamphetamine with a 98% +/- 7% purity level.

[53] This methamphetamine was subsequently submitted to the Western Regional Laboratory, tested, and confirmed to be 1787.3 grams of methamphetamine with a 98% +/- 7% purity level.

[54] **GARCIA** was identified as the user of phone number 661-900-3045 because the intercepted communications with the user of this phone number coincided with surveillance observing **GARCIA**'s vehicle arrive at **ORTIZ**'s residence. Additionally, **GARCIA** was arrested with the amount of suspected methamphetamine which he used phone number 661-900-3045 to negotiate and purchase.

- **ORTIZ**: They got no smell or taste the good check umm out when ever
- **GARCIA**: Ok I'm collecting chips all be taping in

213. During this text message exchange, **ORTIZ** indicated that he had some for "725." While this is cheaper than what **ORTIZ** has previously sold methamphetamine for, the price is consistent and within the range for a pound of methamphetamine. **GARCIA** responded that he just obtained a quantity of "15" but was receiving "complaints" which I believe was a reference to **GARCIA** purchasing 15 pounds of methamphetamine from a different source of supply but was receiving complaints from customers. **GARCIA** further indicated that he would get a quantity of "10" from **ORTIZ**. **ORTIZ** described the methamphetamine as being "all chunks" and agreed with **GARCIA** that the methamphetamine was "clear." I know, based on my training and experience, that methamphetamine which is clear or translucent, and has large crystals or chunks, is more desirable than methamphetamine with an off color which is powder. Therefore, I believe that **ORTIZ** and **GARCIA** were describing the quality of the methamphetamine which **ORTIZ** was offering to sell **GARCIA**. At the end of their conversation, **GARCIA** stated he was "collecting chips", which I believe was a reference to collecting drug proceeds, and would meet with **ORTIZ** later.

214. On February 20, 2024, the following series of text messages were intercepted between **ORTIZ** using Target Telephone 10 and an individual subsequently identified as Francisco **GARCIA** using phone number 661-900-3045 as they continued their conversation from the day before.

- **ORTIZ**: Aye if ur free swing by to check one out give u a idea of what i got.
- **GARCIA**: Ok I'm going to be leaving visa in a few
- **ORTIZ**: Ok
- **GARCIA**: You around still
- **ORTIZ**: Yea
- **GARCIA**: Ok I'm on the 198 if u can get 10 of them ready

215. During this text message exchange, **ORTIZ** asked if **GARCIA** wanted to "check one out." Based on their previous communications on February 19, 2024, I knew **ORTIZ** was referencing methamphetamine. **GARCIA** agreed and, during **GARCIA**'s last text message, he indicated he was traveling on Highway 198 and asked **ORTIZ** for a quantity of "10" to be ready. I believe that **GARCIA**

was referring to the ten pounds of methamphetamine he ordered the following day.

216. At approximately 3:23 PM, a phone call was intercepted from **ORTIZ** using Target Telephone 10 to **GARCIA** using phone number 661-900-3045 during which they continued their discussion. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **GARCIA** | Yo. |
| **ORTIZ** | Hey. |
| **GARCIA** | Hey, what's good? |
| **ORTIZ** | What's good? Uh, you don't want to check them out first? Or… |
| **GARCIA** | Um, ye-yeah. I could check them out. |
| | [Voices overlap] |
| **ORTIZ** | I, I… |
| | [Voices overlap] |
| **GARCIA** | …I ain't tripping. |
| | [Voices overlap] |
| **ORTIZ** | Okay. I don't got ten (10) here. I just had one here but… |
| | [Voices overlap] |
| **GARCIA** | Yeah. |
| | [Voices overlap] |
| **ORTIZ** | …I, I can go get them. |
| **GARCIA** | Okay. |
| **ORTIZ** | It's not a big deal. |
| **GARCIA** | Yeah, all right. Yeah. Um, if anything, I can stop by, check it out first and then after, uh, I'm going to be needing them for sure. |
| **ORTIZ** | Okay. Yeah, yeah, just come check… |
| | [Voices overlap] |
| **GARCIA** | Okay. |
| | [Voices overlap] |
| **ORTIZ** | …them out. Just so you… I don't want you to grab them and then you not really like them, you know what I mean. |
| **GARCIA** | Yeah, yeah. [U/I] |
| **ORTIZ** | But they all look exactly like what you're going to look at right now. |
| **GARCIA** | Okay, for sure. Uh, you uh… |
| | [Voices overlap] |
| **ORTIZ** | I'm right… |
| | [Voices overlap] |
| **GARCIA** | I'm right here |
| | [Voices overlap] |
| **ORTIZ** | …here at the pad. |
| **GARCIA** | Okay. I'll be there probably … about… like, like ten (10) minutes. |
| **ORTIZ** | All right. |
| **GARCIA** | All right. [U/I]. |
| | **[End of call]** |

217. During this phone call, **ORTIZ** asked **GARCIA** if he wanted to "check them out first", stating that he only had "one" there but could get the rest. I believe that **ORTIZ** was asking **GARCIA** if

he wanted to look at the methamphetamine prior to completing the ten-pound purchase. GARIA agreed stating, "I could check them out" but advised **ORTIZ** that he would "be needing them for sure." **ORTIZ** stated he did not want **GARCIA** to "grab them and then you not really like them", a reference to purchasing the ten pounds of methamphetamine and then regretting the transaction. **ORTIZ** stated that he was at his "pad", a reference to his residence and **GARCIA** stated that he was ten minutes away.

218. During a text message intercepted at 3:27 PM, **GARCIA** advised **ORTIZ**, "I got my sister and my homegirl driving me ok" indicating he would be traveling with two additional individuals.

219. Based on the above intercepted communications, surveillance was conducted at 2680 Bright St, Tulare, CA, **ORTIZ**' residence, via a remote-controlled video surveillance camera. At approximately 3:34 PM, a white Kia sedan arrived at **ORTIZ**' residence and parked in front of his garage. Due to a sporadic feed from the remote-controlled surveillance video camera, surveillance was unable to observe what occurred upon this vehicle's arrival. However, the arrival of the vehicle coinciding with the above intercepted communications confirmed **GARCIA**'s connection to this vehicle as well as to phone number 661-900-3045.

220. At approximately 3:39 PM, a phone call was intercepted from **ORTIZ** using Target Telephone 10 to **FLORES** using phone number 559-378-3171. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **FLORES** | Hello? |
| **ORTIZ** | Hey, what are you doing? |
| **FLORES** | Nothing, what's up? |
| **ORTIZ** | Are you at you pad? |
| **FLORES** | Yeah, why? |
| **ORTIZ** | Hey, can you, uh, um, meet my boy right there across the street and give him ten of'em, he's, he's at my pad looking at one but he's going to buy…he just don't want to travel with all the money there. |
| **FLORES** | Yeah, he already gave you the money? |
| **ORTIZ** | Yeah, he's [U/I]. |
| **FLORES** | Alright. |
| **ORTIZ** | Uh, I'll, I'll call you when he's like close by right there. |
| **FLORES** | Alright, by. |
| | **[End of call]** |

221. During this phone call, **ORTIZ** asked if **FLORES** was at her "pad", or at home.

**FLORES** stated she was and **ORTIZ** asked if **FLORES** could meet "my boy" across the street and "give him ten." During this investigation, **FLORES**' residence has been identified as 190 W. Prosperity Ave, Apt #10, Tulare, CA and she has been observed conducting multiple drug transactions in the Dollar General parking lot located in Tulare, CA. The Dollar General parking lot is across the street and to the west of **FLORES**' residence which matched **ORTIZ** description during this phone call. **ORTIZ** further advised **FLORES** that the third party was at his (**ORTIZ**') "pad", or residence, and was "looking at one." Based on the above-described observations and because this phone call was intercepted while **GARCIA** was at **ORTIZ**' residence, I believe that **GARCIA** was at 2680 Bright St, Tulare, CA to observe a pound of methamphetamine prior to conducting a larger transaction with ORITZ. **ORTIZ** then informed **FLORES**, "he's going to buy…he just don't want to travel with all the money there." **FLORES** asked if **GARCIA** gave **ORTIZ** the money for the transaction and **ORTIZ** confirmed he did. Based on this exchange, I believe that **GARCIA** had given **ORTIZ** drug proceeds to complete the negotiated ten-pound methamphetamine transaction and was then planning to meet with **FLORES** to complete the transaction. **ORTIZ** indicated he would contact **FLORES** when **GARCIA** was "close by right there."

222. At approximately 3:50 PM, surveillance observed the white Kia sedan depart from the driveway leading to **ORTIZ**' residence.

223. Also, at approximately 3:50 PM, a phone call was intercepted from **ORTIZ** using Target Telephone 10 to **FLORES** using phone number 559-378-3171. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **FLORES** | Hello? |
| **ORTIZ** | [U/I] |
| **FLORES** | Uh, do you want somebody [U/I] seven-fifty? |
| **ORTIZ** | Yeah, same deal, cause, uh, short what, uh… So, like, when you grab'em, he's already on his way over there. Just, get them in that little duffle bag but, um, that's like, that's like, seven ones that were like real white, white looking cream ones, keep those ones, just give him one of the other ones, ten of the other ones. Cause like, uh, think there's about twenty of them in there. |
| **FLORES** | And the little, um, black…[Voices overlap] |
| **ORTIZ** | The little duffle bag. |
| **FLORES** | Yeah, the little black spider one? |
| **ORTIZ** | Yeah, [U/I], just fucking. I thought he only wanted one, [Hiccup], he came here and fucking looked at it and was like, "I'll take ten", and I was like, "ah fuck." |

| | |
|---|---|
| **FLORES** | Alright, get them together. |
| **ORTIZ** | [Stutters] He's already on his way, just to let… |
| **FLORES** | Alright, by. |
| **ORTIZ** | He's in a little white Camry. |
| **FLORES** | Camry? |
| **ORTIZ** | Yeah. |
| **FLORES** | Alright. |
| | **[End of call]** |

224. During this phone call, **FLORES** stated "seven-fifty", which I believe was a reference to $750 per pound of methamphetamine which was to be transacted. **ORTIZ** affirmed and then informed **FLORES** that **GARCIA** was "already on his way over there." **ORTIZ** then gave **FLORES** instructions on which bag to transport the methamphetamine in and which methamphetamine to get ready for **GARCIA**. **ORTIZ** informed **FLORES** of his interaction with **GARCIA** stating that he thought **GARCIA** only wanted "one", a reference to one pound of methamphetamine, but then told **ORTIZ**, "I'll take ten", a reference to **GARCIA** ordering ten pounds of methamphetamine. **ORTIZ** informed **FLORES** that **GARCIA** was "already on his way" and in a "little white Camry." This vehicle description was incorrect and **ORTIZ** corrected himself during subsequent intercepted communications.

225. In anticipation of **FLORES** transporting ten pounds of methamphetamine to the Dollar General, surveillance was being conducted at her residence of 190 W. Prosperity Ave, Apt 10, Tulare, CA via a remote-controlled video surveillance camera which showed the following activity. At approximately 3:52 PM, **FLORES** was observed walking away from her residence of 190 W. Prosperity Ave, Apt 10, Tulare, CA, to 182 W. Prosperity Ave, Apt 9, Tulare, CA, a known stash location used by **FLORES** and **ORTIZ**[55]. **FLORES** entered 182 W. Prosperity Ave, Apt 9, Tulare, CA and, at approximately 4:00 PM, exited this residence carrying a weighted plastic bag. **FLORES** walked back toward her residence and her BMW sedan was observed departing the area at approximately 4:02 PM.

226. Beginning at approximately 4:06 PM, a series of phone calls were intercepted during which **ORTIZ** used Target Telephone 10 to communicate with both **FLORES** and **GARCIA**. During these intercepted communications, **ORTIZ** informed **FLORES** and **GARCIA** what the other was driving, correctly describing **GARCIA**'s vehicle as a "white Kia", and informing both when the other

---

[55] 190 W. Prosperity Ave, Apt 10, Tulare, CA (**FLORES** residence) and 182 W. Prosperity Ave, Apt 9, Tulare, CA (Stash location) are two structures on the same property and approximately 20 yards from each other.

had arrived.

227. Surveillance was established in the area of the Dollar General parking lot. Surveillance observed **FLORES**' BMW sedan arrive in the parking lot first. Minutes later, surveillance observed the white Kia sedan arrive and park next to **FLORES**' BMW sedan. Surveillance observed an individual, subsequently identified as **GARCIA**, exit from the rear of the Kia sedan toward **FLORES**' vehicle. Seconds later, surveillance observed **GARCIA** return to the Kia sedan and enter as the back-seat passenger. Because **FLORES**' vehicle and **GARCIA**'s vehicle were parked in close proximity, surveillance was unable to observe the actual exchange of methamphetamine between the two. However, based on the prior intercepted communications and the observations described above, it was believed that **GARCIA** had obtained ten pounds of methamphetamine from **FLORES** and a vehicle stop on the white Kia sedan was arranged.

228. Surveillance followed the white Kia sedan form the Dollar General until a vehicle stop was conducted in the city of Tulare, CA by a TPD marked unit. During this stop, **GARCIA** was identified as the sole rear passenger in the vehicle. As TPD Detectives were detaining **GARCIA**, a loaded handgun fell from his waist band. During a subsequent search of the vehicle, approximately ten pounds of suspected methamphetamine[56] was located in the rear passenger floorboard of the vehicle and was further contained in a gray plastic bag. This gray plastic bag matched the description of the bag **FLORES** was previously observed departing 182 W. Prosperity Ave, Apt 9, Tulare, CA with prior to meeting with **GARCIA**.

229. Based on this information, I believe that **GARCIA** had initially met with **ORTIZ** at 2680 Bright St, Tulare, CA to view one pound of methamphetamine in preparation of conducting a larger transaction of ten pounds of methamphetamine. During a series of intercepted communications, **ORTIZ** directed **FLORES** to conduct the transaction with **GARCIA** after which time **FLORES** departed her residence of 190 W. Prosperity Ave, Apt 10, Tulare, CA and obtained the methamphetamine at 182 W. Prosperity Ave, Apt 9, Tulare, CA, a known stash location. **ORTIZ** then arranged for **FLORES** to meet **GARCIA** at the Dollar General where the exchange of methamphetamine occurred. This

---

[56] A presumptive test was subsequently conducted on the suspected methamphetamine seized from **GARCIA** which tested presumptive positive for the presence of methamphetamine.

methamphetamine, as well as a firearm, were subsequently seized from **GARCIA** during a vehicle stop.

**R. ROBLES Obtains Methamphetamine from ORTIZ and FLORES**

**1. ROBLES Orders Methamphetamine from ORTIZ, is Supplied by FLORES, and Subsequently Arrested on February 13, 2024, with One Pound of Methamphetamine and a Firearm.**

230. During this investigation, **ROBLES** had been identified as a frequent methamphetamine customer being supplied by **ORTIZ** as well as the user of phone number 559-415-5004[57].

231. On February 13, 2024, a phone call was intercepted to **ORTIZ** using Target Telephone 10 from **ROBLES** using phone number 559-415-5004. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **ORTIZ** | Hello. |
| **ROBLES** | [U/I]. |
| **ORTIZ** | Hey, what's up? |
| **ROBLES** | I need one. |
| **ORTIZ** | Okay, let me, let me call my sister and I'll call you right back right now. |
| **ROBLES** | Okay, okay. So, I can call your sister if you want. |
| | [Voices overlap] |
| **ORTIZ** | Hold on, hold on… huh? |
| **ROBLES** | I'm right here in Hanford still, but I can call your sister if you want. |
| **ORTIZ** | I'll call her. Let me, let me call cause she don't like to answer her phone sometimes. |

[57] Edgar **ROBLES** is a Target Subject in Wire Intercept 1:24-SW-0036JLT based on his ongoing criminal connection to **ORTIZ**. The following is an excerpt from the affidavit in support of this wire intercept further describing **ORTIZ** and **ROBLES**' criminal relationship. "*During this investigation, multiple pertinent drug related communications were intercepted between **ORTIZ** using Target Telephone 3 and Edgar **ROBLES** using phone numbers 559-415-5004 and 559-571-3141. Phone number 559-415-5004 is subscribed to Angelica Granco with a listed address of 977 Northstar Dr, Hanford, CA. This is also **ROBLES**' residence per his California DMV record. Although the subscriber of phone number 559-571-3141 has not been received, a voice comparison from intercepted communications confirmed it is being used by the same individual as phone number 559-415-5004, who is **ROBLES**. **ROBLES** was identified as the user of both phone numbers based on intercepted communications indicating he was to conduct a drug transaction at **ORTIZ**' residence and surveillance, conducted via a remote-controlled video camera, confirming **ROBLES** arrived in a white Toyota Corolla with California license plate 6XVU250, a vehicle registered to him with a listed address of 977 Northstar Dr, Hanford, CA. The following is an example of one of these transactions. On December 22, 2023, a series of phone calls were intercepted between **ORTIZ** using Target Telephone 3 and **ROBLES** using phone number 559-571-3141. During their initial intercepted communications, **ROBLES** indicated a third party in Mexico owed him "34." As the conversation progressed, this amount was determined to be $3,400 and **ORTIZ** and **ROBLES** arranged for the third party to send the funds to **FLORES** via **FLORES**' "Cash App" account. **ORTIZ** stated that he could supply **ROBLES** with "four (4) pounds" for the money. This would equate to a unit price of $850 per pound of methamphetamine, a price consistent with what **ORTIZ** was charging other methamphetamine customers. **ROBLES** confirmed he would take four pounds of methamphetamine in exchange for the money transfer. **ORTIZ** subsequently sent a text to **ROBLES** with **FLORES**' Cash App user name of "Cake558." Communications were then intercepted between **ORTIZ** and **FLORES** and **ORTIZ** and **ROBLES** confirming the money transfer had occurred. **ORTIZ** then arranged to meet **ROBLES** at his (**ORTIZ**') residence. Based on these intercepted communications, surveillance was being conducted at **ORTIZ**' residence via a remote-controlled video camera and, at 12:32 PM, surveillance observed **ROBLES** arrive in his Toyota Corolla which was registered to him. Surveillance observed **ORTIZ** transfer a weighted grocery bag to **ROBLES** after which time **ROBLES** departed. Based on the intercepted communication and surveillance, I believe that **ROBLES** had received four pounds of methamphetamine from **ORTIZ**. Therefore, I believe that **ROBLES** is a methamphetamine supplied by **ORTIZ**.*" **ROBLES** is a convicted felon.

| | |
|---|---|
| **ROBLES** | Oh all right my frie-… |
| | **[End of call]** |

232. During this phone call, **ROBLES** informed **ORTIZ** that he needed a quantity of "one." Although no further description was provided, I believe that **ROBLES** was referring to a pound of methamphetamine based on their prior transactions conducted during this investigation. **ORTIZ** stated he would call his sister, a reference to **FLORES**, and would call **ROBLES** back. **ROBLES** indicate that he was in Hanford.

233. At approximately 6:30 PM, and the next intercepted phone call was from **ORTIZ** using Target Telephone 10 to **FLORES** using phone number 559-378-3171. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **FLORES** | Hello. |
| **ORTIZ** | Hey, you, you in town? Or are you at home or some shit? |
| **FLORES** | I'm heading home. Why? What happened? |
| **ORTIZ** | That [PH] one Paisa needed a P. |
| **FLORES** | Oh I'm on my way… |
| | [Voices overlap] |
| **ORTIZ** | But he in Hanford, he ain't gonna… |
| | [Voices overlap] |
| **FLORES** | I'm, I'm on my way home. |
| **ORTIZ** | Oh, he coming from Hanford so he's gonna be like twenty thirty minutes. Want me to tell him to go to the store right there? |
| **FLORES** | Yeah. |
| **ORTIZ** | All right. |
| | **[End of call]** |

234. During this phone call, **FLORES** indicated she was heading home, a reference to 190 W. Prosperity Ave, Apt 10, Tulare, CA, her identified residence during this investigation. **ORTIZ** stated, "That one Paisa needed a P." I know, based on my training and experience, that the term "P" is often used as a code word for a pound of methamphetamine. Since **ORTIZ** had just finished a conversation during which **ROBLES** asked for "one", I believe **ORTIZ** used the term Paisa to refer to **ROBLES**. **ORTIZ** informed **FLORES** that **ROBLES** was in Hanford and asked **FLORES** if she wanted **ROBLES** to go to the "store." **FLORES** agreed by stating, "yeah." I know, based on prior transactions, that the store was a reference to the Dollar General located in Tulare, CA, a location **FLORES** has consistently used to conduct drug transactions during this investigation. **ORTIZ** also estimated that

**ROBLES** was twenty to thirty minutes from the meeting.

235. At approximately 6:31 PM and immediately after the above intercepted communication, a phone call was intercepted from **ORTIZ** using Target Telephone 4 to **ROBLES** using phone number 559-415-5004. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **ROBLES** | Yes sir! |
| **ORTIZ** | Hey. |
| **ROBLES** | Yeah. |
| **ORTIZ** | Oh yeah. |
| **ROBLES** | Yeah. |
| **ORTIZ** | Call, call, call her when you get to the store. |
| **ROBLES** | Okay, that's good. |
| **ORTIZ** | Later. |
| **ROBLES** | Alright. Bye. Thank you. |
| | **[End of call]** |

236. During this phone call, **ORTIZ** directed **ROBLES** to "call her", a reference to **FLORES**, once **ROBLES** arrived at the "store", which was known to be the Dollar General. Based on this statement, I believed that **ROBLES** would be traveling to the Dollar General to obtain one pound of methamphetamine from **FLORES**.

237. At approximately 7:19 PM, surveillance observed **FLORES**' BMW sedan and **ROBLES**' Toyota Corolla with California license plate 6JXU250 parked in close proximity to each other in the Dollar General parking lot. Although the exchange between **FLORES** and **ROBLES** was not directly observed due to it being dark outside, the presence of both vehicles confirmed that the transaction negotiated during the prior intercepted communications occurred and a vehicle stop on the Toyota Corolla was arranged.

238. Surveillance followed the Toyota Corolla from the Dollar General parking lot until a Tulare Police Department marked patrol unit initiated a stop on **ROBLES** in the city of Tulare, CA. During the stop, **ROBLES** was identified as the driver of the vehicle and was believed to be operating the vehicle while under the influence. As TPD officers attempted to remove **ROBLES** from the vehicle, he began resisting and in the struggle that ensued, a firearm fell from the area of his waistband. **ROBLES** shouted to a second occupant of the vehicle, a seventeen-year-old female who was a reported runaway from Kings County to, "throw everything away." Based on this information, it was believed

that **ROBLES** resisted arrest and also attempted to destroy evidence. During a search of **ROBLES**' person, officers located a small baggy containing approximately ten to fifteen blue pills consistent with counterfeit oxycodone tablets which contain fentanyl and two smaller baggies containing suspected methamphetamine. The firearm which fell from **ROBLES**' possession was determined to have been reported stolen. During a subsequent search of **ROBLES**' vehicle, a second firearm was located along with approximately one pound of suspected methamphetamine[58].

239. Based on the above intercepted communications, surveillance, and seizure, I believe that **ROBLES** ordered a pound of methamphetamine from **ORTIZ**. In turn, **ORTIZ** directed **FLORES** to supply **ROBLES** with the methamphetamine and the transaction occurred at the Dollar General parking lot in the city of Tulare. **ROBLES** was subsequently arrested while transporting the pound of methamphetamine and was also illegally in possession of two firearms and associated ammunition.

### 2. Additional Methamphetamine Transactions Between ORTIZ and ROBLES during this Investigation

240. As established above, **ROBLES** ordered and purchased pound quantities of methamphetamine from **ORTIZ**. At the time of the initiation of the wire intercepts in this investigation, **ORTIZ** and **ROBLES** were in an established criminal relationship. Therefore, as previously described, co-conspirators in such relationships often describe only the quantity of methamphetamine, usually referenced in whole numbers, which will be transacted and discuss how the transaction will be completed. During the wire intercepts conducted during this investigation, pertinent drug related communications were intercepted between Alfonso **ORTIZ** and Edgar **ROBLES** fitting this pattern of criminal activity. Therefore, I believe the numbers referenced during their communications referred to pound quantities of methamphetamine which were sold by **ORTIZ** to **ROBLES**. The following table is a summary of their intercepted communications and what I believe is the quantity of methamphetamine transacted.

| Date | Quantity | Description |
|---|---|---|
| 10/03/2023 | 1 lb | **ROBLES** asked **ORTIZ** for another 1. |
| 10/10/2023 | 2 lbs | **ROBLES** asked **ORTIZ** for 1 for now. |
| 10/11/2023 | 2 lbs | **ROBLES** text asking for 2. |
| 10/19/2023 | 1 lb | **ROBLES** asked **ORTIZ** for 1. |

58 A presumptive test was conducted on the one pound of suspected methamphetamine seized from **ROBLES** which returned presumptive positive for methamphetamine.

| Date | Quantity | Description |
|---|---|---|
| 10/21/2023 | 1 lb | **ROBLES** asked **ORTIZ** for 1 of the same one. Told **ORTIZ** he was outside. |
| 10/22/2023 | 1 lb | **ROBLES** asked **ORTIZ** for 2 by the store. |
| 10/23/2023 | 1 lb | **ROBLES** asked **ORTIZ** for 1 and said he was on the way. |
| 10/25/2023 | 2 lbs | **ROBLES** asked **ORTIZ** if he could stop by for 2. |
| 10/25/2023 | 2 lbs | **ROBLES** asked **ORTIZ** if he could get another 2. **ORTIZ** said yeah to go to **ORTIZs** house. **ORTIZ** said he was there. |
| 10/26/2023 | 4 lbs | **ROBLES** asked **ORTIZ** for 4. |
| 10/27/2023 | 2 lbs | **ROBLES** asked **ORTIZ** for 2. |
| 12/16/2023 | 2 lbs | **ROBLES** asked **ORTIZ** for 2. **ORTIZ** told **ROBLES** to come to his house. |
| 12/17/2023 | 1 lb | **ROBLES** asked **ORTIZ** for 1. |
| 12/22/2023 | 2 lbs | **ROBLES** said he had opened 2 and it was short by 4-5 grams. |
| 12/29/2023 | 2 lbs | **ROBLES** said he wanted 2. |
| 12/31/2023 | 2 lbs | **ROBLES** said he needed another 2. |
| 01/08/2024 | 20 grams | **ORTIZ** said he only had 20 grams Edgar said he will take it. |
| 2/13/2024 | 1 lb | **ROBLES** asked **ORTIZ** for 1. |

241. The above table indicates that **ROBLES** has purchased over 29 pounds of methamphetamine from **ORTIZ** during this investigation.

### S. Priscilla PITTS Purchases One Pound of Methamphetamine from ORTIZ

242. On February 19, 2024, at approximately 4:57 PM, a phone call was intercepted to **ORTIZ** using Target Telephone 10 from an individual subsequently identified as Priscilla **PITTS** using phone number 559-372-5854. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **ORTIZ** | Hello? |
| **PITTS** | Hey, um, can I grab one of those things? |
| **ORTIZ** | Yeah. |
| **PITTS** | Ok, I'm coming back from Bakersfield right now so I should be like an hour and a half, probably, I'll be…[Voices overlap] |
| **ORTIZ** | Ok, um, I'm in like, I can meet you at the, honestly I'm in like the first exit as you get off of Tulare. |
| **PITTS** | Ok, ok, I'll give you a call when I get close. [Voices overlap] |
| **ORTIZ** | The, the, where the Love, where like the Loves, when you get of on the exit, a little store. |
| **PITTS** | Like the Paige, like the Paige exit? |
| **ORTIZ** | Yeah, I'm right there hanging out [U/I] spot. |
| **PITTS** | Alright. [Voices overlap] |
| **ORTIZ** | Come [U/I] spot or [U/I], up to you. |
| **PITTS** | Alright, I'll give you a call when I'm, uh, a little bit closer. Alright, thank you, by. |
| | **[End of call]** |

243. During this phone call, **PITTS** ordered a quantity of "one" from **ORTIZ** which **ORTIZ** agreed to supply. Although no further description of the "one" was provided during this intercepted

communication, I believed it represented a quantity of methamphetamine based on prior intercepted communications involving **PITTS**[59]. **ORTIZ** and **PITTS** then agreed to meet off of the "Paige exit" in Tulare, CA which is close to **ORTIZ**' identified address of 2680 Bright St, Tulare, CA.

244. Additional communications occurred during which **PITTS** offered to pay for the methamphetamine using "Zelle", a peer-to-peer money transfer service. After further negotiations, **PITTS** agreed to pay cash for the methamphetamine.

245. At approximately 5:47 PM, a phone call was intercepted to **ORTIZ** using Target Telephone 10 from **PITTS** using phone number 559-372-5854. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| | **[Beginning of call]** |
| **ORTIZ** | Hello? |
| **PITTS** | Hey, I'll be there in about ten minutes. Um, can you, uh, put a half ounce to the side for me? |
| **ORTIZ** | To do what? |
| **PITTS** | Can you break a half ounce? |
| **ORTIZ** | A half ounce? |
| **PITTS** | Yeah, cause I'm drop it off right there in Tulare. |
| **ORTIZ** | Alright. |
| **PITTS** | I [U/I], I have all the cash for you. [U/I] [Voices overlap] |
| **ORTIZ** | Ok, where do, uh, you want to just meet me at this pad then? |
| **PITTS** | Yeah, I can meet you at the house. |
| **ORTIZ** | Do you know where it's at? |
| **PITTS** | Uh, my girl remembers, yeah. |
| **ORTIZ** | Oh, ok, yeah, [U/I]. |
| **PITTS** | Huh? |

[59] During an intercepted communication on February 14, 2024, **ORTIZ** and **PITTS** discussed a third party receiving a "pound" and "four ounces." I know that these quantities are consistent with common weights methamphetamine is transacted in.

| | |
|---|---|
| **ORTIZ** | Has Celly-Cell brought you here before? |
| **PITTS** | Uh, I think so, I went there [U/I], no? |
| **ORTIZ** | Oh, yeah, yeah, you did. |
| **PITTS** | Yeah, yeah, she remembers. |
| **ORTIZ** | Ok, cool. |
| **PITTS** | Alright, thank you. |
| **ORTIZ** | Alright, by. |
| | **[End of call]** |

246. During this phone call, **PITTS** asked **ORTIZ** to separate a "half ounce" for her for someone in Tulare. I know that methamphetamine is often transacted in half ounce quantities. Based on this statement, the pending transaction was believed to be for the original "one", which was anticipated to be a large quantity of methamphetamine, as well as a half-ounce of methamphetamine. Based on **ORTIZ** directing **PITTS** to his "pad", the transaction was anticipated to occur at **ORTIZ**'s residence of 2680 Bright St, Tulare, CA.

247. At approximately 5:53 PM, via a remote-control video surveillance camera, surveillance observed **PITTS** arrive at **ORTIZ** residence as the front passenger of a grey sedan. This vehicle is registered to **PITTS**. **PITTS** entered the garage of **ORTIZ**' residence and minutes later departed with a bag. **PITTS** returned to the grey sedan and departed.

248. Based on the above intercepted communications and surveillance, a vehicle stop was initiated on the grey sedan after departing **ORTIZ**' residence. During the stop, officers identified three subjects in the vehicle: a female driver, Priscilla **PITTS** was in the front right passenger seat and was identified via her California driver's license, and the right rear passenger was a juvenile female who **PITTS** identified as her 8-year-old daughter. A search of the vehicle was conducted resulting in the seizure of approximately one pound of suspected methamphetamine[60] as well as a smaller amount of suspected methamphetamine, consistent with a half-ounce. **PITTS** was taken into custody and a cell

[60] A presumptive test was subsequently conducted on the suspected methamphetamine seized from **PITTS** which tested presumptive positive for methamphetamine.

phone located in her possession was confirmed to be 559-372-5854[61], the same phone number **PITTS** used to contact **ORTIZ** during the intercepted communications described above.

249. Based on the intercepted phone calls, surveillance, and seizure, I believe that **PITTS** had ordered a pound of methamphetamine from **ORTIZ** during a series of intercepted communications, picked up the methamphetamine from **ORTIZ** at 2680 Bright St, Tulare, CA, and was transporting the methamphetamine at the time she was stopped and arrested.

**T. <u>Carlos Fernando MACIAS Manzo Supplies Methamphetamine to ORTIZ and Transports Drug Proceeds</u>**

250. On January 4, 2024, the following series of text messages were intercepted between **ORTIZ** using Target Telephone 4 and an individual subsequently identified as Carlos Fernando **MACIAS**[62] using phone number 530-930-9330.

- **MACIAS**: What's up boss happy new year
- **ORTIZ**: Happy new years my boy
- **ORTIZ**: How u been
- **MACIAS**: Hanging in there my friend he am going to see my boy 2morrow I may call you then got good news for you if you ok with that
- **ORTIZ**: Yea let me know u know me I'm open to work if the price right
- **MACIAS**: Right on boss
- **ORTIZ**: I'll be waiting on it call
- **ORTIZ**: Your call

251. During this text message exchange, **MACIAS** stated that he was going to see his "boy"

---

[61] The device was confirmed to be phone number 559-372-5854 by investigators placing a controlled phone call to this phone number and observing the device's faceplate receive a call from the controlled phone number.

[62] MACIAS was later identified as the user of 530-930-9330 on February 19, 2024, after intercepting a phone call between MACIAS, using 530-930-9330, and ORTIZ, using Target Telephone 4, during which MACIAS told ORTIZ he was pulling up behind his car, while surveillance subsequently observed a cream-colored SUV arrive at ORTIZ' residence. MACIAS departed ORTIZ' residence a short time later, and was followed, under constant surveillance, until a traffic stop was conducted on the cream-colored SUV on CA HWY 99 northbound. MACIAS was the driver and sole occupant of the vehicle, in which, investigators found and seized $65,040 in suspected drug proceeds. Based on intercepted communications where the user of 530-930-9330 described arriving at ORTIZ' residence, along with surveillance simultaneously observing the cream-colored SUV arrive at ORTIZ' house, and the fact that the driver and sole occupant of the cream colored SUV was MACIAS, I believe that user of 530-930-9330 was MACIAS.

and may have "good news" for **ORTIZ**. **ORTIZ** responded, "I'm open to work if the price right." I know, based on my training and experience, that the term "work" is often used by drug traffickers as a general reference to drugs or drug trafficking. Therefore, **ORTIZ**' response indicated he was amenable to receiving drugs from **MACIAS** but this decision would be dependent on the cost of the drugs being offered by **MACIAS**. The text message exchange ended with **ORTIZ** indicating he would be waiting on **MACIAS'** call.

252. Wire Intercept 1:23-SW-00292-JLT terminated on January 9, 2024 with no further pertinent drug related communications between **ORTIZ** and **MACIAS**. On February 6, 2024, Wire Intercept 1:24-SW-0036-JLT was initiated. Between the dates of the two wire intercepts when no interception was occurring, CDRs showed that Target Telephone 4 and 530-930-9330 remained in communication, with 93 text messages and 30 phone calls occurring between these dates. Based on this information, I believe that **ORTIZ** and **MACIAs** continued communicating in furtherance of this conspiracy.

253. On February 13, 2024, at approximately 5:31 PM, a phone call was intercepted to **ORTIZ** using Target Telephone 4 from **MACIAS** using phone number 530-930-9330. The initial portion of this phone call was social with **ORTIZ** and **MACIAS** discussing the Superbowl. The following exchange then occurred.

| NAME | TRANSCRIPTION |
|---|---|
| MACIAS | Hey, hey, um, so, I got, I got you messages too, you know, um, um, so it was shy, right? |
| **ORTIZ** | Yeah, just a few of those, just a few, I went and checked every one of them but it was only seven out of all of them. |

254. **MACIAS** indicated he had received **ORTIZ**' message and asked, "it was shy, right?" **ORTIZ** responded that he had checked "every one of them" and "seven out of all of them" were this way. I believe that the term "shy" was a reference to drugs **ORTIZ** received from **MACIAS** being less weight than anticipated and that **ORTIZ** informed **MACIAS** of this problem during and un-intercepted message prompting **MACIAS'** statement. While the type of drug supplied by **MACIAS** was not further described, I believe that the message was in reference to methamphetamine. This is because **ORTIZ** had received a complaint from one of his known methamphetamine customers, that a "bag" was "twenty-three grams" short, or less weight than expected. I believe, based on my training, experience, and

established criminal relationship, that a bag referred to a pound of methamphetamine which was short, or missing twenty-three grams. This complaint was received by **ORTIZ** from the customer on February 10, 2023, two days prior to the complaint being referenced by **MACIAS**.

255. The communication between **ORTIZ** and **MACIAS** continued as follows.

| NAME | TRANSCRIPTION |
|---|---|
| **MACIAS** | Yeah, ok, yeah, I'll [Stutters], my friends about to call me right now. Hey, uh, so, so, not this weekend man or what's up? |
| **ORTIZ** | Well, it's cause, we got, there's a world ag show right here so they got the whole, where you get of at, it's all blocked right there, cause they're gonna have police there. They direct traffic cause of how busy it is out here. [Voices overlap] |
| **MACIAS** | Really, oh shit. [Voices overlap] |
| **ORTIZ** | So, so I was, they're done either Friday or Saturday. So I was thinking just to wait till Sunday or that Monday. You know? |
| **MACIAS** | Uh-huh, okay. |
| **ORTIZ** | Cause I don't wanna, I don't want you guys to come and town and then…[Voices overlap] |
| **MACIAS** | Oh, ok, no, that, that, that's perfect man and, and, and you know, that means a lot. Then I appreciate that you take care of, you know, every detail. |

256. During this portion of the conversation, **MACIAS** acknowledged **ORTIZ**' assessment that seven pounds of the methamphetamine where "shy", or less weight than expected. **MACIAS** then began asking about a time frame to meet, asking if the "weekend" was possible. In response, **ORTIZ** reference the "ag show", a yearly event near **ORTIZ**' residence, and warned **MACIAS** that "they're gonna have police there." Based on this warning, I believe that **MACIAS** would be transporting a shipment of drugs to **ORTIZ** and was being warned to choose a different date to avoid law enforcement detection. **ORTIZ** offered an alternative day of "Sunday" or "Monday", a reference to February 18, 2024 or February 19, 2024. In response, **MACIAS** expressed appreciation, thanking **ORTIZ** for taking care of "every detail." This response indicated **MACIAS** was thankful for **ORTIZ**' warning and recognized the need to avoid law enforcement detection. Based on this conversation, I believed that **MACIAS** was planning to travel to **ORTIZ'** location with a shipment of drugs and had to be careful due to law enforcement presence in the area.

257. On February 19, 2024, at approximately 11:08 AM, a phone call was intercepted to **ORTIZ** using Target Telephone 4 from **MACIAS** using phone number 530-930-9330. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| **ORTIZ** | Hello. |
| MACIAS | Hey, what's up, bro? |

| | |
|---|---|
| **ORTIZ** | What up? |
| MACIAS | Hey, not much, uhm… I just wanted to let you know, uhm, ooh [PH] probably like about an hour or so. |
| **ORTIZ** | Oh shit! Okay. [Chuckles] |
| MACIAS | Yeah, I'm like… Uh, I think [PH] it's an hour a little bit, hour fifteen (15) something like that [U/I]. |
| **ORTIZ** | Okay, I'll be ready. |
| MACIAS | Yeah. All right. So… Yeah, I'll, I'll see you there then. |
| **ORTIZ** | All right. |
| MACIAS | Okay. All right, boss. |
| **ORTIZ** | All right. |
| | **[End of call]** |

258. During this phone call, **MACIAS** informed **ORTIZ** that he was "an hour a little bit" away from **ORTIZ** location. **ORTIZ** first responded with surprise but then stated, "I'll be ready." The timing of this phone call, occurring on the February 19, 2024, matched the date **ORTIZ** suggested **MACIAS** arrive with the shipment of drugs to avoid law enforcement. Based on this information, and because this intercepted phone call was the next intercepted communication between **ORTIZ** and **MACIAS**, I believe it was a continuation of their discussion of the pending drug shipment.

259. At approximately 12:16 PM, a phone call was intercepted to **ORTIZ** using Target Telephone 4 from **MACIAS** using phone number 530-930-9330. The following is a transcript of this phone call.

| NAME | TRANSCRIPTION |
|---|---|
| **ORTIZ** | Hello. [Coughs] |
| **MACIAS** | What's up, boss? Uhm, what's it called… I'm right here. Just uh… |
| **ORTIZ** | It's hella pouring. |
| **MACIAS** | Huh? |
| **ORTIZ** | It's hella raining. [Chuckles] |
| **MACIAS** | Hey man, fuck! It's crazy! |
| **ORTIZ** | Out of nowhere right now, literally. |
| **MACIAS** | Yeah, man. I'll tell you right now… This, the road is really bad bro. |
| **ORTIZ** | Yeah, yeah. |
| **MACIAS** | Like too much. It's been years since I haven't seen like, like water like that [Chuckles]. |
| **ORTIZ** | Yeah, that shits pretty fucked up [U/I]. |
| **MACIAS** | Yeah. |
| **ORTIZ** | It's [U/I]… Where you at? In the front yard or are you… |
| | [Voices overlap] |
| **MACIAS** | I mean yeah, I'm right, right behind the vehicle, but I don't know is that okay, just uh… |
| **ORTIZ** | Yeah, yeah, yeah. That's cool right there. Let me uh, let me, right now, I'll go out there right now. |
| **MACIAS** | Yeah, the, just [U/I] the garage door, is that okay? |
| **ORTIZ** | Yeah, I'mma open the garage right now. |
| **MACIAS** | Oh okay. All right. |

| | |
|---|---|
| | **[End of call]** |

260. The timing of this phone call was consistent with the prior interception during which **MACIAS** indicated he was a little over an hour away from **ORTIZ**' location. Furthermore, both **ORTIZ** and **MACIAS** commented on the rain which was consistent with the weather at **ORTIZ**' residence on February 19, 2024. **MACIAS** then stated that he was parked "behind the vehicle" and by the "garage door."

261. At approximately the same time of the above phone call, surveillance observed a cream-colored Acura SUV arrive and park in front of **ORTIZ**' garage as indicated in the phone call. This vehicle is registered to an unknown female. Surveillance then observed **MACIAS** exit at the driver of this vehicle and meet with **ORTIZ**. **MACIAS** and **ORTIZ** then removed three cardboard boxes from the back cargo area of off the Acura SUV and carry the boxes into **ORTIZ**' garage. **MACIAS** and **ORTIZ** were then out of sight for several minutes. At approximately 1:07 PM, surveillance observed **MACIAS** exit **ORTIZ**' garage carrying a bag, enter the Acura sedan as the driver and sole occupant, and then depart the area of **ORTIZ**' residence.

262. Surveillance was maintained on **MACIAS** after departing **ORTIZ**' residence. Based on the above intercepted communications and surveillance, I believed that **MACIAS** had dropped off a shipment of methamphetamine to **MACIAS** and had departed with drug proceeds. Based on this information, a vehicle stop was arranged on **MACIAS**.

263. At approximately 2:01 PM, while **MACIAS** was driving north bound on Highway 99, a vehicle stop was conducted on him utilizing a Tulare County Sheriff's Office marked patrol unit. During this stop, MACIAS was positively identified as the driver and sole occupant of the Acura SUV. During a subsequent search of this vehicle, $65,040 in US currency was located in cargo area of the Acura SUV. This US currency was located in a bag consistent with the bag surveillance observed **MACIAS** earlier departing **ORTIZ**' residence with. The US currency was seized as suspected drug proceeds.

264. Based on the above intercepted communications, surveillance, and seizure, I believe that **MACIAS** had supplied **ORTIZ** with a shipment of methamphetamine and, in turn, received $65,040 in drug proceeds which he was transporting at the time he was stopped and the currency was seized.

265. On February 19, 2024, and after the meeting between **MACIAS** and **ORTIZ**,

communications were intercepted during which **ORTIZ** began offering methamphetamine to known drug customers for reduced cost. For example and as previously described, a series of text messages occurred between **ORTIZ** using Target Telephone 10 and Francisco **GARCIA** using phone number 661-900-3045. These text messages began at 1:47 PM, 40 minutes after **MACIAS** departed **ORTIZ**' residence. During their text message exchange, **ORTIZ** informed **MACIAS**, "Hey there is some 725 in town if you want to look at them." $725 is consistent with the range of price for a pound of methamphetamine but significantly cheaper than the price **ORTIZ** has consistent transacted methamphetamine. **ORTIZ** usually charged methamphetamine customers between $800 and $900 depending on the customer purchasing. **ORTIZ** explained the reason for the lower price by stating, "Yea my people gave me extra i didnt need on a front and i dont like fronts so im jus saling them cheap so i can pay them." Based on the above information, I believe that **ORTIZ** was referring to **MACIAS** as "my people" who provided methamphetamine on credit, commonly referred to as "a front", and that **ORTIZ** was attempting to sell the methamphetamine supplied by **MACIAS** at a reduced rate. Based on this information, I believe that the boxes which were observed earlier in the day being transferred to from **MACIAS'** vehicle to **ORTIZ**' garage contained a large shipment of methamphetamine.

### U. <u>Jorge PEREZ Transports Methamphetamine on Behalf of ALVARADO.</u>

#### 1. Identification of PEREZ as a Drug Transporter for Alberto ALVARADO

266. In the affidavit in support of Wire Intercept 1:24-SW-0036-JLT, Jorge **PEREZ** is listed as a Target Subject. **PEREZ** was not directly intercepted during prior wire intercepts in this investigation. However, **PEREZ** was observed during surveillance participating in criminal activity at the direction of **ALVARADO**. For example, on January 3, 2024, a series of communications were intercepted between **ALVARADO** and Alfonso **ORTIZ**. The communications indicated **ALVARADO** was arranging to deliver a quantity of "30" to **ORTIZ** for $20,700 in drug proceeds. This equates to a unit price of $690 which, based on my training and experience, is consistent with and within the range of illicit prices of methamphetamine. Based on this information, I believe that **ALVARADO** was arranging to distribute a quantity of thirty pounds of methamphetamine to **ORTIZ**. Based on this information, surveillance was initiated on **ORTIZ**' residence in Tulare, CA and a gray Toyota Camry with California license plate 9AIM663 arrived and the driver and sole occupant was subsequently identified as **PEREZ**.

Surveillance observed **ORTIZ** meet with **PEREZ** and a large cardboard box be transferred from the Toyota Camry to **ORTIZ**' garage. Surveillance then observed **PEREZ** departing **ORTIZ**' garage with a small bag. Based on the initial intercepted communications, these observations were consistent with **PEREZ** transporting a shipment of methamphetamine to **ORTIZ** and then receiving drug proceeds in return, at **ALVARADO**'s direction.

267. On January 9, 2024, surveillance was being conducted on **PEREZ** and observed him park the Toyota Camry at a rental facility in Visalia, CA and obtained a second rental vehicle, a black Nissan Altima with California license plate 9JFZ590. Surveillance followed **PEREZ** in this second rental vehicle south bound on Highway 99 and then south bound on Interstate 5. After **PEREZ** passed through the Los Angeles, CA area and was continuing south bound, a decision was made to conduct a vehicle stop on him. This stop was conducted in Oceanside, CA during which **PEREZ** was positively identified based on his CA driver's license. During the stop, a search of **PEREZ** and his vehicle was conducted. During this search, a firearm was located in **PEREZ's** possession along with $9,200 in US currency. The firearm was seized and the $9,200 in US currency was seized as drug proceeds. **PEREZ'** transportation of the firearm toward San Diego was consistent with a previous intercepted communication during which **ALVARADO** indicated the "Arab", believed to be **PEREZ**, was showing him photos of "toys", a code word often used to refer to firearms, and that **ALVARADO** had directed **PEREZ** to bring the firearms to San Diego. Based on the above information, I believe that **PEREZ** transports drugs, firearms, as well as drug proceeds, at **ALVARADO**'s direction.

### 2. Identification of PEREZ as a Drug Transporter for Roberto SORIA

268. On February 8, 2024, at approximately 9:49 AM, a phone call was intercepted from SORIA[63] using Target Telephone 9 to **PEREZ** using phone number 559-595-3866[64]. The following is a

---

[63] Roberto SORIA, initially identified only as "DON ROBERTO", was confirmed to be the user of Target Telephone 9 during Wire Intercept 1:24-SW-0036-JLT based on the following series of events. Upon the initiation of this wire intercept, communications were intercepted between DON ROBERTO using Target Telephone 9 and PEREZ using phone number 559-595-3866. On February 9, 2024, at approximately 9:05 PM, a phone call was intercepted indicating DON ROBERTO and PEREZ were going to meet on "El Monte." Based on this information, I believe that DON ROBERTO and PEREZ would be together on the morning of February 9, 2024.

Surveillance was being conducted at PEREZ' identified residence of 12908 Ave 419, Orosi, CA via a remote-controlled video surveillance camera. At approximately 10:43 AM, surveillance observed a rental Toyota Camry arrive followed by a white Toyota pickup with California license plate 57382W1 which is registered to Roberto SORIA Cuevas. Surveillance observed PEREZ load a box into the back of this pickup after which time the vehicle departed PEREZ' residence. The Toyota pickup has consistently been observed arriving and departing from 13989 Ave 384, Yettem, CA

transcript of this phone call[65].

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| **PEREZ** | Hello. |
| SORIA | Hey. |
| **PEREZ** | Uh-huh. |
| SORIA | I have, I had the phone turned off. |
| **PEREZ** | Oh, that is not good. |
| SORIA | Uh, go ahead and take ten (10) to Chaka [PH] right there to the house. |
| **PEREZ** | Okay, that's fine. I will take them right now. |
| SORIA | All right then. |
| **PEREZ** | Yes, okay. |
| | **[End of call]** |

269. During this intercepted communication, SORIA directed **PEREZ** to take a quantity of "10" to an individual named "CHAKA" which **PEREZ** agreed to do by stating, "I will take them right now." During this initial communication, only the quantity of product was discussed without further description. I know, based on my training and experience, that drug traffickers who are established in a criminal relationship, will often only refer to the quantity of drug to be transacted without providing further description such as quality or price. This is because these details are already known to the participants based on multiple prior transactions. Based on their known roles within this conspiracy, I believe that SORIA was directing **PEREZ** to transport drugs to a customer known as "CHAKA" during this intercepted communication.

---

during this investigation. This address is owned by and has been associated with SORIA during prior investigations. Based on the intercepted communication and surveillance indicating PEREZ and DON ROBERTO were together the morning of February 9, 2024, followed by a vehicle observed at PEREZ' residence registered to SORIA, I believe that DON ROBERTO was SORIA.

Later on February 9, 2024, surveillance was being conducted on SORIA and, while in view of surveillance, a controlled phone call was placed to Target Telephone 9. This phone call was not answered. However, immediately after, surveillance observed SORIA use a phone to make a phone call. This observation was consistent with SORIA attempting to call the controlled number back.

Lastly, on February 25, 2024, SORIA was arrested during a traffic stop while transporting approximately 10 lbs of suspected methamphetamine. Four cell phones were seized from SORIA at the time of his arrest. A controlled phone call was placed to Target Telephone 9 and the controlled phone number was observed on one of the seized cell phones faceplate. Based on this information, SORIA was identified as DON ROBERTO and the user of Target Telephone 9.

[64] Phone number 559-595-3866 is subscribed to "Jorge AVILA" with a listed address of 12822 Ave 416, Orosi, CA. Jorge AVILA is a listed alias for Jorge PEREZ per his criminal history record. PEREZ was arrested on February 23 2024 and investigators confirmed one of the multiple cell phones he was in possession of was phone number 559-595-3866. The device was confirmed to be phone number 559-595-3866 by investigators placing a controlled phone call to this phone number and observing the device's faceplate receive a call from the controlled phone number. Based on this information, PEREZ was conformed to be the user of phone number 559-595-3866.

[65] The communications involving SORIA in this affidavit occurred in Spanish and the transcription in this affidavit is an English translation.

270. At approximately 10:21 AM, a phone call was intercepted to SORIA using Target Telephone 9 from an individual referred to as "CHAKA". The following is a transcript of this phone call.

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| SORIA | Hello. |
| CHAKA | Is he coming? [Background: noise] |
| SORIA | Uh, yeah, I think so. Let me call him and ask where he is at. |
| CHAKA | All right, because they are waiting on me. [Background: noise] |
| SORIA | All right then. |
| CHAKA | Bye. |
| | **[End of call]** |

271. During this phone call, CHAKA asked if a third party was coming. Based on other intercepted phone calls, the third party being referred to was **PEREZ**. Therefore, the user of phone number 559-366-5778 was believed to be the drug customer "CHAKA" referred to during the prior phone call between SORIA and **PEREZ**. During this phone call, SORIA stated, "Let me call him and ask where he is at." Based on this statement, I believe that SORIA would call **PEREZ** and ask for the status of the drug delivery to CHAKA.

272. At approximately 10:22 AM and immediately after the above intercepted communications between SORIA and CHAKA, a phone call was intercepted from SORIA using Target Telephone 9 to **PEREZ** using phone number 559-595-3866. This phone call occurred in Spanish and the following is an English translation of this phone call.

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| PEREZ | Hello. |
| SORIA | Are you on the way? |
| PEREZ | Yeah, I'm, I'm right here making a turn to head over …to where he lives. |
| SORIA | Okay. |
| PEREZ | Yeah. |
| SORIA | All right, bye. |
| | **[End of call]** |

273. During this phone call, SORIA asked if **PEREZ** was "on the way", which I believe meant transporting the drugs to CHAKA. **PEREZ** stated that he was making the turn to where CHAKA lives. Based on this phone call, I believe that **PEREZ** was completing the delivery of drugs to CHAKA.

274. At approximately 11:54 AM, a phone call was intercepted from SORIA using Target

Telephone 9 to **PEREZ** using phone number 559-595-3866. This phone call occurred in Spanish and the following is an English translation.

| NAME | TRANSLATION |
|---|---|
| **PEREZ** | Hello. |
| SORIA | How's it going? |
| **PEREZ** | Just here at home. |
| SORIA | Uh, this old man just left. |
| **PEREZ** | Oh already? Oh, okay. |
| SORIA | How much did Chaka give you? |
| **PEREZ** | Hmm it was eight (8). |
| SORIA | Oh. Can you bring them here to uh Orosi? I will see… |
| | [Voices overlap] |
| **PEREZ** | … Yes. |
| SORIA | … the young guy there. |
| **PEREZ** | Uh huh, all right. |
| SORIA | All right then. |
| **PEREZ** | Yeah, thank you. |
| | **[End of call]** |

275. During this phone call, SORIA asked **PEREZ**, "how much did Chaka give you" and **PEREZ** responded "eight." I know, based on my training and experience, that $800 for a pound of methamphetamine is a price consistent with multiple other drug transactions conducted by this DTO during this investigation. Therefore, I believe the amount of "eight" is consistent with **PEREZ** receiving $8,000 in drug proceeds for supplying CHAKA with ten pounds of methamphetamine. SORIA asked **PEREZ** to bring the drug proceeds to "Orosi" for a third party referred to as "the young guy" and **PEREZ** agreed. Based on this information, I believe that **PEREZ** also acted as drug and drug proceeds transporter for SORIA as well as **ALVARADO**.

### 3. Arrest of PEREZ on February 23, 2024 while Transporting 20 Pounds of Methamphetamine for ALVARADO

276. On February 23, 2024, at approximately 9:25 AM, a phone call was intercepted to **ALVARADO** using Target Telephone 8 from an individual referred to as "Dominic". During this phone call, **ALVARADO** and Dominic discussed "Nike", a code word which has been consistently used during this investigation to refer to cocaine. Regarding the "Nike", **ALVARADO** and Dominic engaged in the following conversation.

| NAME | TRANSCRPTION |
|---|---|
| **ALVARADO** | Hey dog, they gave me some Nike yesterday to check in TJ, Dominic… |
| DOMINIC | Yeah. |
| **ALVARADO** | Holy shit dog. Holy shit. [Voices overlap] |

| | |
|---|---|
| DOMINIC | Fuck. |
| **ALVARADO** | You, have you ever rocked it before? |

277. During this portion of the conversation, **ALVARADO** informed Dominic that he had obtained "Nike", or cocaine, in "TJ", a reference to Tijuana, Mexico. **ALVARADO** expressed excitement about the cocaine and asked if Dominic had "ever rocked it before". Following this question, **ALVARADO** gave a detailed explanation of making crack cocaine, commonly referred to as "rock" cocaine, out of powder cocaine. I know, based on my training and experience, that making crack cocaine out of powder cocaine is a way to test the overall purity of the cocaine since adulterants often used to increase the overall weight of powder cocaine will not convert to crack cocaine. Therefore, after the conversion, if the crack cocaine weighs significantly less than the original powder cocaine, the powder cocaine has a high level of adulterants and is less desirable. By comparing the weight of each, after the conversion occurs, a rudimentary estimate of purity can be obtained.

278. Later in the intercepted communication, the following conversation occurred between **ALVARADO** and Dominic.

| **NAME** | **TRANSCRPTION** |
|---|---|
| **ALVARADO** | No, I'll, I'll have homeboy go get it. I just got to get, I got to take some money up there. I, I don't need your money but I got other money right there, [U/I] some money of mine. So I got just have George, I got to have George go get it, my money, and then go to Bakersfield. But Bakersfield's only two hours away dog. You know what I mean? |
| DOMINIC | Yeah. |
| **ALVARADO** | Bakersfield's only two hours away |

279. During this part of the conversation, **ALVARADO** stated, "I got to have George go get it, my money, and then go to Bakersfield." Because this message was in reference to the "Nike", or cocaine, discussed in detail earlier in this phone call, I believe that **ALVARADO** was arranging for a drug transporter named "George" to transport a shipment of cocaine from Bakersfield. I know that George is Jorge in Spanish. Therefore, I believed that **PEREZ**, who was a known drug transporter for **ALVARADO**, was the individual being referred to during this phone call.

280. In anticipation of **PEREZ** transporting drugs on behalf of **ALVARADO**, surveillance was being conducted at 12908 Ave 419, Orosi, CA which was identified as **PEREZ'** residence during this investigation. At approximately 11:30 AM, surveillance observed **PEREZ** depart the residence driving a red Hyundai Elantra with California license plate 8WYC921. This was a rental vehicle which

surveillance observed **PEREZ** obtain the day prior (February 22, 2024) in Visalia, CA. After departing his residence, **PEREZ'** location was generally monitored utilizing precise location information being obtained from phone number 559-595-3866[66]. Precise location information indicated **PEREZ** traveled from his residence to the Los Angeles, CA area where he remained for a short period of time prior to returning back northbound.

281. At approximately 5:27 PM, a phone call was intercepted to **ALVARADO** using Target Telephone 8 from Dominic. The following is a partial transcript of this phone call.

| NAME | TRANSCRPTION |
|---|---|
| **ALVARADO** | I, I, I sent somebody down to go pick it up right now. |
| DOMINIC | Alright, you don't know when they'll be back? |
| **ALVARADO** | Uh, later tonight or tomorrow morning, early you can get it. They're going to pick up, they're going to pick up five hundred clear too. So they're going, they're going two cars and everything. They're driving home from Bakersfield and everything. You know what I mean? |

282. During this phone call, **ALVARADO** informed Dominic that he had "sent somebody down to go pick it up right now." This statement was consistent with **PEREZ** traveling to the Los Angeles, CA area as described above. **ALVARADO** further stated that "they're going to pick up five hundred clear too." I know, based on my training and experience, that the term "clear" is a common code word used to refer to methamphetamine. Based on this statement, I believe that **PEREZ** would be transporting a drug shipment that would include methamphetamine.

283. In anticipation of **PEREZ** returning to Tulare County with a shipment of drugs, surveillance was initiated in Kern County north bound on Interstate 5 and then north bound on Highway 99. At approximately 7:04 PM, surveillance observed **PEREZ'** red Hyundai Elantra traveling northbound on Highway 99, south of Bakersfield, CA. Surveillance was maintained on this vehicle north bound through Kern County and then into Tulare County.

284. Based on the above intercepted communications and **PEREZ'** travel pattern, a vehicle stop was initiated on **PEREZ** as he was traveling northbound on Highway 99 in Tulare County. During the stop, a search of **PEREZ'** vehicle was conducted which resulted in the seizure of approximately 20

[66] On February 12, 2024, the Honorable Erica P. Grosjean, US Magistrate Judge for the Eastern District of California, signed Search Warrant 1:24-sw-00042-EPG authorizing the collection of precise location information from multiple phones to include 559-595-3866 used by PEREZ.

pounds of suspected methamphetamine[67]. PEREZ was in possession of multiple cell phones, one of which was confirmed to be phone number 559-595-3866[68], the phone number he was using to communicate with SORIA during intercepted communications.

285. On February 24, 2024, at approximately 2:22 PM, a phone call was intercepted to **ALVARADO** using Target Telephone 8 from Dominic. During this phone call, Dominic asked **ALVARADO**, "How we looking", which I believe was an inquiry into the pending cocaine shipment. **ALVARADO** responded, "terrible", and asked Dominic to look up "George Avila Perez", **PEREZ'** name. **ALVARADO** indicated that **PEREZ'** bail was two million dollars. This information matched PEREZ' booking information and amount of bail per his Tulare County booking. Dominic expressed dismay but **ALVARADO** responded, "but I'm working on another one" and indicated he would call Dominic later. Based on this information, I believe that **ALVARADO** had become aware of **PEREZ'** arrest the night before because the methamphetamine being transported by **PEREZ** belonged to him. That is why **ALVARADO** referred to **PEREZ'** arrest as being terrible for him (**ALVARADO**). **ALVARADO** indicated that he had another drug shipment pending.

286. Based on the above information, I believe that **PEREZ** transports firearms, drugs and drug proceeds on behalf of this DFTO and was arrested on February 23, 2024 while transporting methamphetamine on behalf of **ALVARADO**.

**V. <u>James Earl MELO Possesses Controlled Substances with the Intent to Distribute.</u>**

287. During this investigation, call detail record analysis was being conducted on one of the Target Telephones of Wire Intercept 1:23-SW-00292-JLT. The Target Telephone was being used by a currently uncharged co-conspirator who was criminally associated with ORTIZ. During this analysis, phone number 559-748-6794 was identified as being in frequent contact with the Target Telephone. Phone number 559-748-6794 is subscribed to "Ericka MELO," with a listed address of "3610 W. College Ave, Visalia, CA." Ericka MELO is James MELO's wife based on previous police contacts establishing this relationship. Furthermore, 3610 W. College Ave, Visalia, CA is James MELO's address per his California

---

[67] A presumptive test was subsequently conducted on the suspected methamphetamine which returned presumptive positive for methamphetamine.

[68] The device was confirmed to be phone number 559-595-3866 by investigators placing a controlled phone call to this phone number and observing the device's faceplate receive a call from the controlled phone number.

DMV record and prior police contacts. "Jimmy" is a listed alias on MELO's criminal history. During a search of the Kings County Jail inmate phone system, two recorded phone calls which occurred in October 2022 were located with phone number 559-748-6794. During these recorded phone calls, the user of phone number 559-748-6794 was referred to by the inmate as "Jim" which is short for Jimmy, MELO's alias. Based on this information, MELO was identified as the user of phone number 559-748-6794. It was anticipated that a criminal relationship existed between MELO and the uncharged co-conspirator and a remote controlled video camera was installed to monitor the activities at 3610 W. College Ave, Visalia, CA.

288. On December 8, 2023, utilizing this remote-controlled video camera, investigators began conducting surveillance at 3610 W College Ave, Visalia, CA. While conducting surveillance at 3610 W College Ave, Visalia, CA, investigators observed MELO open the garage door almost every day between 3:00 pm to 4:00 pm, leave the garage door open, and walk around the driveway. Investigators observed that once the garage door at 3610 W College opened in the afternoon, the residence began to receive a lot of vehicular and foot traffic. Investigators observed that the majority of the traffic would arrive at the front of the residence, go inside the garage and depart after a short duration. Based on my training and experience, along with observations made during this case, I know that this type of activity, such has heavy vehicular and foot traffic coupled with staying for a short duration is indicative of narcotics sales; therefore, I believe that MELO was selling narcotics from his residence at 3610 W College Ave in Visalia, CA.

289. On December 29, 2023, at approximately 3:20 pm, Detective Jeff Dowling observed, via remote controlled video camera, an individual subsequently identified as Customer 1 arrive at 3610 W. College Ave riding a bicycle. Customer 1 set down his bicycle and went inside the open garage. Det. Dowling had observed MELO, via a remote-controlled video camera, walking in and out of the garage several times prior to Customer 1 arriving. At approximately 3:22pm, Det. Dowling observed Customer 1 exit the garage and depart MELO's residence on his bicycle. Based on my training and experience, I know that narcotics transactions are typically short in duration; therefore, I believe that Customer 1 had visited MELO's residence in order to purchase narcotics. Surveillance followed Customer 1, riding the bicycle, to Tulare Ave and Emerald St, where Customer 1 was stopped by Visalia Police Department K9 Officer Gonzales. Customer 1 was found to be on CDC Parole and searched. He was found to have 3.4

grams of methamphetamine, 3.3 grams of cocaine, 0.4 grams of fentanyl, a functioning digital scale and extra baggies on his person and was arrested.

290. On January 2, 2024, at approximately 3:15 pm, Det. Dowling observed, via a remote-controlled video camera, a white Chevy Colorado arrive at 3610 W. College Ave, MELO's residence. The unidentified driver and sole occupant of the vehicle, subsequently identified as Customer 2, exited the driver seat of the Chevy Colorado and walked into the open garage. Earlier that afternoon, Det. Dowling had observed MELO, via a remote-controlled video camera, walking in and out of the garage several times. The white Chevy Colorado came back registered to Customer 2, who is a known narcotics trafficker in the Visalia, CA area. At approximately 3:20 pm, Customer 2 exited the garage, entered his vehicle, and departed MELO's residence. Investigators followed the Chevy Colorado to the area of Tulare Ave and Mountain St, where Visalia Police Department Officer Chavez attempted a traffic stop on the Colorado. The driver of the Chevy Colorado did not yield for Officer Chavez and led him on a short vehicle pursuit, where the vehicle pulled into a residence. Customer 2 exited the vehicle and was taken into custody by Visalia Police Department. Officers searched the Colorado, and located two one-ounce bags of suspected methamphetamine inside of the vehicle.

291. On January 9, 2024, at approximately 3:55 pm, while monitoring a remote-controlled video camera, Det. Dowling observed MELO walking around the driveway and into the open garage at his residence. Shortly after, an individual later identified as Customer 1 arrived at the residence riding a bicycle, get off his bicycle, and then go into the garage on foot. At 3:57 pm, Customer 1 exited the garage and rode his bicycle away from the residence. Customer 1 was followed by surveillance, and he appeared to be conducting counter surveillance by looking into cars and looking all around. At 4:02 pm Customer 1 returned to MELO's residence and went back into the garage. At 4:04 pm Customer 1 exited the garage and rode away from MELO's residence. Customer 1 was followed by surveillance, stopped by Visalia Police Department Officer Hernandez, and was identified as Customer 1, who is the same subject that was arrested by VPD Officer Gonzalez on December 29, 2023. Customer 1 was found to be in possession of 15 grams of suspected methamphetamine, 4 grams of suspected cocaine HCL, 0.4 grams of suspected fentanyl, a digital scale, and packaging materials.

292. On January 23, 2024, the Honorable Jennifer Shirk, Superior Court Judge for Tulare

County, signed a search warrant for 3610 W College Ave, Visalia, CA. On January 25, 2024, Visalia Police Department's Special Enforcement Bureau executed the search warrant. Officers located one vacuum sealed bag containing .70 kilograms of suspected methamphetamine[69], another vacuum sealed bag containing 67.7 grams of suspected cocaine, and 109.4 grams of suspected heroin. These items were located along the backyard fence line of the residence buried in a drainpipe. Inside the garage, officers located 25 (46.4 grams) Oxycodone pills inside a black bag, $7,000 inside a disinfectant wipe box, $6,300 inside a seal tight box, and a number of food saver bags. Finally, officers located another $3,119 in the home office. Post-Miranda, MELO denied knowledge of the narcotics in the backyard of his residence.

## III. REQUEST FOR SEALING

293. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the records relate to an ongoing investigation that includes multiple targets who have not yet been apprehended. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness. Such a disclosure would give the targets an opportunity to notify confederates, change patterns of behavior and/or take steps to destroy evidence.

## IV. CONCLUSION

294. Based on the totality of facts set forth in this affidavit, I believe there is probable cause to believe that the defendants committed the violations as described in paragraph 1.

295. I respectfully request the issuance of arrest warrants for individuals listed above..

I declare under penalty of perjury that the facts contained herein are true and correct to the best of my knowledge and belief.

Aaron Acosta, Special Agent
Drug Enforcement Administration

[69] All of the exhibits listed were sent to the Western Regional Laboratory for analysis on January 31, 2024. A presumptive test was conducted on the 700 grams of suspected methamphetamine, which returned presumptive positive for methamphetamine.

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 41.1, by internet/ telephone this 6 day of March, 2024.

B. McAuliffe

The Honorable Barbara A. McAuliffe
United States Magistrate Judge

Re 23 defendants complaint

Approved as to form and substance:

/s/ Antonio J. Pataca
Antonio J. Pataca
Assistant United States Attorney

# PENALTY SLIP

| | |
|---|---|
| **DEFENDANT:** | **ALBERTO ALVARADO** |
| **COUNT:** | **Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. §§ 846, 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |

# PENALTY SLIP

**DEFENDANT:** **ALFONSO ORTIZ**

| | |
|---|---|
| **COUNT:** | **Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. §§ 846, 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |
| **COUNT:** | **Distribution of Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. § 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |

**PENALTY SLIP**

| | |
|---|---|
| **DEFENDANT:** | **ANGELICA FLORES** |
| **COUNT:** | **Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. §§ 846, 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |
| **COUNT:** | **Distribution of Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. § 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |

# PENALTY SLIP

**DEFENDANT:** **YERLLY MALDONADO VEGA**

**COUNT:** **Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine**

**VIOLATION:** 21 U.S.C. §§ 846, 841(a)(1)

**PENALTY:** Mandatory minimum of 10 years in prison and up to life; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years and up to life

**COUNT:** **Possession with Intent to Distribute Methamphetamine**

**VIOLATION:** 21 U.S.C. § 841(a)(1)

**PENALTY:** Mandatory minimum of 10 years in prison and up to life; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years and up to life

# PENALTY SLIP

**DEFENDANT:** **ANTHONY OCHOA**

**COUNT:** **Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine**

**VIOLATION:** 21 U.S.C. §§ 846, 841(a)(1)

**PENALTY:** Mandatory minimum of 10 years in prison and up to life; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years and up to life

**COUNT:** **Possession with Intent to Distribute Methamphetamine**

**VIOLATION:** 21 U.S.C. § 841(a)(1)

**PENALTY:** Mandatory minimum of 10 years in prison and up to life; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years and up to life

**PENALTY SLIP**

| | |
|---|---|
| **DEFENDANT:** | **JORGE PEREZ** |
| **COUNT:** | **Possession with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. § 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |

# PENALTY SLIP

| | |
|---|---|
| **DEFENDANT:** | **CARLOS FERNANDO MACIAS MANZO** |
| **COUNT:** | Distribution of Methamphetamine |
| **VIOLATION:** | 21 U.S.C. § 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |

**PENALTY SLIP**

| | |
|---|---|
| **DEFENDANT:** | **LORRAINE RENTERIA** |
| **COUNT:** | **Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. §§ 846, 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life in prison; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |
| **COUNT:** | **Misprision** |
| **VIOLATION:** | 18 U.S.C. § 4 |
| **PENALTY:** | Maximum of 3 years in prison; or<br>Fine of up to $250,000; or both fine and imprisonment<br>Supervised release of up to one year |

# PENALTY SLIP

**DEFENDANT:** **FRANCISCO GARCIA**

**COUNT:** **Distribution of Methamphetamine**

**VIOLATION:** 21 U.S.C. § 841(a)(1)

**PENALTY:** Mandatory minimum of 10 years in prison and up to life; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years and up to life

**COUNT:** **Possession with Intent to Distribute Methamphetamine**

**VIOLATION:** 21 U.S.C. § 841(a)(1)

**PENALTY:** Mandatory minimum of 10 years in prison and up to life; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years and up to life

# PENALTY SLIP

**DEFENDANT:** **CORY DONALDSON**

**COUNT:** **Distribution of Methamphetamine**

**VIOLATION:** 21 U.S.C. § 841(a)(1)

**PENALTY:** Mandatory minimum of 10 years in prison and up to life; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years and up to life

**COUNT:** **Felon in Possession of a Firearm**

**VIOLATION:** 18 U.S.C. § 922(g)(1)

**PENALTY:** Up to 15 years in prison; or
Not more than $250,000 fine or both fine and imprisonment
A three-year term of Supervised Release
$100 special assessment

**PENALTY SLIP**

**DEFENDANT:** **ADAM SAHAGUN**

**COUNT SIX:** **Felon in Possession of a Firearm and Ammunition**

**VIOLATION:** 18 U.S.C. § 922(g)(1)

**PENALTY:** Up to 15 years in prison; or
Not more than $250,000 fine or both
A three-year term of Supervised Release
$100 special assessment

## PENALTY SLIP

| | |
|---|---|
| **DEFENDANT:** | **JOSHUA BROCK** |
| **COUNT:** | **Possession with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. § 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |

# PENALTY SLIP

| | |
|---|---|
| **DEFENDANT:** | **ALEJANDRO HERNANDEZ DIARTE** |
| **COUNT:** | **Possession with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. § 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |

**PENALTY SLIP**

| | |
|---|---|
| **DEFENDANT:** | **ARNOLD HUERTA** |
| **COUNT:** | **Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. §§ 846, 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |
| **COUNT:** | **Felon in Possession of Ammunition** |
| **VIOLATION:** | 18 U.S.C. § 922(g)(1) |
| **PENALTY:** | Up to 15 years in prison; or<br>Not more than $250,000 fine or both<br>A three-year term of Supervised Release<br>$100 special assessment |

**PENALTY SLIP**

| | |
|---|---|
| **DEFENDANT:** | **CORNELL HICKS** |
| **COUNT:** | **Possession with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. § 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |

# PENALTY SLIP

**DEFENDANT:** **LANDON JONES**

**COUNT:** **Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine**

**VIOLATION:** 21 U.S.C. §§ 846, 841(a)(1)

**PENALTY:** Mandatory minimum of 10 years in prison and up to life; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years and up to life

# PENALTY SLIP

| | |
|---|---|
| **DEFENDANT:** | **WILLIAM BOSMA** |
| **COUNT:** | **Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. §§ 846, 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |
| **COUNT:** | **Possession with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. § 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |

# PENALTY SLIP

**DEFENDANT:** **JENNIFER HUERTA**

**COUNT:** **Possession with Intent to Distribute Methamphetamine**

**VIOLATION:** 21 U.S.C. § 841(a)(1)

**PENALTY:** Mandatory minimum of 5 years in prison and a maximum of up to 40 years in prison; or
Fine of up to $5,000,000; or both fine and imprisonment
Supervised release of at least 4 years up to life

# PENALTY SLIP

**DEFENDANT:** **EDGAR ROBLES AMEZQUITA**

**COUNT:** **Possession with Intent to Distribute Methamphetamine**

**VIOLATION:** 21 U.S.C. § 841(a)(1)

**PENALTY:** Mandatory minimum of 5 years in prison and a maximum of up to 40 years in prison; or
Fine of up to $5,000,000; or both fine and imprisonment
Supervised release of at least 4 years up to life

## PENALTY SLIP

**DEFENDANT:** **PRISCILLA PITTS**

**COUNT:** Possession with Intent to Distribute Methamphetamine

**VIOLATION:** 21 U.S.C. § 841(a)(1)

**PENALTY:** Mandatory minimum of 5 years in prison and a maximum of up to 40 years in prison; or
Fine of up to $5,000,000; or both fine and imprisonment
Supervised release of at least 4 years up to life

# PENALTY SLIP

**DEFENDANT:** **JAMES MELO**

**COUNT:** Possession with Intent to Distribute Methamphetamine, Cocaine, and Heroin

**VIOLATION:** 21 U.S.C. § 841(a)(1)

**PENALTY:** Mandatory minimum of 5 years in prison and a maximum of up to 40 years in prison; or
Fine of up to $5,000,000; or both fine and imprisonment
Supervised release of at least 4 years up to life

**PENALTY SLIP**

**DEFENDANT:** **Jesus Marin**

**COUNT:** **Possession with Intent to Distribute Methamphetamine**

**VIOLATION:** 21 U.S.C. § 841(a)(1)

**PENALTY:** Mandatory minimum of 10 years in prison and up to life; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years and up to life

# PENALTY SLIP

| | |
|---|---|
| **DEFENDANT:** | **MARIE QUAADMAN** |
| **COUNT:** | **Distribution of Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. § 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life |